**UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CAROL McNEELY, | ) | |
| | ) | |
| On behalf of herself and all others | ) | |
| similarly situated, | ) | Civil No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| METROPOLITAN LIFE INSURANCE | ) | |
| COMPANY, METROPOLITAN LIFE | ) | |
| RETIREMENT PLAN FOR UNITED | ) | |
| STATES EMPLOYEES, METLIFE | ) | |
| OPTIONS & CHOICES PLAN, and | ) | |
| WELFARE BENEFIT PLAN FOR | ) | |
| EMPLOYEES OF METROPOLITAN LIFE,) | | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## I.  INTRODUCTION

1.      Since at least 2002, Metropolitan Life Insurance Company ("MetLife") has hired

licensed dentists to act as consultants evaluating claims for benefits submitted by policyholders,

participants, and beneficiaries in employee benefit plans ("Dental Consultants").  MetLife has

compensated these Dental Consultants as independent contractors even though, at least until

November 2017, it determined and controlled all aspects of the performance of their duties to an

extent that makes them employees, not independent contractors.  MetLife also has engaged other

health professionals, including upon information and belief, physicians, chiropractors,

psychologists, nurses, and hygienists, to evaluate claims for benefits.  Upon information and

belief, MetLife has paid these health professionals as independent contractors but, at least until

November 2017, exerted levels of control over the performance of their duties that were similar

to the controls placed on Dental Consultants.  In this complaint, the term "Health Consultants"

shall refer to Dental Consultants and other health professionals, if any, hired by MetLife to evaluate the claims of policyholders, participants and beneficiaries whom MetLife compensated for their work as independent contractors rather than as employees.

2.      Until November 2017, MetLife's form written agreements for Dental Consultants did not specify whether they were employees or independent contractors, but the terms and conditions were consistent with employee than independent contractor status.  These agreements gave MetLife the right to exercise control over Dental Consultants' means, sequence and methods of performing work.  At least until November 2017, MetLife also exercised control over the work of the Dental Consultants as if they were employees.  Among other actions, MetLife dictated Dental Consultants' maximum hours of work, required them to work at MetLife's offices, and required them to record their hours of work on forms issued by MetLife.  MetLife required them to use computer hardware and software that it has provided to them and owned by MetLife.  The company services and updates that hardware and software free of charge to the Dental Consultants.  The company also provided Dental Consultants the files that they review, imposed detailed, comprehensive guidelines about how to perform that work, trained them, supervised their work through its managers, created standards by which to assess the quality and quantity of their performance, and assessed their performance under those standards.  For these and other reasons set out below, Plaintiff Carol McNeely, Dental Consultants, and (upon information and belief) the other Health Consultants were employees of MetLife, not independent contractors at least until November 2017.

3.      Since November 2017, MetLife's essential controls over the means and manner by which Dental Consultants and (upon information and belief) the other Health Consultants have remained, while MetLife has relinquished other, less essential controls.

4.      While MetLife's control over Dental Consultants and other Health Consultants made them common law employees at least until November 2017, MetLife has compensated Dental Consultants and the other Health Consultants as independent contractors, not as employees.  As a result, the Health Consultants have not received any of the protections and benefits accorded to employees under federal and state laws even though they have been, in fact, employees of MetLife.

5.      MetLife's failure to compensate Health Consultants as employees benefitted it and cost these consultants monetarily in four ways.  First, MetLife has not paid Ms. McNeely and other Health Consultants overtime pay when they work more than forty hours in a week. Overtime pay was required because MetLife has not paid Health Consultants on a salary basis, which is necessary under both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 213, and the wage and hour laws of the States in which they worked in order for employees to qualify as exempt, except under limited circumstances not applicable here.  Instead MetLife has paid them based on the number of hours worked times a contracted rate per hour, and has ignored the requirement to pay overtime for non-exempt workers.  MetLife's failure to pay Health Consultants overtime despite not paying them on a salary basis has violated both federal and state wage and hour laws.

6.      Second, MetLife has paid Dental Consultants, and upon information and belief all Health Consultants on a monthly basis, whereas the laws of the State of Illinois (the State in which Ms. McNeely worked) and other States in which Health Consultants worked, such as New York and New Jersey, has required it to pay non-exempt employees no less frequently than bi-weekly.  MetLife thus had the use of the money it owed Health Consultants for several extra weeks each month, and deprived them of the use of that money.

7.     Third, MetLife has offered employees a valuable set of employee benefits, including but not limited to a variety of largely employer-paid insurance plans and a defined benefit pension plan (together the "Defendant Plans").  Health Consultants have not received, and have never been informed of, these benefits.  Upon information and belief, some or all of the Defendant Plans are open to all MetLife employees or all full-time MetLife employees, which included some or all of the Health Consultants.  The failure to allow eligible Health Consultants to participate in the Defendant Plans, or even to inform eligible Health Consultants of their right to participate in these plans, has saved MetLife and deprived these consultants of substantial compensation in the form of employee benefits and violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

8.     Finally, MetLife has not met its obligation to pay the employer share of FICA taxes (generally equal to 7.65% of employee pay), and instead shifted that burden onto Health Consultants, by characterizing them as independent contractors rather than employees.  MetLife has been unjustly enriched by the amount of FICA taxes that it has shifted onto the backs of the Health Consultants.

9.     Ms. McNeely brings:  a proposed collective action under the FLSA on behalf of all Health Consultants who worked for MetLife at any time during the three years between the filing of the Complaint and October 31, 2017; a proposed class action on behalf of all Health Consultants who worked for MetLife at any time during the six years between the filing of the Complaint and October 31, 2017 to litigate the ERISA claims; and proposed class actions to litigate the claims for violations of Illinois statutes and common law on behalf of the Health Consultants who worked at any time within the applicable limitations periods in the State of Illinois and October 31, 2017.  If Health Consultants who join the case have worked in other

4

States and would be adequate representatives, it is anticipated that similar proposed classes, based on State law claims, would be added on behalf of Health Consultants who have worked in some or all of those States.  And if Health Consultants who join the case have worked for MetLife after October 31, 2017 and would be adequate representatives, Plaintiffs may seek leave to amend the collective and class action definitions to encompass Health Consultants who worked for MetLife after October 31, 2017.

## II.  <u>JURISDICTION AND VENUE</u>.

10.     The jurisdiction of this Court over the claims under federal law is invoked pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United States, and pursuant to 28 U.S.C. § 1337, which confers original jurisdiction upon this court in a civil action arising under any Act of Congress regulating commerce.

11.     The jurisdiction of this Court over the claims under state laws is invoked pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction upon this Court over claims "that are so related to claims in the action within [its] original jurisdiction that they for part of the same case or controversy . . . ."

12.     Venue is proper in this Court under 28 U.S.C. § 1391 because MetLife and the Plan Defendants reside in this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Venue also is proper in this Court as to the ERISA claims under 29 U.S.C. § 1132(e)(2) because, for such claims, venue is proper where the plans are administered, a fiduciary breach occurred, the defendant resides, or the defendant may be found.

### III.  PARTIES

13.     Plaintiff Carol McNeely resides in Chicago, Illinois and worked for MetLife at its offices in Aurora, Illinois as a Dental Consultant from 2002 until November 2017.  Throughout that time and to the present, she has held all necessary licenses and certifications to practice as a dentist in the State of Illinois.  Attached as Exhibit A is the Consent to Join signed by Ms. McNeely.

14.     Metropolitan Life Insurance Company ("MetLife") is a subsidiary of the holding company MetLife, Inc., which de-mutualized and became a stock company in 2000.  MetLife is domiciled and has its principal place of business in New York, New York.  Among other products, MetLife sells, services, and pays claims on dental, life, disability, vision, and accident and health insurance policies.

15.     MetLife is sued not only as the employer of Ms. McNeely and the other Health Consultants, but also as the administrator, and therefore the fiduciary, of the three employee benefit plans identified in the next three paragraphs and of the sub-plans of those plans.

16.     The Metropolitan Life Retirement Plan for United States Employees (the "Defined Benefit Plan") is an ERISA-covered defined benefit plan that provides pension, death, and retiree-medical benefits to eligible employees.  It is sued only with respect to the ERISA denial of benefits claim.  MetLife is the administrator and a fiduciary of the Defined Benefit Plan.

17.     The MetLife Options & Choices Plan (the "Primary Welfare Plan") is an ERISA-covered welfare plan that provides eligible active employees with medical and prescription drug coverage and through various sub-plans provides them dental coverage, group-term life insurance, short-term and long-term disability coverage, flexible spending accounts, work-life

assistance coverage (employee assistance programs), and survivor benefit coverage.  Sub-plans

of the Welfare Plan also provide medical, dental, and survivor benefit coverage to certain former

employees, and continuation of certain benefits upon the termination of medical coverage.  The

Primary Welfare Plan is sued only with respect to the ERISA denial of benefits claim.  MetLife

is the administrator and a fiduciary of the Primary Welfare Plan.

18.     The Welfare Benefit Plan for Employees of Metropolitan Life (the "Secondary

Welfare Plan") is an ERISA-covered welfare plan that provides eligible employees with life

insurance, critical illness insurance, and legal insurance.  It is sued only with respect to the

ERISA denial of benefits claim.  MetLife is the administrator and a fiduciary of the Secondary

Welfare Plan.

## IV.  METLIFE'S RELATIONSHIPS WITH MS. MCNEELY AND OTHER HEALTH CONSULTANTS

### A.     MetLife Employed Numerous Health Consultants Throughout the United States

19.     In a publication issued in 2015,[1] MetLife stated that it had 101 Dental

Consultants.  Ms. McNeely currently is aware of the identities of about 89 Dental Consultants as

of late 2017.  These Dental Consultants were assigned to five offices:  about 56 in Aurora,

Illinois; about 12 in Utica, New York; about 9 in Bridgewater, New Jersey; about 8 in Warwick,

Rhode Island; and about 4 in Irving, Texas.

20.     The number of Dental Consultants whom MetLife employed was relatively

constant during the period from 2007 through 2017.

21.     Regardless of location, and as discussed in more detail below, MetLife gave these

Dental Consultants the same or similar contracts, assigned them the same or similar job duties,

provided them the same or similar training, afforded them the same or similar resources, and

---

[1] https://ebview.com/pdfgenerator/ViewPdf/IEEE/Claims_and_Service_exp_0216.pdf.

compensated them, denied them employee benefits, and failed to pay the employer share of FICA taxes in the same manner.

22.     MetLife also engages other Health Consultants with professional licenses and/or certifications in numbers currently unknown to Ms. McNeely to analyze claims and perform other work similar to that performed by Dental Consultants.  These Health Consultants include hygienists, doctors, chiropractors, psychologists, and nurses.  For example, MetLife's supervisor of the Dental Consultants wrote an email to about 80 Dental Consultants dated December 1, 2017 stating in part, "We are looking to bring on additional dentists ***and hygienists*** to our team and wanted to make you all aware in case you may know of anyone who may be interested in consulting for MetLife." (Emphasis added.)  And the contract that went into effect November 1, 2017, which is discussed below, states in part, "Contractor warrants and represents that Contractor, at all times during the term of this Agreement: a) holds all the necessary licenses and certifications to practice as a dentist, ***physician, psychologist or chiropractor*** in a jurisdiction in the United States." (Emphasis added.)

23.     Upon information and belief, MetLife gave Dental Consultants and other Health Consultants the same or similar contracts, hired all Health Consultants to evaluate claims for benefits, provided all Health Consultants training concerning evaluation of claims, afforded all Health Consultants the  resources with which to perform their duties, and compensated all Health Consultants as independent contractors with monthly payments, no right to overtime, no right to receive employee benefits, and the obligation to pay all FICA taxes.

**B.     MetLife Gave All Health Consultants the Same or Similar Contracts Which, Until November 2017, Were Consistent with Them Being MetLife Employees.**

24.     Throughout the applicable liability periods, MetLife used standardized contracts for all Dental Consultants each year.  These contracts were not subject to negotiation, except

possibly as to the hourly pay rates.  All Dental Consultants received the same or similar standardized contracts each year.  All such contracts were for annual terms, although, as discussed below, MetLife cancelled the 2017 standardized contract as of November 1, 2017 and sent Dental Consultants via email a new form contract for the period from November 1, 2017 through October 31, 2018, rather than waiting for the 2017  contract to expire on December 31, 2017.  The new proffered contract had to be signed by MetLife and a Dental Consultant for that consultant's employment to continue after October 30, 2017.

25.     Attached as Exhibit B is the contract that Ms. McNeely signed in late 2016 for calendar year 2017 (the "Prior Contract").  Her signed contracts for each of the prior ten years were similar, although they varied in certain respects, such as her compensation rate per hour. All of the other Dental Consultants signed contracts for each year through 2017 that were substantially similar in language and terms as Exhibit B.

26.     Upon information and belief, Health Consultants other than Dental Consultants signed contracts for each year through 2017 that were substantially similar in language and terms as Exhibit B.

27.     Attached as Exhibit C is the contract that MetLife sent to Ms. McNeely via email in October 2017 for the year from November 1, 2017 through October 31, 2018 (the "New Contract").  Ms. McNeely chose not to sign Exhibit C and her employment with MetLife ended on October 31, 2017.

28.     Upon information and belief, all of the other Health Consultants received standardized contracts similar to Exhibit C at some time prior to November 1, 2017.

29.     A comparison of numerous provisions of the New Contract with the corresponding provisions (if any) of the Prior Contract reveals that MetLife introduced the new

contract early rather than wait until the expiration of the Prior Contract to try to create a façade that the Health Consultants were independent contractors rather than employees.

30.     The Prior Contract is simply labeled an "agreement", while the New Contract is titled an "independent contractor agreement."

31.     The Prior Contract does not expressly address whether consultants are employees or independent contractors.  By contrast, paragraph 1 of the New Contract begins, "Contractor agrees that Contractor is an independent contractor."  It later states, "Contractor further acknowledges and agrees that nothing in this Agreement is intended to or creates any employment relationship between Contractor and MetLife, and that MetLife is not Contractor's employer."  Ex. C, ¶ 1.

32.     As to compensation, the Prior Contract merely stated the rate at which consultants would be paid; in Ms. McNeely's case, $52.00 per hour.  Ex. B, ¶ 1.  The New Contract not only states the hourly rate of pay, but states that the consultant will be compensated "upon submission of an invoice for the Services actually performed," that "MetLife will issue Contractor an IRS Form 1099," and that "Contractor shall be directly and solely responsible for all costs of self-employment, including federal, state and local income tax payments for Contractor, including charges or premiums for F.I.C.A., workers compensation and general liability insurance, unemployment insurance and other taxes …."  Ex. C, ¶ 3, 3(b), 3(c).  Neither the Prior Contract nor the New Contract specifies how frequently consultants will be paid, such as weekly, bi-weekly, or monthly.

33.     The Prior Contract states that "MetLife will reimburse You for … reasonable expenses, including [travel expenses and] telephone charges, incurred by You in the course and scope of your duties under this Agreement."  Ex. B, ¶ 3.  The New Contract differs:  "Contractor

10

is responsible for any business expenses incurred by him/her during the Service Period, except as set forth herein or agreed upon by the Parties in writing, and is responsible for his /her own profit or loss in connection with the Services rendered under this Agreement." Ex. C, ¶ 3(a).

34.     The Prior Contract does not address how many hours of work per week the consultants may work.  The New Contract states that "Contractor will set his/her own schedule [and] hours … for performance of the Services rendered, subject only to the limits identified in this Agreement and only to the extent that such limits are not inconsistent with Contractor's independent contractor status."  Ex. C, ¶ 1(a).  It adds, "Contractor acknowledges that, during the Service Period, Contractor may only be providing Services on a periodic or occasional basis (for example, for an 8 or 9 week block during the Service Period). Contractor acknowledges and agrees that MetLife does not guarantee that Contractor will be engaged to provide any Services during the Service Period."  *Id.*, ¶ 5.

35.     The Prior Contract identifies the consultant's "duties."  Ex. B, ¶ 2.  The New Contract contains a schedule of services that the Health Consultant "agrees to provide" to MetLife.  Ex. C, Schedule A.  Consultants' duties under the Prior contract and the services that they agree to provide under the New Contract are similar.  The Prior Contract lists: "a) Reviewing dental claims and rendering your professional opinion; b) Providing advice and counsel to the Claims Office staff; c) Communicating via telephone with submitting dentists to explain and clarify dental claims; and, d) Training Dental Consultants, as may be required."  Ex. B, ¶ 2.  Each of these four duties appears in the schedule of services under the New Contract, albeit with more language describing them, and a fifth service is added: "Assisting MetLife's Claims Office Staff and Special Investigation Unit with potential fraudulent dental claims submissions and fraud investigations, including abuse and overutilization."  Ex. C, Schedule A.

36. The Prior Contract does not address MetLife's extent of control over the consultants' performance of their duties for the company. The New Contract, in contrast, states that the consultant "shall not be subject to the direction, control or supervision of MetLife with respect to the performance of his/her services hereunder. Contractor will have exclusive control over the manner and means by which he/she performs the Services rendered." Ex. C, ¶ 1(a). Of course, MetLife's statement that Contractors will have exclusive control over the manner and means by which they perform services does not make it so.

37. The Prior Contract does not address which party will provide the supplies, materials, or computer resources for the consultant to perform his or her duties to MetLife. But the New Contract states that the consultant "will provide the supplies, materials or other items needed to perform the Services pursuant to this Agreement, except as set forth herein or as agreed upon in writing by MetLife." Ex. C, ¶ 1(c). Again, the reality is different: MetLife still provides at least some of the supplies, materials and other items that the contractors need to perform their duties under the New Contract.

38. The Prior Contract specifies that "[w]hile engaged in the activities set forth in this Agreement, you will not accept employment of any character hostile to the interests of MetLife or otherwise engage in activities adverse to the interests of MetLife.…" Ex. B, ¶ 7. The New Contract purports to give consultants more freedom: "Subject only to the limit on not engaging in competing endeavors as noted below, Contractor is free to perform services for any other individuals or entities of Contractor's choice during the Service Period, and there is no expectation that services provided to MetLife are exclusive …." Ex. C, ¶ 1(d). However, the reference in the initial proviso greatly reduces that purported freedom, as the agreement elsewhere provides, "While providing the Services Contractor will not accept employment or

12

enter into any other relationship of any character which is in conflict with, is directly competitive with or which is hostile to the interests of MetLife or otherwise engage in activities adverse to the interests of MetLife." *Id.*, ¶ 9.

**C.    MetLife's Practices Establish that Health Consultants Are Employees.**

      **1.    MetLife's relationships with Health Consultants and close supervision of their work are typical of employer-employee relationships.**

39.    As alleged above, MetLife's Prior and New Contracts are one-year agreements. They are not project-based.

40.    There was little turnover in Dental Consultants in the ten years or more prior to November 1, 2017.  Very seldom did MetLife or a Dental Consultant refuse to sign the new version of the Prior Contract before the beginning of a new year.  As a result, MetLife has had long, continuous relationships with most Dental Consultants.  For example, Ms. McNeely worked for MetLife as a consultant for about 15 years, from the fall of 2002 until the company sought to impose the New Contract in November 2017.

41.    Upon information and belief, MetLife had similar long, continuous relationships with most other Health Consultants.

42.    Until 2014 MetLife required most Dental Consultants to do all of their work at a MetLife office, although there were exceptions, such as in Texas where MetLife did not have any office for the small number of Dental Consulants there.  As discussed below, MetLife for several years has been in the process of issuing Dental Consultants laptop instead of desktop computers.  Before MetLife has issued a laptop to a Dental Consultant, that consultant has been required to do all of his or her work for MetLife in its office.  As late as October 2017, approximately half of the Dental Consultants at MetLife's office in Aurora, Illinois, where Ms. McNeely and the majority of the Dental Consultants were assigned, had not been issued laptops

and thus were required to work exclusively in the MetLife office.  Moreover, through October 2017 MetLife required most Dental Consultants who had received laptop computers to come into the office at least one day every week to perform their duties, except when family or other circumstances dictated an exception.  .

43.     MetLife has dictated the maximum number of hours Dental Consultants could work in a day.  It has changed that maximum figure from time to time.

44.     MetLife has required Dental Consultants to designate their "regular" schedule, the days of the week and hours in which they typically worked.  Until 2017, MetLife also required Dental Consultants to sign up in advance in order to work weekends or any days or hours outside of their regular schedule.  Dental Consultants have not been allowed simply to log on and work from home or show up at the office.

45.     Until recently, MetLife also required that, once Dental Consultants began work, they work at least four continuous hours.  It did not permit Dental Consultants, for example, to work one or two hours, leave work to perform an errand, and then resume work.

46.     Until late 2016, MetLife required Dental Consultants to sign in and sign out on a time sheet on the days when they worked at MetLife's office.  It even instructed them to sign out when they left the MetLife building and sign back in when they returned.  When Dental Consultants worked from home, they had to email a MetLife secretary their hours at the end of the day.

47.     MetLife eliminated the time sheets on which Dental Consultants had to sign in and sign out and the requirement that they send emails when they worked from home in late 2016 when MetLife switched to electronic timesheets.  But, obviously, MetLife still required

14

each consultant to record his/her time each day; the medium just switched from paper to computer.

48.     Neither technology nor other limitations has dictated that Dental Consultants work at least one day a week at MetLife's offices, work at least four continuous hours, or establish a regular schedule.  Rather, MetLife has mandated these office requirements for its own convenience and control.

49.     MetLife employees have supervised Dental Consultants at the office to ensure that they do not engage in excessive socializing with other Dental Consultants.  A MetLife employee has been charged with sending admonitory emails to Dental Consultants deemed to be spending excessive time away from their desks or having other consultants stopping by their desk for excessive periods.

50.     In addition to the Dental Consultants, MetLife personnel characterized as employees work at MetLife's offices.  Consultants and employees have entered and exited through the same doors and used the same common areas.  In the Aurora, Illinois facility, these common areas include the kitchen, cafeteria and bathrooms.

51.     Upon information and belief, MetLife has exercised similar control over the work locations, work hours, and work behavior of other Health Consultants.

52.     Until November 2016, MetLife required Dental Consultants to submit time records for the number of hours worked each month on a time sheet form prepared by MetLife and disseminated to the consultants.  Since then Dental Consultants still are expected to submit to MetLife the number of hours worked for payment.  They thus are paid based on hours worked during a monthly time period basis rather than based on a fee for a specific project or assignment.

53.     MetLife has compensated Dental Consultants through direct deposit payments rather than through checks.

54.     As alleged above, the Prior Contract provided for consultants to be reimbursed for expenses, including travel expenses, incurred in performing duties for MetLife.  The company in fact reimbursed Dental Consultants for their expenses incurred in performing duties for MetLife throughout the period that the Prior Contract was in effect upon submission of evidence of those expenses, provided that they requested reimbursement on a MetLife-prepared form.

55.     MetLife also has paid $200-300 per year per Dental Consultant for continuing dental education.

56.     Upon information and belief, MetLife had similar payment and expense reimbursement arrangements with the other Health Consultants.

57.     MetLife's Prior and New Contracts, as alleged above, have prohibited Dental Consultants from "accept[ing] employment of any character hostile to the interests of MetLife or otherwise engag[ing] in activities adverse to the interests of MetLife."  The contracts do not specify whether similar employment with a competitor would be hostile to MetLife's interests, but Ms. McNeely understood that employment for a competitor would be deemed hostile, and believes that other Dental Consultants had the same understanding.

**2.      MetLife has provided the Health Consultants with the means to perform their duties, including the claims to review and the equipment, materials, and supplies with which to conduct that review.**

58.     Although the Prior and New Contracts list several job duties for Dental Consultants, they have spent the bulk of their time throughout the past decade reviewing claims. In performing claim reviews, these Dental Consultants review the clinical information submitted by treating dentists and evaluate whether the services rendered, such as crowns, bridges, onlays, implants, or periodontal treatments, were dentally necessary. The Dental Consultants may also

16

recommend that an alternate, less expensive benefit be applied to a service.  If MetLife adopts the Dental Consultant's recommendation that a less costly covered service other than the service actually performed could have produced a professionally acceptable result to treat a dental condition, MetLife pays benefits based only upon the less costly service.

59.     Throughout this period, MetLife has provided Dental Consultants each day with detailed daily assignments, including the claim forms that they evaluate.  For many years, when an assignment required multiple steps, MetLife often gave Dental Consultants the materials for only the initial step or steps, and they needed to request the additional materials once they finished the earlier steps in the review.  MetLife began implementing a new system in March 2017 that was fully implemented by that summer under which assignments came in one spreadsheet for all consultants. The spreadsheet typically has assignments alongside a consultant's name, and when a Dental Consultant finished one assignment, she then was expected to begin work on the next assignment on the spreadsheet.

60.     MetLife requires Dental Consultants to use its company issued equipment.  From 2002 through 2013, Dental Consultants received a cubicle, desk, desktop computer, two computer monitors, computer keyboard and mouse, and phone.  In the Aurora office and upon information and belief in the other offices as well, MetLife began in 2013 issuing Dental Consultants laptops, computer bags, docking stations, two computer monitors, computer keyboard and mouse, and phone.  The computers and other equipment remain company property, and must be returned when a Dental Consultant leaves MetLife's employment.

61.     The desktop and laptop computers that MetLife has issued to Dental Consultants have contained MetLife installed software, which the consultants are required to use in performing their job duties.

62.     MetLife employees have monitored and supervised Dental Consultants, often many times a day, via emails and/or instant messaging to find out their progress on their assignments.

63.     MetLife has provided free technical support to Dental Consultants for the company-issued equipment and software.

64.     MetLife also has monitored and tracked Dental Consultants' use of and activity on the computers.  MetLife has not blocked Dental Consultants from surfing the net or otherwise using the computers for non-work purposes.  However, MetLife has monitored their activity and sent mass emails when surfing times increased beyond the company's satisfaction and reminded the Dental Consultants to limit their personal use of the computers.

65.     In addition to company-issued equipment and software, MetLife has provided Dental Consultants with supplies and materials to perform their duties, such as paper, pens and sticky tabs.

66.     Upon information and belief, MetLife has provided the means by which other Health Consultants have performed their work as well.  Upon information and belief, MetLife has provided other Health Consultants the claim materials to evaluate, the computer software on which those consultants perform and record their review, the computer hardware on which that software operates, the technical support to maintain and update the hardware and software, and other supplies and materials.

**3.     MetLife has controlled the manner in which the Health Consultants perform their duties.**

67.     MetLife has controlled the manner by which Dental Consultants have performed their duties largely through the software that they must use and by obligating them to adhere to MetLife's policies and procedures.  For Dental Consultants, this means complying with

MetLife's "Dental Consultant Guidelines" ("Guidelines").  MetLife has prepared and disseminated the Guidelines to Dental Consultants for at least the last ten years, originally in hard copy, but now available as a PDF on their computers.

68.    Dental Consultants do not make independent professional decisions.  Rather, MetLife's Guidelines instruct Dental Consultants on the general principles and practices to apply in evaluating claims.  For example, MetLife currently instructs Dental Consultants that if the procedure used by a dentist and the supporting documentation for a claim do not qualify for benefits, they must deny the claim even if an alternate procedure might have qualified for benefits.  (2017 Guidelines, at 10.)  If instead a dentist submits "two or more treatment plans … for benefit determination, the consultant will routinely recommend benefits for the less costly plan."  (*Id.*)  Similarly, "[b]enefits will be limited to the amount for the least expensive services or supplies that are recognized as adequate by the dental profession."  (*Id.* at 15.)

69.    As another example, the Guidelines inform Dental Consultants that they should concern themselves only with the "necessity, appropriateness and accepted standards of care" for a service.  Other persons at MetLife afterwards determine whether the service is covered by the plan.  (*Id.* at 17.)

70.    The Guidelines also lay out the general procedures Dental Consultants "must" follow when a dentist asks the company to reconsider a benefit decision.  (*Id.* at 18-20.)

71.    In addition to general guidance, the Guidelines include information on specific services, dental codes, forms, appeals, communication and much more.  (*Id.* at 9.)

72.    MetLife has required all new and current consultants to participate in company-sponsored training to further their understanding of MetLife and, of course, control and direct

how consultants perform their duties.  This training has been administered both when Dental

Consultants are hired and periodically thereafter as MetLife deems necessary or appropriate.

73.     Still another source of control for MetLife is its full-time employees assigned to

supervise and manage the Dental Consultants.

74.     By these various means, and others, MetLife conveys to Dental Consultants the

standards that it imposes on them "concerning reporting, review quality and production

expectations."  Among these standards are expectations concerning the minimum number of

claims per hour Dental Consultants should process.  Currently MetLife's expectation is that

Dental Consultants review approximately 20 claims per hour, and a MetLife supervisor sends a

warning email when a consultant falls below 15 claims per hour.  MetLife has terminated Dental

Consultants for failure to meet expectations, especially during an initial probationary period.

Conversely, MetLife has awarded bonuses in the form of temporary increases in hourly rates

based on the number of claims that Dental Consultants as a group were able to process during

"crunch" (high-volume) times.

75.     MetLife has evaluated the performance of Dental Consultants against its standards

through MetLife Quality Assurance.  As one means of evaluation, once or twice a year MetLife

has required Dental Consultants to take quizzes on MetLife premises that are sample claims.

MetLife also has assigned individuals from its quality assurance team to review Dental

Consultants' work and provide an assessment approximately twice a year.

76.     Upon information and belief, other Health Consultants are subject to similar

controls.  MetLife conveys its quality and quantity expectations to them through written

materials, training, and supervisors, and monitors to ensure that these Health Consultants meet

these expectations through a quality assurance process.

**4.      MetLife does not require Health Professionals to identify themselves as independent contractors when they deal with medical providers or other third parties.**

77.      As part of their job duties, Dental Consultants frequently have to talk on the telephone with dentists or their staffs to discuss or obtain information with which to evaluate claims or to respond to questions from those people.  Until November 2017, Dental Consultants frequently identified themselves as "_____ from MetLife."  MetLife did not instruct them to identify themselves in a manner that made clear that they were independent contractors.  Since November 2017, Dental Consultants are supposed to identify themselves as "_____ on behalf of MetLife."

78.      MetLife also has issued company email addresses to Dental Consultants.  These email addresses are indistinguishable from the email addresses of employees, and provide no basis for a dentist or other third party to understand that the Dental Consultant is classified as an independent contractor.

79.      On information and belief, MetLife has not made any effort to instruct other Health Consultants to make clear that they are an independent business and not an employee of MetLife.

**5.      Conclusion:  The Health Consultants are employees, not independent contractors.**

80.      The facts alleged above establish that MetLife's Prior Contract gave it the right to control the means and manner by which Dental Consultants and other Health Consultants performed their job duties, and to treat the Health Consultants as employees rather than independent contractors.  Until that contract was replaced as of November 1, 2017, MetLife used that authority to exercise control over all aspects of the relationship between it and the consultants, including the means and manner by which consultants performed their job duties.

21

As a result, they were employees, not independent contractors, while working under the Prior Contract.

**D.     Health Consultants Have Not Been Exempt Under the FLSA and State Wage and Hour Laws Because MetLife Has Not Compensated Them on a Salary Basis and Because They Hare Not Engaged in the Practice of Medicine**

81.     Throughout the applicable time periods, MetLife has compensated Dental Consultants and other Health Consultants each month by multiplying the number of hours recorded as worked by the agreed hourly rate.  Because the number of hours worked has not been constant from month to month, Health Consultants have not been paid the same amount each month.

82.     MetLife has not compensated Dental Consultants and other Health Consultants for days or parts of days in which they do not work, such as because those days are holidays or the consultants are sick, injured, on vacation, or have a non-work appointment.

83.     The varying amounts of pay per pay period and the failure to compensate Health Consultants when they do not work mean that the consultants have not been paid on a salary basis.

84.     Dental Consultants, hygienists, chiropractors, and psychologists are not licensed in the field of medicine and do not evaluate medical claims for MetLife.

85.     Dental Consultants' duties for MetLife are to evaluate claims for benefits submitted to the company and not to practice dentistry.  They assist MetLife in deciding whether to pay none, some, or all of the cost of services provided by practicing dentists to policyholders or to participants or beneficiaries in dental plans.  Dental Consultants do not have patient-provider relationships with any of the policyholders, participants or beneficiaries, do not diagnose the patients' dental needs for the purpose of providing services to those patients, and do not assist or advise the dentist in providing services to the patient.

86.     Similarly, other Health Consultants' duties for MetLife are to evaluate claims submitted to MetLife and not to practice in the field in which they are licensed. They assist MetLife in deciding whether to pay none, some, or all of the cost of services provided by practicing health care providers to policyholders or to participants or beneficiaries in dental plans.  Health Consultants do not have patient-provider relationships with any of the policyholders, participants or beneficiaries, do not diagnose the patients' health needs for the purpose of providing services to those patients, and do not assist or advise the health care provider in providing services to the patient.

87.     Because Health Consultants are not compensated on a salary basis, and because they are not engaged in the practice of medicine while performing work for MetLife, they do not qualify for any exemption from the requirements that employees receive extra compensation when they work overtime, as required by the FLSA and the wage and hour laws of the State of Illinois.

**E.      MetLife Does Not Pay Health Consultants 50% More Than Their Regular Rates When They Work More than Forty Hours in a Week.**

88.     Some Dental Consultants frequently have worked more than forty hours in a week; other Dental Consultants, including Ms. McNeely, periodically have done so.  They have reported to MetLife their total number of hours worked even though those hours exceeded forty. As a result, MetLife knows that Dental Consultants have exceeded forty hours in a week.  Upon information and belief, MetLife is aware that other Health Consultants also at least sometimes have worked in excess of forty hours in a week for the company.

89.     Neither the Prior Contract nor the New Contract provides that Health Professionals will be compensated at 1.5 times their regular rate for hours in excess of forty in a

week or for any other increase in their hourly rates when they work in excess of forty hours in a week.

90.     In calculating Health Consultants' compensation, MetLife has multiplied the number of hours worked by the hourly rate set out in the Prior Contract or the New Contract, without any upward adjustment for time worked in excess of forty hours in a week.

91.     By not compensating Health Consultants at 1.5 times their regular rate for hours in excess of forty in a week, MetLife has violated the FLSA and the wage and hour laws of the States in which the Health Consultants have been employed.

92.     MetLife has not had a reasonable basis for believing that Health Consultants legally were independent contractors or that they were exempt employees under the FLSA or state wage and hour laws.

93.     MetLife has not acted in good faith in failing to pay Health Consultants 1.5 times their hourly rate for time worked in excess of forty hours in a week, partly because, upon information and belief, it has not made a good faith effort to determine whether the FLSA applied to Health Consultants who worked more than forty hours in a week.

94.     MetLife's violation of the FLSA has been willful in that it acted recklessly in failing to even consider, let alone make a reasonable effort to determine, whether Health Consultants were common law employees and whether, if they were, they were non-exempt under the FLSA.

**F.    MetLife Pays Health Consultants Less Frequently than Once Every Two Weeks**

95.     For the past ten years or longer, MetLife has compensated Dental Consultants for their work for it on a monthly basis.  It has not paid them on or before an established date during

the following month.  Instead, it typically has paid them on a varying date within the first half of the month after the work has been performed.

96.      Upon information and belief, MetLife has likewise compensated other Health Consultants on a monthly basis and on a varying date in the month after they have performed work.

97.      Because Health Consultants are non-exempt employees, MetLife has violated the Wage Payment and Collection Act of the State of Illinois, which requires that non-exempt employees be paid no less frequently than bi-weekly.  It also has violated similar laws of the States of New York and New Jersey.

**G.      MetLife Has Denied Employee Benefits to Health Consultants**

98.      Throughout the past six years or longer, MetLife has offered a wide variety of employee benefits to its employees.  Its employees generally have been eligible to participate in: a defined benefit pension plan called Metropolitan Life Retirement Plan for United States Employees (the "Defined Benefit Plan"); an employee welfare plan called the MetLife Options & Choices Plan (the "Primary Welfare Plan") with numerous sub-plans that collectively provide employees and certain former employees with medical, dental, prescription drug coverage, group-term life insurance, short-term and long-term disability coverage, flexible spending accounts, and work-life assistance coverage (employee assistance programs); and the Welfare Benefit Plan for Employees of Metropolitan Life (the "Secondary Welfare Plan") which provides eligible employees with life insurance, critical illness insurance, and legal insurance.  These three benefit plans are together referred to as the "Defendant Plans".  In addition, MetLife offers eligible employees at least one other ERISA-covered plan, a defined contribution plan called the Savings and Investment Plan for Employees of Metropolitan Life and Participating Affiliates

25

(the "Defined Contribution Plan").  It is not included among the Defendant Plans because, as discussed below, it expressly excludes Heath Consultants from its benefits even though they are common law employees and not independent contractors.  In addition, MetLife provides employees with additional benefits not covered by employee benefit plans, such as paid vacations and personal time off.

99.    Although Health Consultants have been employees, MetLife, the administrator of the Defendant Plans and other employee benefits, have not treated the Health Consultants as eligible to participate in any of the benefits provided by the Defendant Plans, or in any other benefits not provided under ERISA-covered plans, such as paid vacations and personal time off.

100.    MetLife, as the administrator of the Defendant Plans, has not made available to any of the Health Consultants copies of the plan documents and summary plan descriptions for each of the plans.  For example, Health Consultants cannot access those documents using the computers that MetLife has issued to them.  As a result, Health Consultants have not known whether they would qualify for some or all of the benefits under the terms of those documents if they were treated as employees.  The knowledge that Ms. McNeely has acquired concerning the Defendant Plans has been derived shortly prior to the filing of this Complaint from the annual tax returns that MetLife is required by law to file for each of the plans.

101.    Deloitte is the auditor for each of the Defendant Plans.  Attached to the annual tax returns for 2016 for the Defendant Plans are financial statements prepared by Deloitte that, among other information, describe the principal provisions of the Defined Benefit Plan, the Principal Welfare Plan, and the Defined Contribution Plan.

102.    The 2016 tax return for the Defined Contribution Plan states that among persons not eligible to participate in that plan are "Certain individuals performing services for the

26

Participating Affiliates are not eligible, e.g., an individual classified by the Participating Affiliates as a leased employee or independent contractor …"  Based on that language, Plaintiff does not at this time assert any claim based on MetLife's refusal to allow her and other Health Consultants to participate in the Defined Contribution Plan.

103.     Deloitte's description of the Defined Benefit Plan and the Principal Welfare Plan does not mention a similar exclusion.  This omission suggests that Health Consultants were eligible to participate in those plans.  In addition, MetLife has made available on the Internet a form version of a dental plan that can be used by employers who offer MetLife's dental benefits to their employees.  Under this form document, dental benefits are open to all full-time employees, with the term "full time" meaning "at least 17.5 hours per week on the Employer's regular work schedule" and the term "employees" not defined.[2]  This formulation would not have excluded individuals classified by the employer as independent contractors.

104.     Upon information and belief, all Health Consultants have been eligible to participate in the Defendant Plans throughout this period as well as the employee benefits not covered by ERISA, notwithstanding MetLife treating them as ineligible.

105.     MetLife, as administrator of the Defendant Plans and other employee benefits, has breached its duties of due care and of loyalty and its duty to act in accordance with plan documents in failing to analyze and determine that the Health Consultants were indeed employees and hence eligible to participate in some or all of these employee benefits.

106.     MetLife, as administrator of the Defendant Plans and other employee benefits, also has breached its duties of due care and of loyalty and its duty to act in accordance with plan documents in failing to provide the Health Consultants with copies of or access to the plan

---

[2]      https://mybenefits.conexis.com/media/docs/Hewitt/81/METLIFE%20DENTAL%20SPD.pdf

documents, summary plan descriptions, and other documents with respect to the Defendant Plans that ERISA requires be provided to all employees eligible to participate in benefit plans.

107.    The Health Consultants have been denied benefits that they were due under the terms of the Defendant Plans and employee benefits not covered by ERISA.

**H.    MetLife Did Not Pay the Employer Share of FICA Taxes**

108.    Under the Federal Insurance Contributions Act, employees and employers in the United States must pay FICA taxes to the Internal Revenue Service, with the amount of such tax based on the amount of the employee's pay.  The taxes are used to pay Social Security and Medicare benefits.  Each employer in the United States is obligated to (a) pay its portion of the FICA taxes, and (b) withhold the employee portion of those taxes from employee paychecks and pay them to the IRS.

109.    Currently the total FICA tax is 15.3% of each employee's gross pay.  The employer and employee each pays 7.65%.  6.2% of the 7.65% is attributable to Social Security, and 1.45% is attributable to Medicare.  The Medicare portion is uncapped, but any wages earned above an annual cap is not subject to the Social Security portion.  That cap was $127,200 in 2017.

110.    Because MetLife has treated Health Consultants as independent contractors rather than employees, it has reported their annual income to the IRS, and issued to the Health Consultants, a 1099 instead of a W-2 form.

111.    And because MetLife has treated Health Consultants as independent contractors, it has neither paid the employer portion of FICA taxes based on the consultants' monthly pay nor withheld the employee portion from the consultants' monthly pay.

112.     Finally, because MetLife told Health Consultants that they were self-employed independent contractors and issued them 1099 forms, the Health Consultants believed that they had to pay, and did pay, the combined employer and employee amount, that is, 12.4% up to the Social Security cap and 2.9% in Medicare tax – the entire 15.3%.

113.     As a result, Health Consultants were injured and MetLife unjustly enriched itself by shifting an amount equal to 7.65% of each Health Consultant's pay (or a lesser percentage if a Health Consultant's total pay for the year exceeded the Social Security cap) onto the Health Consultants.

## V.   CLASS AND COLLECTIVE ACTION ALLEGATIONS

114.     Ms. McNeely brings five types of claims, as described in Section VI below.  She brings each of them on behalf of similarly situated Health Consultants.  Because the statute or common law under which the claim defines the persons who are similarly situated in different ways, the class or collective action corresponding to each type of claim is defined separately. The chart below briefly summarizes the claims and the differences in the proposed classes and identifies the section of this Complaint that discusses the claim or propose class or collective action in greater detail:

| Claim | | Class or Collective Action | | | | |
|-------|---|----------------------------|---|---|---|---|
| **Basis of Claim** | **Section of Complaint** | **National or State** | **Liability Period** | **Opt-In or Out** | **Section of Complaint** | |
| FLSA | VI.A | National | 2 or 3 years | Opt-In | V.A | |
| ERISA | VI.B | National | 6 years | Opt-Out | V.B | |
| Illinois Minimum Wage Law | VI.C | Illinois | 3 years | Opt-Out | V.C | |
| Illinois Wage Payment and Collection Act | VI.D | Illinois | 10 years | Opt-Out | V.D | |
| Unjust Enrichment | VI.E | Illinois | 5 years | Opt-Out | V.E | |

**A.     Collective Action Pursuant to 29 U.S.C. § 216(b) to Pursue Claims for Violation of the FLSA**

115.     Ms. McNeely incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

116.     Ms. McNeely brings her claims for violation of the FLSA on behalf of herself and any other person who (a) has worked for MetLife as a Health Consultant (b) in the United States (c) at any time between three years prior to the date on which this Complaint is filed and October 31, 2017, and (d) files a timely signed Consent to Join before a deadline to be established by the Court ("Collective Action Members").

117.     The Collective Action Members are similarly situated in that, among other similarities:

a.     MetLife employed the Collective Action Members under similar contracts which, until November 2017, were consistent with them being employees rather than independent contractors;

30

b.      MetLife compensated the Collective Action Members as "independent

contractors";

c.      MetLife required the Collective Action Members to work at its offices either part

or all of their working time;

d.      MetLife supplied the claims that the Collective Action Members analyzed, the

computers and software on which they worked, and other materials and supplies;

e.      MetLife provided training as to how the Collective Action Members were

supposed to perform their duties;

f.      MetLife provided all Dental Consultants who are Collective Action Members

with the Guidelines and all other Collective Action Members with similar

guidance;

g.      MetLife prevented Collective Action Members from performing similar claims

work for other insurance companies;

h.      MetLife reimbursed Collective Action Members for their expenses in performing

their duties for the company;

i.      MetLife calculated Collective Action Members' pay each month by multiplying

the number of hours worked by the Members' hourly pay rate, and consequently,

Members' pay varied from month to month;

j.      MetLife did not increase Collective Action Members' pay rates by 50% for every

hour that they worked over forty hours in a week;

k.      Collective Action Members did not engage in the practice of medicine for

MetLife but instead made recommendations as to payment of claims; and

l.      MetLife's efforts, if any, to determine the appropriate compensation for the

Collective Action Members under the FLSA were the same as to all Members.

**B.      Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Violation of ERISA, 29 U.S.C. § 1001 *et seq.***

118.    Ms. McNeely incorporates all of the allegations in the paragraphs above as if set

forth fully in this paragraph.

119.    Ms. McNeely bring her claims for violation of ERISA on behalf of herself and

any other person who (a) has worked for MetLife as a Health Consultant (b) in the United States

(c) at any time between six years prior to the date on which this Complaint is filed and October

31, 2017.  To the extent that any of the applicable benefit plans limit benefits to employees who

worked a certain number of hours in a stated time period, the Class excludes persons who

worked fewer than the number of hours required to section the benefits provided under that plan

(the "ERISA Class").

120.    The ERISA Class has so many Members that joinder in this action would be

impracticable.  As alleged above, there were at least 89, and possibly about 100, Dental

Consultants who worked for MetLife in the United States in late 2017.  With turnover the

number of Dental Consultants alone probably exceeds 100.  Upon information and belief, other

Health Consultants substantially increase the size of the proposed ERISA Class.  Joinder would

be especially difficult because this action is brought in New York, and Dental Consultants

located in Illinois, Rhode Island, and Texas would have to travel several hundred miles to attend

proceedings.  Ms. McNeely does not know the States in which other Health Consultants have

worked, but many of them undoubtedly also would have to travel long distances to attend

proceedings in the case.

121.     The claims of the ERISA Class raise numerous common issues, including but not limited to:

a.     Has MetLife had the right under the contracts with the ERISA Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.     Has MetLife in fact controlled the means and manner by which ERISA Class Members performed their duties for MetLife and otherwise acted toward them in a manner that made them employees rather than independent contractors?

c.     Were common law employees eligible to participate in the Defendant Plans and non-ERISA benefits even if they were treated as independent contractors by MetLife's Human Resources department?

d.     Did MetLife as administrator of the Defendant Plans exercise reasonable care in determining whether ERISA Class Members were common law employees and otherwise eligible to participate in the Defendant Plans?

e.     Did MetLife as administrator of the Defendant Plans fail to determine that ERISA Class Members were common law employees and otherwise eligible to participate in the Defendant Plans because it considered its own interests rather than provide loyalty to the ERISA Class Members?

f.     Would it have been futile for ERISA Class Members to seek benefits from MetLife, the administrator of the Defendant Plans?

g.     Are ERISA Class Members entitled to injunctive relief directing MetLife as administrator of the Defendant Plans to treat them as eligible for benefits under the Plans pursuant to ERISA § 502(a)(3)?

h.     Are ERISA Class Members entitled to injunctive relief directing MetLife as administrator of the non-ERISA benefits to treat them as eligible for benefits under the common law?

i.     Are ERISA Class Members entitled to other equitable relief in the form of money to compensate them for MetLife's failure to treat them as eligible for employee benefits under the Plans pursuant to ERISA § 502(a)(3)?

j.     Are ERISA Class Members entitled to monetary relief to compensate them for MetLife's failure to treat them as eligible for non-ERISA employee benefits?

k.     Are ERISA Class Members entitled to the value of unpaid benefits under the Plans pursuant to ERISA § 502(a)(1)(B)?

122.    The claims of Ms. McNeely are typical of the other ERISA Class Members because she and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were denied eligibility to participate in the Plans, were not given copies of the Plans, and were protected by the same rights under ERISA.

123.    Ms. McNeely is an adequate representative of the ERISA Class.  She is a member of the ERISA Class, does not have any conflicts with other class members, and has engaged lawyers who are experienced in the litigation of employment class action lawsuits and in the litigation of claims under ERISA.

124.    The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of these claims.

125.    A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  Ms. McNeely is unaware of any other litigation raising similar claims against MetLife brought by individual ERISA Class Members.  The claims are not

sufficiently large monetarily to give individual ERISA Class Members an interest in controlling

the litigation of separate claims. The commonality of the issues makes it desirable to concentrate

the litigation in one forum.  The claims do not raise any difficulties in managing this litigation

that do not exist in all class actions, and litigating the common issues once is more efficient than

litigating them multiple times and avoids the risk of inconsistent results.

C.      **Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Violation of Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.***

126.    Ms. McNeely incorporates all of the allegations in the paragraphs above as if set

forth fully in this paragraph.

127.    Ms. McNeely brings her claim for violation of the Illinois Minimum Wage Law

on behalf of herself and any other person who (a) has worked for MetLife as a Health Consultant

(b) in the State of Illinois, and (c) worked more than forty hours in a week at least once between

the three years prior to the date on which this Complaint is filed and October 31, 2017, according

to the consultant's time records submitted to MetLife (the "Illinois Overtime Class").

128.    The Illinois Overtime Class has so many Members that joinder in this action

would be impracticable.  As alleged above, there were about 55 Members who  worked as Dental

Consultants for MetLife in the State of Illinois in late 2017.  With turnover there are at least 60

Members of the proposed class who are Dental Consultants.  Upon information and belief, other

Health Consultants substantially increase the size of the proposed Illinois Overtime Class.

Joinder would be especially difficult because this action is brought in New York, several

hundred miles away from Illinois.

129.   The claims of the Illinois Overtime Class raise numerous common issues, including but not limited to:

a.   Has MetLife had the right under the contracts with the Illinois Overtime Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.   Has MetLife in fact controlled the means and manner by which Illinois Overtime Class Members performed their duties for MetLife and otherwise acted toward them in a manner that made them employees rather than independent contractors?

c.   Has MetLife's method of calculating the compensation of Illinois Overtime Class Members, multiplying the number of hours worked times an hourly rate, been inconsistent with Members being paid on a salary or fee basis?

d.   Are Illinois Overtime Class Members non-exempt employees because they were not paid on a salaried basis?

e.   Has MetLife failed to pay Overtime Class Members 50% more than their normal hourly rate when they worked more than 40 hours in a week?

130.   The claim of Ms. McNeely is typical of the other Illinois Overtime Class Members because she and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were not paid on a salaried or fee basis, and were not paid 50% more than their normal rates for hours worked in excess of 40 in a week.

131.   Ms. McNeely is an adequate representative of the Illinois Overtime Class.  She is a member of the Illinois Overtime Class, does not have any conflicts with other class members,

and has engaged lawyers who are experienced in wage and hour law and in the litigation of

employment class action lawsuits.

132.    The common issues, including but not limited to those identified above, will

predominate over any individualized issues in the litigation of this claim.

133.    A class action would be superior to other available methods for fairly and

efficiently adjudicating the dispute.  Ms. McNeely is unaware of any other litigation raising

similar claims against MetLife brought by individual Illinois Overtime Class Members.  The

claims are not sufficiently large monetarily to give individual members an interest in controlling

the litigation of separate claims. The commonality of the issues makes it desirable to concentrate

the litigation in one forum.  The claims do not raise any difficulties in managing this litigation

that do not exist in all class actions, and litigating the common issues once is more efficient than

litigating them multiple times and avoids the risk of inconsistent results.

**D.      Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Violation of Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.***

134.    Ms. McNeely incorporates all of the allegations in the paragraphs above as if set

forth fully in this paragraph.

135.    Ms. McNeely brings her claims for violation of the IWPCA on behalf of herself

and any other person who (a) has worked for MetLife as a Health Consultant (b) in the State of

Illinois, (c) at any time between ten years prior to the date on which this Complaint is filed and

October 31, 2017 (the "Illinois Monthly Payment Class").

136.    The Illinois Monthly Payment Class has so many members that joinder in this

action would be impracticable.  As alleged above, there are about 55 members who  worked as

Dental Consultants for MetLife in the State of Illinois in late 2017.  With turnover there are at

least 60 members of the proposed class who are Dental Consultants.  Upon information and

belief, other Health Consultants substantially increase the size of the proposed Illinois Monthly Payment Class.  Joinder would be especially difficult because this action is brought in New York, several hundred miles away from Illinois.

137.    The claims of the Illinois Monthly Payment Class raise numerous common issues, including but not limited to:

a.    Has MetLife had the right under the contracts with the Illinois Monthly Payment Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.    Has MetLife in fact controlled the means and manner by which Illinois Month Payment Class Members performed their duties for MetLife and otherwise acted toward them in a manner that made them employees rather than independent contractors?

c.    Has MetLife's method of calculating the compensation of Illinois Month Payment Class Members, multiplying the number of hours worked times an hourly rate, inconsistent with paying them on a salary basis?

d.    Did MetLife fail to pay Illinois Month Payment Class Members on a bi-weekly or more frequent basis?

138.    The claims of Ms. McNeely are typical of the other Illinois Monthly Payment Class Members because she and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were not paid on a salaried basis, and were not paid bi-weekly or more frequently.

139.     Ms. McNeely is an adequate representative of the Illinois Monthly Payment Class.  She is a member of the class, does not have any conflicts with other class members, and has engaged lawyers who are experienced in the litigation of employment class action lawsuits.

140.     The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

141.     A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  Ms. McNeely is unaware of any other litigation raising similar claims against MetLife brought by individual Illinois Monthly Payment Class Members. The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**D.     Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Unjust Enrichment Claims**

142.     Ms. McNeely incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

143.     Ms. McNeely brings her unjust enrichment claims on behalf of herself and any other person who (a) has worked for MetLife as a Health Consultant (b) in the State of Illinois, (c) at any time between five years prior to the date on which this Complaint is filed and October 31, 2017 (the "Illinois Unjust Enrichment Class").

144.     The Illinois Unjust Enrichment Class has so many members that joinder in this action would be impracticable.  As alleged above, there were about 55 members who  worked as Dental Consultants for MetLife in the State of Illinois in late 2017.  With turnover there are at

least 60 members of the proposed class who are Dental Consultants.  Upon information and belief, other Health Consultants substantially increase the size of the proposed Illinois Unjust Enrichment Class.  Joinder would be especially difficult because this action is brought in New York, several hundred miles away from Illinois.

145.    The claims of the Illinois Unjust Enrichment Class raise numerous common issues, including but not limited to:

a.    Has MetLife had the right under the contracts with the Illinois Unjust Enrichment Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.    Has MetLife in fact controlled the means and manner by which Illinois Unjust Enrichment Class Members performed their duties for MetLife and otherwise acted toward them in a manner that made them employees rather than independent contractors?

c.    Has MetLife's failure to pay the employer's share of FICA taxes and shifting of that burden to Illinois Unjust Enrichment Class Members enriched MetLife in the amount of the taxes in a manner that is unjust under applicable law?

146.    The claims of Ms. McNeely are typical of the other Illinois Unjust Enrichment Class Members because she and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, and paid the entirety of FICA taxes on their income instead of having MetLife pay half of those taxes.

40

147. Ms. McNeely is an adequate representative of the Illinois Unjust Enrichment Class. She is a member of the class, does not have any conflicts with other class members, and has engaged lawyers who are experienced in the litigation of employment class action lawsuits.

148. The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

149. A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute. Ms. McNeely is unaware of any other litigation raising similar claims against MetLife brought by individual Illinois Unjust Enrichment Class Members. The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum. The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

## VI.   COUNTS

**A.    Count One:  MetLife's Violation of Rights of Ms. McNeely and Members of the Collective Action Under the FLSA**

150. Ms. McNeely incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

151. The contracts under which Ms. McNeely and other Collective Action Members worked until November 1, 2017 were consistent with their being employees of MetLife. Until November 1, 2017, MetLife also controlled the means and manner by which Members perform their job duties. This control, and MetLife's other behavior toward Members set forth in the Complaint, makes Ms. McNeely and other Collective Action Members employees rather than independent contractors.

152.    The Collective Action Members are non-exempt employees under the FLSA.
Except in limited circumstances not applicable here, employees cannot be exempt under either
the professional or administrative exemption unless they are compensated on a salary basis.
Under both the Prior Contract and the New Contract, MetLife has compensated Members by
multiplying the number of hours worked each month by an hourly rate specified in those
contracts.  Consequently, the Members' compensation has varied from month to month with the
number of hours worked.  When Collective Action Members have worked fewer hours because
of vacations, holidays, sickness, or other reasons, they have not been compensated for those
unworked hours.  Collective Action Members have been non-exempt employees.

153.    MetLife has compensated Collective Action Members at only their regular pay
rate, not at 1.5 times their regular pay rate, for time worked in excess of forty hours in a week.
The failure to pay non-exempt employees overtime pay when they work in excess of forty hours
in a week violates the FLSA.

154.    MetLife's violation of the FLSA damaged Ms. McNeely and Collective Action
Members in that they did not receive the overtime premium pay to which they were entitled
when they worked more than forty hours in a week.

155.    MetLife's violation of the FLSA was willful.  Upon information and belief, it
recklessly failed to consider its obligations to Collective Action Members under the FLSA.
Accordingly, the limitations period for the FLSA claims is three years pursuant to 29 U.S.C. §
255.

156.    MetLife has not had a reasonable basis for not paying Collective Action Members
1.5 times their regular pay rate for time worked in excess of forty hours in a week.  Upon
information and belief, MetLife also has not made a good faith effort to determine its obligations

under the FLSA to Collective Action Members.  As a result, the Members are entitled to liquidated damages under 29 U.S.C. § 260, along with attorneys' fees, expenses, and costs.

**B.    Count Two:  Violation by MetLife as Employer and as the Administrator of the Defendant Plans of the Rights of Ms. McNeely and ERISA Class Members**

157.    Ms. McNeely incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

158.    The contracts under which Ms. McNeely and other ERISA Class Members worked until November 1, 2017 were consistent with their being employees of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which ERISA Class Members performed their job duties.  This control and MetLife's other behavior makes the Members employees rather than independent contractors.

159.    MetLife has offered a generous package of employee benefits to ERISA Class Members under the Defendant Plans as well as other benefits.  MetLife, however, did not make any of its employee benefits available to ERISA Class Members or provide them with any information about the plans.  The lack of information prevented Members from evaluating whether they were eligible for those benefits.

160.    Notwithstanding some uncertainty created by this lack of information, upon information and belief all common law employees of MetLife (including ERISA Class Members) have been eligible for some or all of MetLife's employee benefits.

161.    As the administrator of Defendant Plans, MetLife was a fiduciary of those plans. Even if some of MetLife's employee benefit plans are not governed by ERISA, MetLife's administration of those plans made it a fiduciary as a matter of common law.

162.    ERISA § 401(a)(1)(B) requires MetLife, as the fiduciary of the Defendant Plans, to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a

prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). The common law requires MetLife, as the fiduciary of any non-ERISA plans, to act with similar care.

163. For the past six years (and longer), MetLife did not act with the appropriate level of care required of fiduciaries in treating ERISA Class Members as not eligible for benefits under some or all of MetLife's employee benefit plans and in not providing them with information about the plans.

164. ERISA § 401(a)(1)(A) requires MetLife, as the fiduciary of the Defendant Plans, to act "solely in the interest of the participants and beneficiaries and for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A). The common law requires MetLife, as the fiduciary of any non-ERISA plans, to act with similar loyalty to participants and beneficiaries.

165. In treating ERISA Class Members as not eligible for benefits under MetLife's employee benefit plans for the past six years or longer, MetLife has placed its own interests over the interests of the ERISA Class Members in violation of its duty of loyalty to the Members.

166. Finally, ERISA § 401(a)(1)(D) requires MetLife, as the fiduciary of the Defendant Plans, to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA. 29 U.S.C. § 1104(a)(1)(D). The common law requires MetLife, as the fiduciary of any non-ERISA plans, to act in accordance with the terms of the instrument creating the fiduciary relationship subject to the other duties governing fiduciaries, such as the duties of reasonable care and loyalty.

167.   In treating Members as not eligible for benefits under MetLife's employee benefit plans for the past six years or longer, upon information and belief MetLife did not act in accordance with the plan documents.

168.   The violations of ERISA by MetLife over the past six years or longer have caused harm to Ms. McNeely and ERISA Class Members in that they have not received the employee benefits to which they were entitled.

169.   ERISA § 502(a)(3) authorizes participants, including persons wrongly excluded from participation in employee benefit plans, to bring an action "to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations …."  29 U.S.C. § 1132(a)(3).  Thus, Ms. McNeely may bring this action to obtain "other appropriate equitable relief" for the failure of MetLife to treat them as eligible for those benefits in the past.  The "other appropriate equitable relief" includes but is not limited to an accounting of unpaid benefits to ERISA Class Members followed by payment of the value of the benefits that the accounting determines to be unpaid.

170.   MetLife has not treated ERISA Class Members as common law employees, and wrongly denied them benefits under some or all of its employee benefit plans, for the past ten years or longer.  ERISA § 502(a)(1)(B) authorizes any participant, including any person wrongly excluded from participation in an employee benefit plan, to bring an action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."  29 U.S.C. § 1132(a)(1)(B).  As a result, Ms. McNeely may bring this action under this subsection to obtain for herself and the ERISA Class Members the value of the past unpaid benefits caused by the failure of MetLife to treat them as eligible, along with attorneys' fees, expenses, and costs.

**C.**     **Count Three:  MetLife's Violation of Rights of Ms. McNeely and Members of the Illinois Overtime Class Under the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq*.**

171.    Ms. McNeely incorporates all of the allegations in the paragraphs above, including but not limited to the paragraphs with respect to Count One, as if set forth fully in this paragraph.

172.    For the same reasons that MetLife has violated the FLSA when it has failed to pay Collective Action Members at the rate of 1.5 times their regular rate of pay when they work more than 40 hours in a workweek, MetLife also has violated the IMWL, and in particular the overtime provisions at 820 ILCS 105/4a, when it has failed to pay Illinois Overtime Class Members at the rate of 1.5 times their regular rate of pay when they work more than 40 hours in a workweek.

173.    MetLife's violation of the IMWL damaged Ms. McNeely and Illinois Overtime Class Members in that they have not received the overtime premium pay to which they were entitled for any week during the lliability period when they have worked more than forty hours in that week.

174.    As a result, Ms. McNeely and Illinois Overtime Class Members are entitled to the amounts of the underpayment and 2% per month for each month for which the underpayment has existed for the past three years or longer, along with attorneys' fees, expenses, and costs.

**D.**     **Count Four:  MetLife's Violation of Rights of Ms. McNeely and Members of the Illinois Monthly Payment Class Under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq*.**

175.    Ms. McNeely incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

176.    The contracts under which Ms. McNeely and other Illinois Monthly Payment Class Members worked until November 1, 2017 were consistent with their being employees of

MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which Members performed their job duties.  This control, and MetLife's other behavior toward Illinois Monthly Payment Class Members set forth in the Complaint, makes the Members employees rather than independent contractors.

177.    The Illinois Monthly Payment Class Members are non-exempt employees under the FLSA.  Except in limited circumstances not applicable here, employees cannot be exempt under either the professional or administrative exemption unless they are compensated on a salary basis.  Under both the Prior Contract and the New Contract, MetLife has compensated Members by multiplying the number of hours worked each month by an hourly rate specified in those contracts.  Consequently, the Illinois Monthly Payment Class Members' compensation varies from month to month with the number of hours worked.  When Members have worked fewer hours because of vacations, holidays, sickness, or other reasons, MetLife has not compensated them for the unworked hours.

178.    MetLife has paid Illinois Monthly Payment Class Members once a month, and even then, not on a regular day of the month.  By paying Illinois Monthly Payment Class Members, who are non-exempt employees, less frequently than once every two weeks, MetLife has violated the 820 ILCS 115/3 of the IWPCA for the past ten years or longer.  And by delaying payment for more than 13 days after the end of the longest allowed pay period for non-exempt employees, which is bi-weekly, MetLife has violated 820 ILCS 115/4 of the IWPCA for the past ten years or longer.

179.    MetLife's violation of the IWPCA has damaged Ms. McNeely and Illinois Monthly Payment Class Members in that they have not received timely pay for the past ten years

or more.  MetLife has had the use of the money they were owed each month, while the Illinois

Monthly Payment Class Members have been deprived of its use.

180.    As a result, Ms. McNeely and Illinois Monthly Payment Class Members are

entitled to 2% of the amounts of the late payments each month for which the payments were

made in violation of the IWPCA, along with attorneys' fees, expenses, and costs.

**E.    Count Five:  MetLife's Unjust Enrichment by Shifting the Obligation to Pay the Employer Share of FICA to Members of the Illinois Unjust Enrichment Class**

181.    Ms. McNeely incorporates all of the allegations in the paragraphs above as if set

forth fully in this paragraph.

182.    The contracts under which Ms. McNeely and other Illinois Unjust Enrichment

Class Members worked until November 1, 2017 were consistent with their being employees of

MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which

Members have performed their job duties.  This control, and MetLife's other behavior toward

Illinois Unjust Enrichment Class Members set forth in the Complaint, makes the class members

employees rather than independent contractors.

183.    Notwithstanding that the Illinois Unjust Enrichment Class Members were

employees under the common law, MetLife compensated them as independent contractors,

informed them that they were indeed independent contractors, and reported their income to the

IRS on 1099 forms.

184.    As a result of these actions by MetLife, Illinois Unjust Enrichment Class

Members, including Ms. McNeely, paid an amount equal to the employer share of FICA taxes

that MetLife actually owed.  The payment by Ms. McNeely and other Class Members of

MetLife's debt to the IRS resulted in a benefit to MetLife.

185.    MetLife intended to induce Ms. McNeely and other Illinois Unjust Enrichment

Class Members to pay the IRS the equivalent of the employer share of FICA taxes.  Indeed, the

New Contract expressly states, "Contractor shall be directly and solely responsible for all costs

of self-employment, including … charges or premiums for F.I.C.A."

186.    MetLife understood from the lack of any inquiries from the IRS about the

payment of the employer share of FICA taxes that Illinois Unjust Enrichment Class Members

had done as MetLife intended by paying self-employment taxes equivalent to the amount

MetLife owed the IRS for the employer share of FICA taxes.

187.    MetLife's retention of the benefit that it induced Illinois Unjust Enrichment Class

Members to confer on it by paying the equivalent of the employer share of FICA taxes violates

fundamental principles of justice, equity, and good conscience.

## VII.  PRAYER FOR RELIEF

WHEREFORE, Ms. McNeely requests that this Court enter a judgment against MetLife

and in favor of Ms. McNeely and the Members and award the following relief:

A.    Conditionally certifying the collective action identified in Section V.A above

pursuant to 29 U.S.C. § 216(b) to litigate  its members' FLSA claims, followed by

sending of Court-approved notice of their right to opt in to all of those members,

and thereafter denying any motion to decertify the collective action that MetLife

may file;

B.    Certifying the classes identified in Sections V.B-E above pursuant to Fed. R. Civ.

P. 23(b)(3) or (c)(4) to litigate the claims identified in Sections VI.B-E above;

C.    Declaring Plaintiff Carol McNeely to be the representatives of the collective
      action identified in Section V.A above and the representative of each of the
      proposed classes identified in Sections V.B-E above;

D.    Declaring Plaintiff's counsel to be the counsel for the collective action and each
      of the proposed classes;

E.    Declaring that the limitations period for the FLSA claim will be three years
      pursuant to 29 U.S.C. § 255 and awarding Ms. McNeely and other Collective
      Action Members the amount of overtime pay that MetLife did not pay to them,
      liquidated damages in an equal amount, attorneys' fees, expenses, and costs;

F.    Ordering an accounting of the employee benefits that ERISA Class Members
      should have but have not received and, after that accounting is completed,
      directing that the benefits or the benefit values that Ms. McNeely and other
      ERISA Class Members should have but have not received be paid or given to the
      ERISA Class Members or credited to accounts to be established for them, along
      with attorneys' fees, expenses, and costs;

G.    If relief is awarded to the ERISA Class under ERISA § 502(a)(1)(B) instead of
      502(a)(3), ordering that MetLife and/or its benefit plans pay or give ERISA Class
      Members the value of the employee benefits that the ERISA Class Members
      should have but have not received or credit such amounts to accounts to be
      established for them, along with attorneys' fees, expenses, and costs;

H.    Awarding Illinois Overtime Class Members the amount of overtime pay that
      MetLife did not pay to them, an amount equal to the total of the amount of unpaid
      overtime each month times .02 times the number of months between when each

50

amount should have been paid and actually was paid, attorneys' fees, expenses, and costs;

I.      Awarding Illinois Monthly Payment Class Members an amount calculated by multiplying each late payment by .02 and totaling the products, along with attorneys' fees, expenses, and costs;

J.      Awarding Illinois Unjust Enrichment Class Members an amount equal to the amount of FICA tax that they have paid that was owed by MetLife as the employer share of FICA taxes;

K.      Awarding pre- and post-judgment interest on any awards;

L.      Granting Ms. McNeely and the members of the class and collective actions such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## VIII.   <u>DEMAND FOR A JURY TRIAL</u>

Ms. McNeely, on behalf of herself and the collective and class actions that she seeks to represent, demands a jury trial on all issues triable as of right by a jury.

Respectfully submitted,

_____

**STACEY GRAY PC**
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 227-9163
Facsimile: (866) 224-6703
sgray@staceygray.com

**MEHRI & SKALET PLLC**

Cyrus Mehri (*pro hac vice to be sought*)
Steven A. Skalet (*pro hac vice to be sought*)
Michael D. Lieder (*pro hac vice to be sought*)
Joanna K. Wasik
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
cmehri@findjustice.com
sskalet@findjustice.com
mlieder@findjustice.com
jwasik@findjustice.com

# Exhibit A

## CONSENT TO JOIN COLLECTIVE ACTION
## UNDER SECTION 216(b) OF THE FAIR LABOR STANDARDS ACT, 29 U.S.C. § 216(b)

By signing and returning this consent form I consent to:

1.      Be a party plaintiff in a lawsuit against Metropolitan Life Insurance Company

("MetLife") in order to seek redress for alleged violations of the Fair Labor Standards Act

("FLSA"), pursuant to 29 U.S.C. § 216(b).  I understand that the lawsuit contains claims in

addition to the FLSA violations, but that if I do not sign and return this form I will not be able to

join in the litigation of the claim that MetLife violated the FLSA by not paying me and others

overtime pay when I worked more than 40 hours in a week; and

2.      Designate Mehri & Skalet, PLLC and Stacey Gray PC to represent me in this case

and to make decisions on my behalf concerning the litigation and in the event of a possible

settlement on a class or collective action basis. I agree to be bound by any adjudication of this

action.

1/30/18
_____
Date

_____
Signature

Carol J. McNeely
_____
Printed Name

Aurora, IL
_____
City and State in which I worked for MetLife

Dentist
_____
Medical or Health Field

# Exhibit B



Metropolitan Life Insurance Company
5950 Airport Road Oriskany, NY 13424

November 30, 2016

Dr. Carol J. McNeely
███████████████████
███████████

Dear Dr. Carol J. McNeely:

This agreement ("Agreement") supersedes any previous communication regarding your relationship with Metropolitan Life Insurance Company ("MetLife"). As a Dental Consultant for MetLife for the period beginning on or about January 1, 2017 and ending on December 31, 2017, Dr. Carol J. McNeely (hereinafter, "You") is subject to the following conditions:

1.      For rendering services as described below, You will be compensated at the rate of $52.00 per hour.

2.      Your duties shall include, but not be limited to, the following:

    a)      Reviewing dental claims and rendering your professional opinion;

    b)      Providing advice and counsel to the Claims Office staff;

    c)      Communicating via telephone with submitting dentists to explain and clarify dental claims; and,

    d)      Training Dental Consultants, as may be required.

3.      MetLife will reimburse You for:

    a)      Reasonable travel expenses incurred by You in your travel away from your place of business as may be required by MetLife; and,

    b)      Other reasonable expenses, including telephone charges, incurred by You in the course and scope of your duties under this Agreement.

4.   This Agreement may be terminated by either You or MetLife (each a "Party" and collectively, the "Parties") upon thirty days prior written notice. This notice of termination shall be deemed given by a Party at the time when mailed in any United States Post Office enclosed in a registered postpaid envelope to the address of the other Party as stated herein, or to such other address as a Party may designate by prior written notice to the other Party.

5.   This Agreement will terminate on December 31, 2017 unless terminated earlier by written notice as provided in Section 4 of this Agreement. It may be considered for renewal, with or without modification, annually thereafter by MetLife.

6.   You understand that, by the nature of your position as a Dental Consultant, You will become familiar with the nature of MetLife's business, its business secrets, and its methods of doing business. You hereby expressly agree that You will not divulge to any other person or entity or make use of yourself, either directly or indirectly, MetLife's business secrets, its special or general methods of doing business, the nature of its business, or any other confidential information which You have now or may later acquire during the term of this Agreement.

7.   While engaged in the activities set forth in this Agreement, You will not accept employment of any character hostile to the interests of MetLife or otherwise engage in activities adverse to the interests of MetLife. It is understood and agreed that for such assignments that You may receive from MetLife, You will devote your best efforts to your duties as set forth in this Agreement.

8.   You agree that all documentation, communications, records, files, and memoranda made or kept by You in any medium in connection with the services rendered under this Agreement shall be the property of MetLife, and will be returned to MetLife upon termination of this Agreement.

9.   Failure to insist upon strict compliance of any of the terms, convenants, or conditions of this Agreement shall not be deemed a waiver of such terms, convenants, or conditions, nor shall the waiver or relinquishment of any right or power under this Agreement at any time be deemed a waiver or relinquishment of such right or power at any other time.

10.   The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision of this Agreement.

security procedures are adequate to protect and maintain the confidentiality of MetLife PHI;

ii) implement administrative, physical, and technical safeguards that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic MetLife PHI You create, receive, maintain, or transmit;

iii) ensure that any person or entity, including an employee, agent, or subcontractor, to whom You provide such electronic MetLife PHI agrees to implement reasonable and appropriate safeguards to protect it; and

iv) promptly report to MetLife any security incident of which You become aware. In this context, the term "security incident" means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in information systems such as hardware, software, information, data, applications, communications, and people.

e) You agree and acknowledge that you are directly subject to HIPAA as amended by the Health Information Technology for Economic and Clinical Health Act ("HITECH Act"), including its provisions relating to security and privacy of PHI as well as its enforcement and penalty provisions. You agree that you will: (a) comply with all applicable security and privacy provisions of HIPAA as amended by the HITECH Act and as it may be amended from time to time; (b) not act in any way to interfere with or hinder MetLife's ability to comply with HIPAA as amended by the HITECH Act and as it may be amended from time to time; and (c) notify MetLife within five (5) business days of discovering a "breach" as that term is defined in Section 13400 of the HITECH Act at the following e-mail address: securitybreach@metlife.com.

f) In the event You learn of a pattern of activity or practice of MetLife that constitutes a material breach or violation of its obligations relating to PHI under this Agreement, You will take reasonable steps to cure the breach or end the violation. If such steps are unsuccessful, You will terminate this Agreement, if feasible, or, if termination is not feasible, report the problem to the Secretary of Health and Human Services.

g) You agree to promptly mitigate any harmful effect of any use or disclosure of MetLife PHI that is made by You in violation of the requirements of this Agreement.

11.  MetLife will indemnify and hold You harmless for any damages directly resulting from your acts or omissions which are consistent with the terms of the MetLife Dental Consultant Manual in effect at the time of the act or omission and which are authorized by MetLife under this Agreement.

12.  In order to protect the confidentiality of any Protected Health Information ("PHI") disclosed to You pursuant to this Agreement and to satisfy the requirements of the Health Insurance Portability and Accountability Act of 1996 and its privacy regulations, including 45 CFR 164.504(e), all as may be amended from time to time ("HIPAA"), and in consideration of the continuing obligations of the Parties pursuant to this Agreement, You hereby agree as follows:

   a)  PHI means individually identifiable information that is transmitted or maintained in any medium  and relates to: the past, present, or future physical or mental health or condition of an individual; the provision of health care to an individual; or, future payment for the provision of health care to the individual.  PHI includes, but is not limited to demographic information, such as names; geographic subdivisions smaller than a state (including but not limited to street addresses and ZIP codes); all elements of dates (except year) for dates directly related to an individual, including but not limited to birth date; telephone numbers; fax numbers; electronic mail (E-mail) addresses; Social Security numbers; Medical record numbers; health plan beneficiary numbers; account numbers; certificate/license numbers; vehicle identifiers and serial numbers, including license plate numbers; device identifiers and serial numbers; web Universal Resource Locators (URLs); Internet Protocol (IP) address numbers; biometric identifiers, including finger and voice prints; full face photographic images and any comparable images; and, any other unique identifying number, characteristic, or code.

   b)  "MetLife PHI" means any PHI received or created by You in providing services pursuant to this Agreement.

   c)  You agree not to use or disclose MetLife PHI except to perform functions, activities, or services for, or on behalf of, MetLife as specified in this Agreement and consistent with applicable law.

   d)  You agree to:

      i)  use appropriate safeguards to prevent the use or disclosure of MetLife PHI other than as provided for by this Agreement, and You represent and warrant that your

h)      You agree that upon termination of this Agreement You will promptly return to MetLife any MetLife PHI in your possession.

i)      You agree that the breach of any provision of this Section 12 shall constitute a material breach of this Agreement and shall provide grounds for immediate termination of this Agreement by MetLife.

j)      You agree to indemnify MetLife for, and hold MetLife harmless from, any liability incurred by MetLife (including reasonable attorney's fees) resulting or arising from your use or disclosure of MetLife PHI other than as permitted by the terms of this Section 12.

13.     This document constitutes the entire Agreement between the Parties and all prior agreements, if any, whether written or oral, are hereby rendered null, void, and of no effect.  The terms of this Agreement may only be waived, changed, modified, or discharged by an agreement in writing signed by the Party against whom enforcement of any waiver, change, modification, or discharge is sought.

If the provisions set forth above are satisfactory to You, signify your acceptance of the terms of this Agreement by dating, signing, and returning the signed original Agreement, and retaining for yourself a copy of the signed Agreement.

Very truly yours,

_Brian T. Fitzgibbons_   November 30, 2016
Brian Fitzgibbons            Date
Manager- MCR Clinical
MetLife

**AGREED AND ACCEPTED**

_Carol J. McNeely_   11/30/16
Consultant's Signature       Date

_____
Dr. Carol J. McNeely

# Exhibit C

Metropolitan Life Insurance Company



5950 Airport Road Oriskany, NY  13424


October 5, 2017

Carol McNeely, DDS

████████████████

Re: INDEPENDENT CONTRACTOR AGREEMENT

Dear Dr. McNeely:

This Independent Contractor Agreement ("Agreement") is entered into effective on the Start Date written below (the "Effective Date") by and among the Metropolitan Life Insurance Company ("MetLife") and the below-named contractor (the "Contractor") (each, a "Party" and collectively, the "Parties") and supersedes any previous communication regarding your relationship with MetLife.  Subject to the terms and conditions of this Agreement, including Section 7 regarding Termination:

        **Contractor Name:  Carol McNeely, DDS**
        **Agreement Start Date: November 1, 2017**
        **Agreement End Date: October 31, 2018**
        **Role of Contractor: Dental Consultant**

MetLife desires to contract with Contractor to utilize Contractor's skill, knowledge, and expertise to provide various Services as defined in this Agreement.  Contractor desires to contract with MetLife, on a non-exclusive basis, to provide such Services.

In consideration of the mutual promises set forth herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, and intending to be legally bound, the Parties expressly agree to the terms and conditions contained in this Agreement.

1.     **Relationship.**  Contractor agrees that Contractor is an independent contractor. Contractor will provide Services as an independent contractor, and on a non-exclusive basis, as defined in Schedule A to this Agreement (which is included herein by reference), or as may be amended by the Parties in writing.  Contractor agrees that the period of Contractor's services to MetLife will be limited solely to the period from the Agreement Start Date to the Agreement End Date noted above (the "Service Period") and that Contractor's contracting relationship with MetLife will end at the conclusion of the Service Period unless terminated sooner under the terms of this Agreement.  Nothing in this Agreement is intended to or creates

any relationship between Contractor and MetLife other than as an independent contractor to provide the Services during the Service Period. Contractor further acknowledges and agrees that nothing in this Agreement is intended to or creates any employment relationship between Contractor and MetLife, and that MetLife is not Contractor's employer.

a)  It is understood and agreed to between the Parties that, in rendering services pursuant to this Agreement, Contractor is and shall act in the capacity of an independent contractor and shall not be subject to the direction, control or supervision of MetLife with respect to the performance of his/her services hereunder. Contractor will have exclusive control over the manner and means by which he/she performs the Services rendered. Contractor will set his/her own schedule, hours, and location for performance of the Services rendered, subject only to the limits identified in this Agreement and only to the extent that such limits are not inconsistent with Contractor's independent contractor status.

b)  Contractor shall not be considered or be deemed in any way to be an employee of MetLife and Contractor has no right or power, express or implied, to do any act or thing that would bind MetLife in any away. Nothing herein shall create nor be deemed to create an employment relationship between Contractor and MetLife.

c)  Contractor will provide the supplies, materials or other items needed to perform the Services pursuant to this Agreement, except as set forth herein or as agreed upon in writing by MetLife.

d)  Subject only to the limit on not engaging in competing endeavors as noted below, Contractor is free to perform services for any other individuals or entities of Contractor's choice during the Service Period, and there is no expectation that services provided to MetLife are exclusive or will continue following the End Date set forth in this Agreement.

2.  **Qualifications.** Contractor warrants and represents that Contractor, at all times during the term of this Agreement:

a)  holds all the necessary licenses and certifications to practice as a dentist, physician, psychologist or chiropractor in a jurisdiction in the United States;

b)  is board certified in Contractor's practice area specialty;

c)  maintains an up-to-date Curriculum Vitae; and

     d)     shall provide documents sufficient to demonstrate compliance with Sections (a) through (c) of this Section 2 upon MetLife's request.

3.    **Compensation.** For rendering the Services Contractor will be compensated at the rate of $46.80 per hour upon submission of an invoice for the Services actually performed.

     a)     Contractor is responsible for any business expenses incurred by him/her during the Service Period, except as set forth herein or agreed upon by the Parties in writing, and is responsible for his/her own profit or loss in connection with the Services rendered under this Agreement.

     b)     MetLife will issue Contractor an IRS Form 1099 for payments made under this Agreement.

     c)     Contractor shall be directly and solely responsible for all costs of self-employment, including federal, state and local income tax payments for Contractor, including charges or premiums for F.I.C.A., workers compensation and general liability insurance, unemployment insurance and other taxes (including penalties and interest), and any other insurance MetLife may require in conjunction with Contractor's services performed under this Agreement.  Contractor agrees to remit to all applicable tax authorities all monies which need to be withheld or otherwise paid. Contractor agrees to indemnify and hold MetLife harmless with respect to any and all such taxes, penalties, premiums, or other liabilities or obligations that may arise relating to services provided by him/her or payments made to him/her pursuant to this Agreement.  Contractor also shall be directly responsible for submitting all tax returns and reports required by any governmental body.

4.    **Statement of Work.**  Contractor agrees to provide the Services as defined in the attached Schedule A.

5.    **Timing.**  The Parties further agree that the timetables for any and all deliverables will be mutually agreed to by the Parties and will end no later than the Agreement End Date.  Contractor acknowledges that, during the Service Period, Contractor may only be providing Services on a periodic or occasional basis (for example, for an 8 or 9 week block during the Service Period).   Contractor acknowledges and agrees that MetLife does not guarantee that Contractor will be engaged to provide any Services during the Service Period.

6.    **Time Between Projects is Not Work Time for Any Purposes.**  Any time during the Service Period during which Contractor does not perform Services pursuant to this Agreement shall not be considered work time or hours of work for any

purposes.  Contractor acknowledges that during such period(s) in which he/she is not providing any Services Contractor is also not on call, is not working or providing any services to MetLife, and is not entitled to any compensation or benefits of any kind.

7.   **Termination.**

a)      This Agreement may be terminated by either Contractor or MetLife upon thirty days prior written notice.

b)      This Agreement will terminate on October 31, 2018 unless terminated earlier by written notice as provided in this Section 8(a) of this Agreement Thereafter, the Agreement will renew automatically for one (1) year unless MetLife delivers to Contractor notice of its intent not to renew prior to expiration of the term.

c)      MetLife may terminate this Agreement immediately without prior written notice if Contractor: (1) breaches any provision of this Agreement; or (2) engages in conduct, which in the judgment of MetLife, is injurious to MetLife.

8.   **Confidential Information and Trade Secrets.**

a)      Contractor understands that, by the nature of the position as a Dental Consultant, Contractor will become familiar with the nature and/or content of MetLife's trade secrets, proprietary data or other confidential information concerning MetLife's business or operations, which information became known or available to Contractor during the term of this Agreement ("Confidential Information"). Contractor hereby expressly agrees that Contractor will not divulge to any other person or entity or make use of, either directly or indirectly, MetLife's business secrets, its special or general methods of doing business, the nature of its business, or any other Confidential Information which Contractor has now or may later acquire during the term of this Agreement.  Upon the termination of this Agreement, Contractor shall promptly return all Confidential Information to MetLife, whether in written or electronic form, and Contractor shall not retain any copies, extracts, or other reproductions thereof, in whole or in part, of such Confidential Information in any form whatsoever.

b)      Contractor recognizes that MetLife may suffer irreparable harm as the result of the unauthorized disclosure, reproduction or use of any Confidential Information and that monetary damages will be inadequate to compensate MetLife for such breach.  Therefore, Contractor agrees that in the event of any failure to comply with the provisions of this Section, MetLife shall be entitled to a preliminary injunction, and an order of

seizure and impoundment under Section 503 of the Copyright Act upon an ex-parte application by MetLife to protect and recover the Confidential Information, and that Contractor shall not object to the entry of an injunction or other equitable relief against Contractor on the basis of an adequate remedy at law being available.

9.     **Other Employment.**  While providing the Services  Contractor will not accept employment or enter into any other relationship of any character which is in conflict with, is directly competitive with or which is hostile to the interests of MetLife or otherwise engage in activities adverse to the interests of MetLife.

10.    **Proprietary Rights and Ownership of Records.**  Contractor agrees that all materials in any format ("Material") which shall include documentation, communications, records, files, and memoranda made or kept or prepared by Contractor in any medium in connection with the Services rendered under this Agreement, whether completed or in the process of creation, shall be deemed to be work made for hire and made in the course of the Services rendered hereunder and shall belong exclusively to MetLife, and all Material will be returned to MetLife upon termination of this Agreement.  If any of the Material does not qualify for treatment as works made for hire or if Contractor retains any interest in any of the Material for any other reason, including but not limited to any rights of attribution or other moral rights, Contractor agrees to grant, assign and transfer and hereby grants, assigns and transfers to MetLife exclusive ownership of all right, title, and interest, including all United States and international copyrights and all other intellectual property rights in the Material, and all of the rights of use, attribution, registration, renewal or moral rights with respect thereof, free and clear of any and all claims for royalties or other compensation.  Contractor will promptly execute, acknowledge and deliver all applications, oaths, declarations and further documents, and will provide such additional assistance as MetLife or its counsel may deem necessary or desirable to evidence MetLife's sole and exclusive title to such Material.

11.    **Indemnification and Cooperation.**
       a)     MetLife agrees to indemnify and hold Contractor harmless for acts or omissions by reason of Contractor's performance of Services for MetLife against expenses actually and reasonably incurred by Contractor if Contractor acted consistent with the terms of the MetLife Dental Consultant Guidelines and within the scope of the Services as defined in Schedule A.

       b)     Contractor agrees to indemnify and hold MetLife harmless for acts or omissions by reason of Contractor's performance of Services for MetLife against expenses actually and reasonably incurred by MetLife from any and all losses and expenses sustained by MetLife as a result of: (1) any intentionally wrongful, fraudulent, reckless, negligent act or omission, or

any unauthorized conduct by the Contractor; and (2) the unauthorized use or disclosure by the information in accordance with this Agreement, including Sections 9 and 13 of this Agreement.  Notwithstanding the foregoing, MetLife shall have no right to indemnification from Contractor for any losses and expenses sustained by MetLife that are caused by the wrongful act of MetLife.

c)      During the term of this Agreement and at any time thereafter, Contractor shall, at reasonable times and with due regard for Contractor's other obligations, cooperate with MetLife in any internal investigation, any administrative, regulatory or judicial proceeding or any dispute with a third party as reasonably requested by MetLife, including being available upon reasonable notice for interviews and factual investigations, appearing at MetLife's request to give testimony without requiring the service of a subpoena or other legal process, volunteering to MetLife all pertinent information and turning over to MetLife all relevant documents which are or may come into Contractor's possession, at all times.  If MetLife requires Contractor's cooperation in accordance with this Section, MetLife shall reimburse Contractor for reasonable travel expenses, including lodging and meals, upon submission of receipts.

12.     **Protected Health Information.**  Contractor agrees to execute and comply with the HIPAA Business Associate Agreement attached as Schedule B.

13.     **Publicity.**  Nothing contained in this Agreement shall be construed as conferring any right to use, or to refer to in any advertising, publicity, promotion, marketing or other activities, any name, trade name, trade or service mark, or any other designation of MetLife or any of its affiliated entities, including, but not limited to, any contraction, abbreviation or simulation thereof.  Contractor agrees not to disclose to any third party that it has performed or contracted to perform Services hereunder for MetLife, or the terms or conditions of this Agreement, without the prior express written consent of MetLife.  Contractor may disclose that it has performed Services for MetLife on a Curriculum Vitae, or in connection with any interview or application for a job opportunity without MetLife's written consent.

14.     **Notices.**  Except as otherwise provided, any notice or correspondence required or permitted under the terms of this Agreement or required by law must be in writing and must be (a) delivered in person, (b) sent by first-class registered mail or air mail, as appropriate, (c) sent by overnight air courier, or (d) sent via email with delivery confirmation, in each case properly posted and fully prepaid, to the appropriate address stated below for Contractor and above for MetLife.  Either party may change its address for notice by providing notice to the other party given in accordance with this paragraph.  Notices will be considered to have been given at the time of actual delivery in person, five (5) business days after deposit in the mail as set forth above, or one (1) business day after delivery to an

overnight air courier service or sending via email.

15. **Limitation of Remedies.**  Except to the extent required by law or as otherwise provided in this  Agreement, Contractor agrees that MetLife shall not be liable for any lost profits, lost savings or other special, indirect or consequential damages suffered by Contractor, even if MetLife has been advised of or could have foreseen the possibility of such damages.  The aggregate liability of MetLife under this Agreement for damages resulting from MetLife's actions shall not exceed the total fees owed by MetLife to the Contractor for services provided hereunder.

16. **Miscellaneous.**

   a) **Assignment.**  Contractor may not assign, sell or transfer this Agreement, Contractor's obligations under this Agreement or any interest under this Agreement without the prior written consent of MetLife.  MetLife may assign all or any part of its right, title and interest in this Agreement in its sole discretion.

   b) **Waiver.**  Failure to insist upon strict compliance with any of the terms, covenants, or conditions of this Agreement shall not be deemed a waiver of such terms, covenants, or conditions or any others, nor shall the waiver or relinquishment of any right or power under this Agreement at any time be deemed a waiver or relinquishment of such right or power or any others at any other time.

   c) **Severability.**  The invalidity or unenforceability of any provision of this Agreement shall in no way affect the validity or enforceability of any other provision of this Agreement.

   d) **Applicable Law and Forum.**  This Agreement shall be governed by and construed, and the legal relations between the parties shall be determined in accordance with, the laws of the State of New York, without giving effect to the principles of conflicts of laws.  No suit or action arising under or with respect to this Agreement shall be brought unless instituted and maintained in any state or federal court of competent jurisdiction in New York County, State of New York.

   e) **Survival.**  Contractor's representations, warranties and obligations set forth in Sections 8, 10, 12, 13, and 15 (d) shall survive the termination of this Agreement and continue in full force and effect.

   f) **Entire Agreement and Amendments.** This document constitutes the entire Agreement between the Parties and all prior agreements, if any, whether written or oral, are hereby rendered null, void, and of no effect. The terms of this Agreement may only be waived, changed, modified, or discharged by an agreement in writing signed by the Party against whom

enforcement of any waiver, change, modification, or discharge is sought. Provided that the amendment is not inconsistent with Contractor's independent contractor status, this Agreement may also be amended by MetLife mailing to Contractor  a written notice of amendment, signed by an authorized representative of MetLife and specifically referring to this Section 16(f) .  Any amendment pursuant to this paragraph shall take effect fifteen (15) days after the date of the mailing of the notice of amendment.

g)   **Headings.**  The headings in each Section of the Agreement are for convenience of reference only and shall be of no legal effect in the interpretation of the Agreement.

If the provisions set forth above are satisfactory to the Contractor, signify acceptance of the terms of this Agreement by dating, signing, and returning the signed original Agreement, and retaining a copy of the signed Agreement.

Very truly yours,

_____10/5/2017_____
Michael Sirni                                                    Date
Assistant Vice President
MetLife

**AGREED AND ACCEPTED**

_____
Contractor's  Signature                          Date

Carol McNeely, DDS

**Schedule A: Services and Statement of Work.**

1.      In the role of Dental Consultant, Contractor agrees to provide the following
        services (collectively, the "Services") to MetLife:

      a)      Providing the clinical review of dental claims utilizing, but not limited to,
        all submitted clinical documentation and correspondence while rendering
        your professional opinion for consideration when MetLife makes a benefit
        recommendation;

      b)      Providing clinical and processing advice and counsel to the Claims Office
        staff for MetLife clinical policies, utilization management claim reviews,
        claim appeals, claim and quality of care grievances, and insurance
        department claim complaints;

      c)      Communicating via telephone with claim submitting treating dentists and
        dental offices to explain and clarify MetLife dental claims benefit
        recommendations;

      d)      Assisting MetLife's Claims Office Staff and Special Investigation Unit
        with potential fraudulent dental claim submissions and fraud
        investigations, including abuse and overutilization; and

      e)      Training Dental Consultants, as may be required, assisting the Chief
        Dental officer with establishing MetLife's clinical policies including
        identification of current dental standards of care parameters utilized in
        dental necessity benefit recommendations for all MetLife utilization claim
        management programs.

2.      In seeking an opinion from Contractor, it is not MetLife's request or intent that
        Contractor "practice medicine," suggest treatment to a claimant's own
        physician(s) or directly influence patient care in performing the Services for
        MetLife.  MetLife and Contractor acknowledge that no physician-patient
        relationship is created with any claimant as a result of the provision of the
        Services.  Contractor will not present or offer any information or advice to a

claimant's health care provider, or a claimant, with the intention that it will impact or affect a claimant's treatment.

3.      Contractor acknowledges that he/she is available to render the Services in accordance with this Schedule and the Agreement.  MetLife will determine in its sole discretion how many cases, if any, to refer to Contractor.  Contractor will determine, in Contractor's discretion, how many cases upon which to provide Services.

4.      Contractor will provide MetLife with the specific Services set forth in this Schedule, and as may be amended by the Parties in writing.  The Parties acknowledge and agree that Contractor's services will be limited to those Services. If Contractor and MetLife agree that Contractor will provide additional Services during the Service Period other than as defined in this this Schedule, the Schedule shall be amended in writing to reflect such additional Services and the terms of the Agreement shall apply to any Services provided.



**HIPAA BUSINESS ASSOCIATE AGREEMENT**

This Business Associate Agreement ("BAA") sets forth the agreement between the Metropolitan Life Insurance Company ("**MetLife**") and Insert BA Name ("**Business Associate**") (collectively, the "**Parties**").  Terms appearing with initial upper case letters have the respective meanings assigned to them in this introductory paragraph or in **Section 1** of this BAA, as applicable.

Background

The administrative simplification provisions of the Health Insurance Portability and Accountability Act of 1996 ("**HIPAA**"), and related regulations, require that contracts between covered entities and entities known as business associates comply with enumerated standards and requirements.

The purpose of this BAA is to satisfy the HIPAA standards and requirements. The Parties acknowledge and agree that in providing Services to or on behalf of the Covered Entity, Business Associate will create, receive, use, or disclose Protected Health Information.  The Parties intend to enter into this BAA to address the requirements of HIPAA, HITECH, the Privacy Rule, and the Security Rule as they apply to "business associates," including the establishment of permitted and required uses and disclosures (and appropriate limitations and conditions on such uses and disclosures) of Protected Health Information by Business Associate that is created or received in performing Services on behalf of Covered Entity.

Now therefore, in consideration of the mutual promises below, MetLife and Insert BA Name agree to the following:

**1.      Definitions**

**1.01**    **General Definitions**.  All terms appearing in this BAA with initial upper case letters that are not otherwise defined in this BAA will have the same meaning as that provided for the respective terms in 45 C.F.R. §§ 160.103, 164.103, and 164.501.

**1.02**    **Business Associate** means Insert BA Name.

**1.03**    **Covered Entity** means MetLife.

**1.04**    **Data Aggregation** means, with respect to Protected Health Information the Business Associate creates or receives in its capacity as the Covered Entity's Business Associate, the combining of Protected Health Information by the Business Associate with the Protected Health Information it receives in its capacity as business associate of another covered entity, to permit data analyses that relate to the health care operations of the respective entities.

**1.05**    **Designated Record Set** means a group of records maintained by or for the Covered Entity within the meaning of 45 C.F.R. § 164.501 that consists of: (i) the enrollment, payment, claims adjudication, and case or medical management record systems maintained by or for a health plan; or (ii) records that are used, in whole or in part, by or for the Covered Entity to make decisions about individuals. For purposes of this section, the term "record" means any item, collection, or grouping of information that includes Protected Health Information and is maintained, collected, used, or disseminated by or for the Covered Entity.

**1.06**    **HIPAA** means the Health Insurance Portability and Accountability Act of 1996, Pub. L. 104-191.

**1.07**    **HITECH** means the Health Information Technology for Economic and Clinical Health Act, Pub. L. 111-5.

**1.08**    **Individual** has the same meaning as the term "individual" in 45 C.F.R. § 160.103, and includes a person who qualifies as a personal representative in accordance with 45 C.F.R. § 164.502(g).

**1.09**    **Privacy Rule** means the Standards for Privacy of Individually Identifiable Health Information at 45 C.F.R. Part 160 and Part 164, Subparts A and E.

**1.10**    **Protected Health Information** means individually identifiable health information that is transmitted by electronic media (within the meaning of 45 C.F.R. § 160.103, maintained in electronic media, or maintained or transmitted in any form or medium  including, without limitation, all information (including demographic, medical, and financial information), data, documentation, and materials that are created or received by Business Associate from or on behalf of the Covered Entity in connection with the performance of Services, and related to:

    a.   The past, present, or future physical or mental health or condition of an individual;

    b.   The provision of health care to an individual; or

    c.   The past, present, or future payment for the provision of health care to an individual.

**1.11**    **Required By Law** means the same as the term "required by law" in 45 C.F.R. § 164.103.

**1.12**    **Secretary** means the Secretary of the United States Department of Health and Human Services ("**HHS**") or his designee.

**1.13**    **Security Breach** or **Breach** means the acquisition, access, use, or disclosure of Protected Health Information inconsistent with those outlined in HIPAA which compromises the security or privacy of Protected Health Information, unless that acquisition, access, use, or disclosure is otherwise excluded under 45 C.F.R. § 164.402.  For this purpose, Protected Health Information is "compromised" to the extent that the action poses a significant risk of financial, reputational, or other harm to the individual.

**1.14**    **Security Incident** means the attempted or successful unauthorized access, use, disclosure, modification, or destruction of information or interference with system operations in an information system as defined in 45 C.F.R. § 164.304.

**1.15**    **Security Rule** means the Security Standards at 45 C.F.R. Part 160, Part 162, and Part 164.

**1.16**    **Services** means the functions, activities, or services Business Associate will provide to the Covered Entity under the terms of this BAA.

## 2.  Business Associate's Obligations and Activities

**2.01**    **Non-disclosure of Protected Health Information**.  Business associate agrees not to use or disclose Protected Health Information other than as permitted or required by this BAA or as Required By Law.

**2.02**    **Safeguards.**  Business Associate agrees to use appropriate safeguards to prevent use or disclosure of Protected Health Information other than as provided for by this BAA, the Privacy Rule or the Security Rule.  Business Associate agrees to implement administrative, physical, and technical safeguards, along with policies and procedures that reasonably and appropriately protect the confidentiality, integrity, and availability of the electronic Protected Health Information that it creates, receives, maintains, or transmits on behalf of Covered Entity ("Covered Entity's Protected Health Information").

**2.03** **Mitigation**.  Business Associate agrees to mitigate, to the extent practicable, any harmful effects known to Business Associate about the use or disclosure of Protected Health Information by Business Associate in violation of the requirements of this BAA.

**2.04** **Reporting of Violations**.  Subject to Section 2.05, Business Associate agrees to report to the Covered Entity any use or disclosure of Protected Health Information not provided for by this BAA within 30 days of disclosure or Business Associate's knowledge of disclosure.  Business Associate agrees to report to the Covered Entity any Security Incident of which Business Associate becomes aware.

**2.05** **Breach of Protected Health Information**.  Following discovery of a Breach of Protected Health Information, the Business Associate is required to identify the individual(s) whose Protected Health Information has been acquired, accessed, used, or disclosed and to notify the Covered Entity without unreasonable delay, but no later than 5 days after discovery of the Breach.  For purposes of this Section, a Breach is treated as discovered as of the first day on which such Breach is known to the Business Associate, or, by exercising reasonable diligence would have been known to the Business Associate consistent with 45 C.F.R. § 164.404. Upon discovering the Breach, the Business Associate is required to:
   a.  Identify the entity to which the information was impermissibly disclosed;
   b.  Determine, to the best of its knowledge based on the information of which it becomes aware during its investigation, whether or not the entity is subject to HIPAA and the Privacy Rule;
   c.  Identify the type and amount of Protected Health Information disclosed;
   d.  Determine whether the disclosure poses a significant risk of financial, reputational, or other harm to the individual; and
   e.  If the improperly disclosed Protected Health Information is returned, determine if the information was returned before being accessed for an improper purpose.

**2.06** **Notice of a Breach of Protected Health Information.**  In the event of a Security Breach, the Business Associate, with prior written approval of the Covered Entity, will notify the affected individuals without unreasonable delay, but no later than 60 days after discovery of the Security Breach ("Notice Date").  The notice will include:
   a.  a brief description of the incident;
   b.  date the Security Breach occurred, if known or should have been known;
   c.  date the Security Breach was discovered;
   d.  type of Protected Health Information involved;
   e.  steps individual should take to protect him/ herself from potential harm resulting from the Security Breach;
   f.  brief description of steps Covered Entity has taken to investigate, mitigate losses, and protect against further Security Breaches; and

g. contact information for individuals to ask questions, including a toll-free number, e-mail address, website, or postal address.

To the extent that the Security Breach involves more than 500 residents of a single state or jurisdiction, Business Associate must provide Covered Entity, no later than the Notice Date, the information necessary for Covered Entity to prepare a notice to media outlets as set forth in 45 C.F.R. § 164.406. To the extent that the Security Breach involves more than 500 individuals, Business Associate must provide Covered Entity, no later than the Notice Date, the information necessary for Covered Entity to prepare a notice to the Secretary as set forth in 45 C.F.R. § 164.408. To the extent that the Security Breach involves more than 500 individuals, Business Associate must maintain a log of those Security Breaches ("Security Breach log") and provide that log to the Covered Entity for submission to HHS. The Security Breach log will be provided to Covered Entity annually, not later than 60 days after the end of the calendar year.

**2.07.** **Audits.** Business Associate will allow Covered Entity to audit Business Associate's compliance with the Privacy Rule, Security Rule, and this BAA upon reasonable prior notice and in a reasonable manner. Covered Entity will reimburse Business Associate for its costs in cooperating with Covered Entity's audits.

**2.08.** **Agents and Contractors.** Business Associate agrees to ensure that any Business Associate agent, including subcontractors, to whom it provides Covered Entity's Protected Health Information agrees to substantially similar terms and conditions as those included in this BAA. Business Associate will also ensure that its agents or subcontractors to whom it provides Covered Entity's Protected Health Information agree to implement reasonable and appropriate safeguards to protect electronic Protected Health Information. Business Associate agrees that it is not the agent of the Covered Entity.

**2.09.** **Sanctions.** Business Associate agrees to apply appropriate sanctions against any of its employees or agents with access to the Covered Entity's Protected Health Information who fails to comply with the Covered Entity's privacy policies and procedures.

**2.10.** **Amendment of Protected Health Information.** Business Associate agrees to make appropriate amendments to Protected Health Information in a Designated Record Set that either Covered Entity or an Individual requests pursuant to procedures established under 45 C.F.R. § 164.526. To the extent Business Associate receives a request by an Individual to amend his or her Protected Health Information, Business Associate will communicate its approval or denial by following mutually agreed upon procedures.

**2.11. Disclosure of Internal Practices, Books, and Records.** Business Associate agrees to make internal practices, books, and records (including policies and procedures) about the use and disclosure of Covered Entity's Protected Health Information available to the Covered Entity or, at the Covered Entity's request, to the Secretary, in a time and manner mutually agreed to or designated by the Secretary, to determine the Covered Entity's compliance with the Privacy Rule.

**2.12. Access to Protected Health Information.** Business Associate agrees to respond to Covered Entity's or an Individual's request to inspect or get a copy of Protected Health Information (as provided for in 45 C.F.R. § 164.524) in its possession or in a Designated Record Set within 30 days of receipt as long as complying with that request would not violate HIPAA or the Privacy Rule.

**2.13. Documentation of Disclosures.** Business Associate agrees to document disclosures of Protected Health Information and Information about disclosures as would be required for a Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information consistent with 45 C.F.R. § 164.528. At a minimum, this documentation will include:
a.  Date of each disclosure;
b.  Name of the entity or person who received Protected Health Information and, if known, the address of the entity or person;
c.  Brief description of the Protected Health Information disclosed;
d.  Subject to section 2.14, the disclosures of Protected Health Information that occurred during the six-year period prior to the date of the request for an accounting, if any (or any shorter period of time requested by the individual), and that are otherwise subject to the accounting requirement in 45 C.F.R. § 164.528; and
e.  Brief statement explaining to the Individual why the disclosure was made or, if applicable, instead of this statement, a copy of the Individual's authorization, and a copy of the written disclosure request.

**2.14. Accounting for Disclosures.** Business Associate agrees to provide Covered Entity or an Individual information collected in accordance with section 2.13 in a time and manner mutually determined so as to enable Covered Entity to respond to a request by an Individual for an accounting of disclosures of Protected Health Information consistent with 45 C.F.R. § 164.528. To the extent that the Covered Entity uses or maintains an electronic health record concerning Protected Health Information, Business Associate will provide that accounting to the Individual (or, upon Covered Entity's request, to the Covered Entity for delivery to the Individual) of the disclosures required for the three-year period immediately preceding the date on which the accounting is required. The accounting of disclosures through electronic health records will not be required earlier than the earliest applicable date established by the Secretary.

2.15. **Facilitate the Exercise of Privacy Rights.**   Business Associate agrees to establish procedures that allow individuals to exercise their rights under the Privacy Rule, including the right to:

a. Inspect and obtain copies of records and documents within the possession or control of the Business Associate that contain the Individual's Protected Health Information;

b. Request amendments to their Protected Health Information;

c. Receive an accounting of disclosures Business Associate made of their Protected Health Information

d. Request restrictions on the use or disclosure of Protected Health Information; and

e. Receive communications regarding Protected Health Information at alternative locations or by alternative means.

Business Associate agrees to follow an Individual's request to restrict the disclosure of their Protected Health Information, to the extent that those restrictions relate to disclosure to the Covered Entity for carrying out payment or health care operations (but not treatment), and the Protected Health Information is only about a health care item or service for which a health care provider was paid solely from the Individual's own funds.

2.16. **No Waiver of Rights**.  Business Associate agrees to not require Individuals to waive their health information privacy rights as a condition for treatment, payment, or enrollment in the Covered Entity, or eligibility for health benefits.

2.17. **Responses to Subpoenas.**  If Business Associate receives a subpoena, discovery request or other lawful process, with or without an order from a court or administrative tribunal, arising out of or in connection with the Covered Entity or this BAA, including any use or disclosure of Protected Health Information or any failure in Business Associate's health data security measures, Business Associate agrees to fully comply with the notice and protective action obligations set forth in 45 C.F.R. § 164.512(e) in accordance with Business Associate's standard policies and procedures regarding subpoenas, discovery requests, and other lawful process which will be communicated to the Covered Entity upon request.

2.18. **Electronic Transactions.**   To the extent required by HIPAA (including the Standards for Electronic Transactions at 45 C.F.R. Parts 160 and 162), Business Associate agrees to use or conduct, in whole or in part, standard transactions and use code sets or identifiers under the Privacy Rule for or on behalf of Covered Entity as detailed under the Privacy Rule or HIPAA.  Business Associate will also require any subcontractor or agent to comply with these electronic transaction requirements under HIPAA.

2.19. **Security Standards.**  Business Associate acknowledges that it may need to issue and change procedures from time to time to improve electronic data  and file

security, and agrees that those measures will be at least as stringent as may be required by the Privacy Rule or the Security Rule, as applicable.

**2.20.** **Disclosures to Designated Plan Sponsor Representatives.**  MetLife will identify for Business Associate certain MetLife employees authorized to discuss Protected Health Information with Business Associate in connection with an Individual's claim for benefits from the Covered Entity.  If one of these MetLife employees contacts Business Associate to ask about an Individual's claim for benefits, Business Associate will treat that inquiry as concerning "treatment, payment, or healthcare operations" within the meaning of the Privacy Rule, and provide the information permitted under the Privacy Rule.

**2.21.** **Notice of Privacy Practices.**  Covered Entity will prepare and distribute a notice of privacy practices as required by the Privacy Rule.  If Business Associate maintains a website on behalf of Covered Entity that provides information about the Covered Entity's participant services or benefits, Business Associate will make the notice of privacy practices available electronically through the website, and will make certain that the notice of privacy practices is prominently posted on the website.

**3.**      **Business Associate's Permitted Uses and Disclosures**

**3.01.** **General Uses and Disclosures.**  Business Associate agrees to create, receive, use, or disclose Protected Health Information only in a manner that is consistent with this BAA, the Privacy Rule, and the Security Rule, and only in connection with providing services to the Covered Entity.   Covered Entity agrees to limit its Protected Health Information disclosures to the minimum necessary to accomplish the Services.

**3.02.** **Use and Disclosure for Treatment, Payment, and Health Care Operations.**  In providing Services, Business Associate may use and disclose Protected Health Information for "treatment, payment, and health care operations" in accordance with the Privacy Rule, including using or disclosing Protected Health Information to:
   a.  Investigate, pay, audit, and otherwise administer and facilitate the payment of health plan claims;
   b.  Enroll or disenroll participants and beneficiaries in or confirm or deny participant and beneficiary eligibility for participation in the Covered Entity; and
   c.  Coordinate the payment of benefits from the Covered Entity when a participant or beneficiary is enrolled in another health plan which provides similar benefits.

**3.03. Use and Disclosure for Public Health, Health Oversight, and Law Enforcement Purposes.**  In providing Services, Business Associate may use and disclose Protected Health Information in accordance with the Privacy Rule to:

    a. Provide needed information to government agencies engaged in public health, health oversight, or law enforcement, and as otherwise Required by Law; and

    b. Report violations of law to appropriate Federal and State authorities, consistent with 45 C.F.R. § 164.502(j)(1).

**3.04. Use for Management and Administration of Business Associate.**  Business Associate may use Protected Health Information to carry out its legal responsibilities and for its proper management and administration.  This use will conform to the uses and disclosures allowed by the Privacy Rule.

**3.05. Disclosure for Management and Administration of Business Associate.**  Business Associate may disclose Protected Health Information for its proper management and administration as long as the disclosure is permitted by law.  Business Associate may also disclose Protected Health Information with (1) Covered Entity's prior written approval; and (2) reasonable assurances from the person to whom the information is to be disclosed that the:

    a. Information will remain confidential;

    b. Information will be used or further disclosed only as Required by Law or for the purpose for which it was disclosed to the person; and

    c. Person will notify the Business Associate if the confidentiality of the information is breached.

**3.06. Use of Data Aggregation Services.**  Business Associate may use Protected Health Information to provide Data Aggregation services about the Covered Entity's health care operations as permitted by 45 C.F.R. § 164.504(e)(2)(i)(B).

**3.07. Prohibition on Sale of Electronic Health Records or Protected Health Information.**  Business Associate agrees not to directly or indirectly receive remuneration in exchange for any Protected Health Information of any Individual, unless Business Associate receives a valid authorization (within the meaning of 45 C.F.R. § 164.508) that specifically allows for Protected Health Information to be further exchanged for remuneration from the entity receiving the Protected Health Information of that Individual.

**4.      Obligations of the Covered Entity**

**4.01     Obligations to Notify Business Associate**.

    a. **Limitations in Notice of Privacy Practices.**  Covered Entity agrees to notify Business Associate of any limitations in the Covered Entity's notice of privacy practices (provided in accordance with the requirements of 45 C.F.R. §

164.520) insofar as those limitations may affect Business Associate's use or disclosure of Protected Health Information.

b.  **Changes in Permission by Individual for Use of Disclosure.**  Covered Entity will notify Business Associate of any changes in or revocation of permission by an Individual to use or disclose Protected Health Information if and to the extent that those changes affect Business Associate's use or disclosure of Protected Health Information.

c.  **Agreements to Restrict Use or Disclosure.**  Covered Entity will notify Business Associate of any restrictions on the use or disclosure of Protected Health Information or any request for confidential communication that the Covered Entity has agreed to consistent with the requirements of 45 C.F.R. § 164.522.  The Covered Entity may also direct Individuals to make similar requests directly to the Business Associate to make the decision whether and to what extent that restriction or request may affect Business Associate's use or disclosure of Protected Health Information.

4.02  **Permissible Requests by Covered Entity.**  Covered Entity will not request Business Associate to use or disclose Protected Health Information in a manner inconsistent with the Privacy Rule or Security Rule.

5.  **Term and Termination**

This BAA will terminate only when all of the Protected Health Information provided by the Covered Entity to the Business Associate or created or received by Business Associate on behalf of the Covered Entity is destroyed or returned to the Covered Entity.  If it is infeasible to return or destroy Protected Health Information, appropriate protections will be extended to that information indefinitely.

6.  **Miscellaneous**

6.01  **Amendments.**  The Parties agree to take the necessary action to amend this BAA from time to time to allow the Covered Entity to comply with changes to the requirements of the Privacy Rule, Security Rule, and HIPAA.

6.02  **Interpretation**.  Any ambiguity in this BAA will be resolved in favor of a meaning that permits the Covered Entity to comply with the Privacy Rule or the Security Rule, as applicable.

6.03  **Inconsistency**.  A court or regulatory agency with authority over the Parties will resolve any inconsistencies between the provisions of this BAA and the Privacy Rule or Security Rule, as may be amended from time to time, in favor of the Privacy Rule or Security Rule.  The provisions of this BAA will control, however,

for any provisions in this BAA that are not the same as, but are nonetheless permitted by, the Privacy Rule or Security Rule.

6.04    **Amendment of Plan Documents**.  Plan Administrator represents that the Plan Sponsor has amended the Plan documents and signed a certification for the Plan in accordance with the Privacy Rule requirements at 45 C.F.R. § 164.504(f) relating to disclosure of Protected Health Information to the Plan Sponsor for certain Plan administration functions, and that Plan Sponsor will only use and disclose Protected Health Information with those Plan document provisions.

IN WITNESS WHEREOF, this BAA is executed by the parties, acting through their duly authorized representatives, as of the dates set forth, below.

For: Metropolitan Life Insurance Company   For: Carol McNeely, DDS


By: _____   By: _____

Name: Michael Sirni_____   Name: _____

Title: Assistant Vice President   Title: _____

Date: 10/5/2017_____   Date:_____