**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| CAROL McNEELY,  SCOTT D. VLK, SHILPA VLK, GEORGE K. BERNHARD, and DEBORAH JOYCE | ) ) ) | |
| | ) | |
| On behalf of themselves and all others similarly situated, | ) ) | Civil No. 1:18-cv-00885-PAC |
| | ) | |
| and | ) | |
| | ) | |
| DAVID T. RUDZIEWICZ, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | CLASS ACTION |
| | ) | |
| METROPOLITAN LIFE INSURANCE COMPANY, METROPOLITAN LIFE RETIREMENT PLAN FOR UNITED STATES EMPLOYEES, SAVINGS AND INVESTMENT PLAN FOR EMPLOYEES OF METROPOLITAN LIFE AND PARTICIPATING AFFILIATES, METLIFE OPTIONS & CHOICES PLAN, and WELFARE BENEFITS PLAN FOR EMPLOYEES OF METROPOLITAN LIFE AND PARTICIPATING AFFILIATES, | ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |

## I.  INTRODUCTION

1.      Beginning some time before 2002, Metropolitan Life Insurance Company ("MetLife") hired licensed dentists and dental hygienists to act as consultants evaluating claims for benefits submitted by policyholders, participants, and beneficiaries in employee benefit plans ("Dental Consultants").  MetLife compensated these Dental Consultants as independent contractors even though, until November 2017, it determined and controlled all aspects of the

performance of their duties to an extent that made them employees, not independent contractors. MetLife also engaged other health professionals, including upon information and belief, physicians, chiropractors, psychologists, and nurses, to evaluate claims for benefits.  Upon information and belief, MetLife paid these health professionals as independent contractors but, until November 2017, exerted levels of control over the performance of their duties that were similar to the controls placed on Dental Consultants.  In this Amended Complaint, the term "Health Consultants" shall refer to Dental Consultants and other health professionals, if any, hired by MetLife to evaluate the claims of policyholders, participants and beneficiaries whom MetLife compensated for their work as independent contractors rather than as employees.

2.      All of the claims in this case arise out of MetLife's decision to misclassify and compensate Dental Consultants and, upon information and belief, other Health Consultants as independent contractors rather than employees.  This misclassification continued through October 31, 2017, when MetLife rewrote its contracts with Health Consultants and changed some of its practices in a manner more consistent with Health Consultants being independent contractors.

3.      Until November 2017, MetLife's form written agreements for Dental Consultants did not specify whether they were employees or independent contractors, but the terms and conditions were consistent with employee rather than independent contractor status.  These agreements gave MetLife the right to exercise control over Dental Consultants' means, sequence and methods of performing work.  At least until November 2017, MetLife also exercised control over the work of the Dental Consultants as if they were employees.  Among other actions, MetLife dictated Dental Consultants' maximum hours of work, required them to work at MetLife's offices, and required them to record their hours of work on forms issued by MetLife.

2

MetLife required them to use computer hardware and software that it provided to them and was owned by MetLife. The company serviced and updated that hardware and software free of charge to the Dental Consultants. The company also provided Dental Consultants the files that they reviewed, imposed detailed, comprehensive guidelines about how to perform that work, trained them, supervised their work through its managers, created standards by which to assess the quality and quantity of their performance, and assessed their performance under those standards. For these and other reasons set out below, Class Representatives Carol McNeely, Scott Vlk, Shilpa Vlk, George Bernhard, and Deborah Joyce, and Opt-In Plaintiff David Rudziewicz, other Dental Consultants, and (upon information and belief) the other Health Consultants were employees of MetLife, not independent contractors until November 2017.

4.      MetLife's failure to compensate Health Consultants as employees benefitted it and cost these consultants monetarily in four ways. First, MetLife did not pay the representative and opt-in plaintiffs and other Health Consultants overtime pay when they worked more than forty hours in a week. Overtime pay was required because MetLife did not pay Health Consultants on a salary basis, which is necessary under both the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 213, and the wage and hour laws of the States in which they worked in order for employees to qualify as exempt, except under limited circumstances not applicable here. Instead MetLife paid them based on the number of hours worked times a contracted rate per hour, and ignored the requirement to pay overtime for non-exempt workers. MetLife's decision not to pay Health Consultants overtime even though it did not pay them on a salary basis violated both federal and state wage and hour laws.

5.      Second, MetLife paid Dental Consultants, and upon information and belief all Health Consultants on a monthly basis, whereas the laws of the State of Illinois (the State in

which three of the class representatives worked) and other States in which Health Consultants worked, including New York, Rhode Island, and Connecticut (where the other two class representatives worked), required it to pay non-exempt employees no less frequently than twice a month.  MetLife thus had the use of the money it owed Health Consultants for two or more extra weeks each month, and deprived them of the use of that money.

6.      Third, MetLife offered employees a valuable set of employee benefits, including but not limited to a variety of largely employer-paid insurance plans and a defined benefit pension plan (together the "Defendant Plans").  Health Consultants did not receive, and MetLife never informed them of, these benefits.  Upon information and belief, some or all of the Defendant Plans were available to all MetLife employees or all full-time MetLife employees except employees expressly excluded by the terms of the Plans.  Upon information and belief, none of the Plan exclusions applied to Health Consultants.  The failure to allow eligible Health Consultants to participate in the Defendant Plans, or even to inform eligible Health Consultants of their right to participate in these plans, saved MetLife and deprived these consultants of substantial compensation in the form of employee benefits and violated the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*

7.      Finally, MetLife did not meet its obligation to pay the employer share of FICA taxes (generally equal to 7.65% of employee pay), and instead shifted that burden onto Health Consultants, by characterizing them as independent contractors rather than employees.  MetLife was unjustly enriched by the amount of FICA taxes that it shifted to the wallets of the Health Consultants.

8.      The representative Plaintiffs bring:  a proposed collective action under the FLSA on behalf of all Health Consultants who worked for MetLife at any time during the three years

4

between the filing of the Complaint and October 31, 2017; a proposed class action on behalf of all Health Consultants who worked for MetLife at any time during the six years between the filing of the Complaint and October 31, 2017 to litigate the ERISA claims; and proposed class actions to litigate the claims for violations of Illinois, New York, and Rhode Island statutes and common law on behalf of the Health Consultants who worked at any time within the applicable limitations periods.  If Health Consultants who join the case (a) have worked in other States in which there were sufficient Health Consultants to satisfy the numerosity requirement for class certification, and (b) would be adequate class representatives, Plaintiffs anticipate that similar proposed classes, based on State law claims, would be added on behalf of Health Consultants who have worked in those States.

## II.  <u>JURISDICTION AND VENUE</u>.

9.     This Court has jurisdiction over the claims under federal law pursuant to 28 U.S.C. § 1331, which confers original jurisdiction upon this Court in a civil action arising under the Constitution or laws of the United States, and pursuant to 28 U.S.C. § 1337, which confers original jurisdiction upon this court in a civil action arising under any Act of Congress regulating commerce.

10.     This Court has jurisdiction over the claims under state laws pursuant to 28 U.S.C. § 1367(a), which confers supplemental jurisdiction upon this Court over claims "that are so related to claims in the action within [its] original jurisdiction that they for part of the same case or controversy . . . ."

**11.**     Venue is proper in this Court under 28 U.S.C. § 1391 because MetLife and the Plan Defendants reside in this judicial district and because a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.  Venue also is proper in this

Court as to the ERISA claims under 29 U.S.C. § 1132(e)(2) because, for such claims, venue is proper where the plans are administered, a fiduciary breach occurred, the defendant resides, or the defendant may be found.

### III.  <u>PARTIES</u>

12.     Plaintiff Carol McNeely resides in Chicago, Illinois and worked for MetLife at its offices in Aurora, Illinois as a Dentist Consultant from 2002 until November 2017.  Throughout that time and to the present, she has held all necessary licenses and certifications to practice as a dentist in the State of Illinois.  Her Consent to Join was filed with the Original Complaint.  She is a representative of the FLSA collective action, the ERISA class action, and each of the class actions asserting claims arising under Illinois law.

13.     Plaintiff Scott D. Vlk resides in North Aurora, Illinois and has worked for MetLife at its offices in Aurora, Illinois as a Dentist Consultant from 2011 until the present. Throughout that time, he has held all necessary licenses and certifications to practice as a dentist in the State of Illinois.  His Consent to Join was filed on March 15, 2018.  He is a representative of the FLSA collective action, the ERISA class action, and each of the class actions asserting claims arising under Illinois law.

14.     Plaintiff Shilpa Vlk resides in North Aurora, Illinois and has worked for MetLife at its offices in Aurora, Illinois as a Dentist Consultant from 2008 until the present.  Throughout that time, she has held all necessary licenses and certifications to practice as a dentist in the State of Illinois.  Her Consent to Join was filed on March 15, 2018.  She is a representative of the FLSA collective action, the ERISA class action, and each of the class actions asserting claims arising under Illinois law.

15.     Plaintiff George Bernhard resides in Pawcatuck, Connecticut and has worked for MetLife since 1993.  Between October 2003 and November 2013 he divided his MetLife working time between the company's Warwick, Rhode Island office and his home in Pawtucket. Beginning in December 2013, Bernhard has worked exclusively from his home in Connecticut as a Dentist Consultant, but he continued to be treated by MetLife as a member of the Rhode Island panel.  Mr. Bernhard ceased working as a Dental Consultant for MetLife on February 28, 2018. Throughout his employment with MetLife, he held all necessary licenses and certifications to practice as a dentist in the State of Indiana.  His Consent to Join was filed on March 15, 2018. He is a representative of the FLSA collective action, the ERISA class action, and each of the class actions asserting claims arising under Rhode Island law.

16.     Plaintiff Deborah Joyce resides in Rome, New York and has worked for MetLife at its offices in Oriskany, New York as a hygienist consultant from 2003 until the present. Throughout that time, she has held all necessary licenses and certifications to practice as an hygienist in the State of New York.  Her Consent to Join was filed on March 15, 2018.  She is a representative of the FLSA collective action, the ERISA class action, and each of the class actions asserting claims arising under New York law.

17.     Opt-in Plaintiff David T. Rudziewicz resides in Chicago, Illinois and has worked for MetLife at its offices in Aurora, Illinois as a Dentist Consultant from 2006 until the present. Throughout that time, he has held all necessary licenses and certifications to practice as a dentist in the State of Illinois.  His Consent to Join was filed on March 15, 2018.  He is not a representative of any class or collective action.

18.     Metropolitan Life Insurance Company ("MetLife") is a subsidiary of the holding company MetLife, Inc., which de-mutualized and became a stock company in 2000.  MetLife is

domiciled and has its principal place of business in New York, New York.  Among other products, MetLife sells, services, and pays claims on dental, life, disability, vision, and accident and health insurance policies.

19.     MetLife is sued not only as the employer of the Plaintiffs and the other Health Consultants, but also as the administrator, and therefore the fiduciary, of the four employee benefit plans identified in the next four paragraphs and of the sub-plans of those plans.

20.     The Metropolitan Life Retirement Plan for United States Employees (the "Defined Benefit Plan") is an ERISA-covered defined benefit plan that provides pension, death, and retiree-medical benefits to eligible employees.  It is sued only with respect to the ERISA denial of benefits claim.  MetLife is the administrator and a fiduciary of the Defined Benefit Plan.

21.     The Savings and Investment Plan for Employees of Metropolitan Life and Participating Affiliates (the "Defined Contribution Plan") is an ERISA-covered defined contribution plan that provides pension benefits to eligible employees.  It is sued only with respect to the ERISA denial of benefits claim.  MetLife is the administrator and a fiduciary of the Defined Contribution Plan.

22.     The MetLife Options & Choices Plan (the "Primary Welfare Plan") is an ERISA-covered welfare plan that provides eligible active employees with medical and prescription drug coverage and through various sub-plans provides them dental coverage, group-term life insurance, short-term and long-term disability coverage, flexible spending accounts, work-life assistance coverage (employee assistance programs), and survivor benefit coverage.  Sub-plans of the Welfare Plan also provide medical, dental, and survivor benefit coverage to certain former employees, and continuation of certain benefits upon the termination of medical coverage.  The

Primary Welfare Plan is sued only with respect to the ERISA denial of benefits claim.  MetLife is the administrator and a fiduciary of the Primary Welfare Plan.

23.     The Welfare Benefits Plan for Employees of Metropolitan Life and Participating Affiliates (the "Secondary Welfare Plan") is an ERISA-covered welfare plan that provides eligible employees with life insurance, critical illness insurance, and legal insurance.  It is sued only with respect to the ERISA denial of benefits claim.  MetLife is the administrator and a fiduciary of the Secondary Welfare Plan.

### IV.  METLIFE'S RELATIONSHIPS WITH PLAINTIFFS AND OTHER HEALTH CONSULTANTS

**A.     MetLife Employed Numerous Health Consultants Throughout the United States**

24.     In a publication issued in 2015,[1] MetLife stated that it had 101 Dental Consultants.  Plaintiffs currently are aware of the identities of about 89 Dentist Consultants as of late 2017.  These Dentist Consultants were assigned to five offices:  about 56 in Aurora, Illinois; about 12 in Oriskany, near Utica, New York; about 9 in Bridgewater, New Jersey; about 8 in Warwick, Rhode Island; and about 4 in Irving, Texas.

25.     Dental hygienists also worked in some or all of the panels of Dentist Consultants. Plaintiffs currently are aware of the identities of four Hygienist Consultants, including Ms. Joyce.  The Hygienist Consultants were subject to the same practices as the Dentist Consultants who worked in the same panels.  In this Amended Complaint the term "Dental Consultants" refers to both Dentist Consultants and Hygienist Consultants.

26.     The number of Dental Consultants whom MetLife employed was relatively constant during the period from 2007 through 2017.

---

[1] https://ebview.com/pdfgenerator/ViewPdf/IEEE/Claims_and_Service_exp_0216.pdf.

27.     Regardless of location, and as discussed in more detail below, MetLife gave these Dental Consultants the same or similar contracts, assigned them the same or similar job duties, provided them the same or similar training, afforded them the same or similar resources, and compensated them, denied them employee benefits, and failed to pay the employer share of FICA taxes in the same manner.

28.     MetLife also engaged other Health Consultants with professional licenses and/or certifications in numbers currently unknown to Plaintiffs to analyze claims and perform other work similar to that performed by Dental Consultants.  These Health Consultants included doctors, chiropractors, psychologists, and nurses.  For example, the contract that went into effect November 1, 2017 between MetLife and each Dental Consultant who chose to continue to work for MetLife, which is discussed below, states in part, "Contractor warrants and represents that Contractor, at all times during the term of this Agreement: a) holds all the necessary licenses and certifications to practice as a dentist, ***physician, psychologist or chiropractor*** in a jurisdiction in the United States." (Emphasis added.)

29.     Upon information and belief, MetLife gave Dental Consultants and other Health Consultants the same or similar contracts, hired all Health Consultants to evaluate claims for benefits, provided all Health Consultants training concerning evaluation of claims, afforded all Health Consultants the  resources with which to perform their duties, and compensated all Health Consultants as independent contractors with monthly payments, no right to overtime, no right to receive employee benefits, and the obligation to pay all FICA taxes.

**B.    MetLife Gave All Health Consultants the Same or Similar Contracts Which, Until November 2017, Were Consistent with Them Being MetLife Employees.**

30.     Throughout the applicable liability periods, MetLife used standardized contracts for all Dental Consultants each year.  These contracts were not subject to negotiation, except

possibly as to the hourly pay rates.  All Dental Consultants received the same or similar standardized contracts each year.  All such contracts were for annual terms, although, as discussed below, MetLife cancelled the 2017 standardized contract as of November 1, 2017 and sent Dental Consultants via email a new form contract for the period from November 1, 2017 through October 31, 2018, rather than waiting for the 2017  contract to expire on December 31, 2017.  The new proffered contract had to be signed by MetLife and a Dental Consultant for that consultant's work to continue after October 31, 2017.

31.     Attached as Exhibit A are copies of the contracts that Ms. Vlk signed for calendar years 2009 and 2017 (the "Prior Contract").  The only differences in language between the two versions of the contract were in her hourly rate and in the addition in the 2017 version of additional provisions concerning HIPAA.  These differences did not affect whether she was an employee or independent contractor.  Ms. Vlk's signed contracts for the other years of her employment were substantially identical to her contracts for 2009 and 2017.  All of the other Dental Consultants signed contracts for each year through 2017 that were substantially identical in language and terms as Exhibit A, although differing in hourly rates.

32.     Upon information and belief, Health Consultants other than Dental Consultants signed contracts for each year through 2017 that were substantially similar in language and terms as Exhibit A.

33.     Attached as Exhibit B is the contract that Ms. Joyce signed in the autumn of 2017 for the period from November 1, 2017 through October 31, 2018 (the "New Contract").  Each of the Plaintiffs, except for Ms. McNeely, signed Exhibit B.  Because she did not sign that contract, Ms. McNeely's service as a MetLife Consultant ended on October 31, 2017.

34.     Upon information and belief, all of the other Health Consultants who still worked as consultants in October 2017 received standardized contracts similar to Exhibit B at some time prior to November 1, 2017, and all Health Consultants who worked for MetLife after October 31, 2017 signed standardized contracts similar to Exhibit B.

35.     A comparison of numerous provisions of the New Contract with the corresponding provisions (if any) of the Prior Contract reveals that MetLife introduced the new contract early rather than wait until the expiration of the Prior Contract to try to create a façade that the Health Consultants were independent contractors rather than employees.

36.     The Prior Contract was simply labeled an "agreement", while the New Contract is titled an "independent contractor agreement."

37.     The Prior Contract did not expressly address whether consultants were employees or independent contractors.  By contrast, paragraph 1 of the New Contract begins, "Contractor agrees that Contractor is an independent contractor."  It later states, "Contractor further acknowledges and agrees that nothing in this Agreement is intended to or creates any employment relationship between Contractor and MetLife, and that MetLife is not Contractor's employer." Ex. C, ¶ 1.

38.     As to compensation, the Prior Contract merely stated the rate at which Dental Consultants would be paid; in Ms. Vlk's case, $44.00 per hour in 2017. Ex. A, ¶ 1.  It did not state that the Dental Consultants would receive an IRS Form 1099, would be responsible for payment of Federal Insurance Contribution Act ("FICA") payments, and would be ineligible to receive employee benefits.  The New Contract not only states the hourly rate of pay, but states that the consultant will be compensated "upon submission of an invoice for the Services actually performed," that "MetLife will issue Contractor an IRS Form 1099," and that "Contractor shall

be directly and solely responsible for all costs of self-employment, including federal, state and local income tax payments for Contractor, including charges or premiums for F.I.C.A., workers compensation and general liability insurance, unemployment insurance and other taxes …."  Ex. C, ¶ 3, 3(b), 3(c).

39.     Neither the Prior Contract nor the New Contract specifies how frequently consultants will be paid, such as weekly, bi-weekly, or monthly.

40.     The Prior Contract stated that "MetLife will reimburse You for … reasonable expenses, including [travel expenses and] telephone charges, incurred by You in the course and scope of your duties under this Agreement."  Ex. B, ¶ 3.  The New Contract differs:  "Contractor is responsible for any business expenses incurred by him/her during the Service Period, except as set forth herein or agreed upon by the Parties in writing, and is responsible for his /her own profit or loss in connection with the Services rendered under this Agreement." Ex. C, ¶ 3(a).

41.     The Prior Contract did not address how many hours of work per week the consultants could work.  The New Contract states that "Contractor will set his/her own schedule [and] hours … for performance of the Services rendered, subject only to the limits identified in this Agreement and only to the extent that such limits are not inconsistent with Contractor's independent contractor status."  Ex. C, ¶ 1(a).  It adds, "Contractor acknowledges that, during the Service Period, Contractor may only be providing Services on a periodic or occasional basis (for example, for an 8 or 9 week block during the Service Period). Contractor acknowledges and agrees that MetLife does not guarantee that Contractor will be engaged to provide any Services during the Service Period."  *Id.*, ¶ 5.

42.     The Prior Contract identified the consultant's "duties."  Ex. B, ¶ 2.  The New Contract contains a schedule of services that the Health Consultant "agrees to provide" to

MetLife. Ex. C, Schedule A.  Consultants' duties under the Prior contract and the services that

they agree to provide under the New Contract are similar.  The Prior Contract listed: "a)

Reviewing dental claims and rendering your professional opinion; b) Providing advice and

counsel to the Claims Office staff; c) Communicating via telephone with submitting dentists to

explain and clarify dental claims; and, d) Training Dental Consultants, as may be required."  Ex.

B, ¶ 2.  Each of these four duties appears in the schedule of services under the New Contract,

albeit with more language describing them, and a fifth service is added: "Assisting MetLife's

Claims Office Staff and Special Investigation Unit with potential fraudulent dental claims

submissions and fraud investigations, including abuse and overutilization."  Ex. C, Schedule A.

43.     The Prior Contract did not address MetLife's extent of control over the

consultants' performance of their duties for the company.  The New Contract, in contrast, states

that the consultant "shall not be subject to the direction, control or supervision of MetLife with

respect to the performance of his/her services hereunder. Contractor will have exclusive control

over the manner and means by which he/she performs the Services rendered."  Ex. C, ¶ 1(a).

44.     The Prior Contract did not address which party would provide the supplies,

materials, or computer resources for the consultant to perform his or her duties to MetLife.  But

the New Contract states that the consultant "will provide the supplies, materials or other items

needed to perform the Services pursuant to this Agreement, except as set forth herein or as

agreed upon in writing by MetLife."  Ex. C, ¶ 1(c).

45.     The Prior Contract specified that "[w]hile engaged in the activities set forth in this

Agreement, you will not accept employment of any character hostile to the interests of MetLife

or otherwise engage in activities adverse to the interests of MetLife.…"  Ex. B, ¶ 7.  The New

Contract purports to give consultants more freedom:  "Subject only to the limit on not engaging

in competing endeavors as noted below, Contractor is free to perform services for any other individuals or entities of Contractor's choice during the Service Period, and there is no expectation that services provided to MetLife are exclusive …."  Ex. C, ¶ 1(d).  However, the reference in the initial proviso greatly reduces that purported freedom, as the agreement elsewhere provides, "While providing the Services Contractor will not accept employment or enter into any other relationship of any character which is in conflict with, is directly competitive with or which is hostile to the interests of MetLife or otherwise engage in activities adverse to the interests of MetLife."  *Id.*, ¶ 9.

46.     The Prior Contract and New Contract are alike in containing integration clauses. The Prior Contract stated:

> This document constitutes the entire Agreement between the Parties and all prior agreements, if any, whether written or oral, are hereby rendered null, void, and of no effect.  The terms of this Agreement may only be waived, changed, modified, or discharged by an agreement in writing signed by the Party against whom enforcement of any waiver, change, modification, or discharge is sought.

**C.     MetLife's Practices Establish that Health Consultants Were Employees Until November 2017.**

**1.     MetLife's relationships with Health Consultants and close supervision of their work are typical of employer-employee relationships.**

47.     As alleged above, MetLife's Prior Contracts had one-year terms.  They were not of project-based duration.

48.     MetLife issued several versions of a Dental Consultant Manual throughout the liability period.  Until May 2017, the Manual contained a "Met Claim Review Mission Statement that includes the sentence, "The members [the Dental Consultants] will conduct themselves in a manner consistent with their professional standing in the Metlife organization and must consider themselves as being representatives of Metlife at all times."  Persons typically are not representatives of an organization with which they are "independent contractors."

49.     There was little turnover in Dental Consultants in the ten years or more prior to November 1, 2017.  Very seldom did MetLife or a Dental Consultant refuse to sign the new version of the Prior Contract before the beginning of a new year.  As a result, MetLife has had long, continuous relationships with most Dental Consultants.  Among the six plaintiffs, for example, tenure as of October 2017 ranged from Mr. Barnhart's 24 years to Mr. Vlk's six years, with an average of roughly 13 years.

50.     Upon information and belief, MetLife had similar long, continuous relationships with most other Health Consultants.

51.     The work of Dental Consultants was closely integrated with the work of persons regarded as MetLife employees.  Prior to the Dental Consultants reviewing claims, persons treating as employees had to input data and scan documentation into the computer system.  After the Dental Consultants completed their review, the claims were submitted to "approvers," also treated as MetLife employees, to complete the claim review process. The approvers sometimes requested more information or explanation from the Dental Consultants.

52.     Until 2014 MetLife required most of the Illinois Dental Consultants to do all of their work at the MetLife office.  Dental Consultants at some or all of the smaller offices were allowed to work from home before then.  After 2014, MetLife engaged in a several-year process of issuing Dental Consultants laptop instead of desktop computers.  Before MetLife has issued a laptop to a Dental Consultant, that consultant was required to do all of his or her work for MetLife in its office.  As late as October 2017, approximately half of the Dental Consultants at MetLife's office in Aurora, Illinois, where Plaintiffs McNeely, Scott Vlk, Shilpa Vlk, and Rudziewicz and the majority of the Dental Consultants were assigned, had not been issued laptops and thus were required to work exclusively in the MetLife office.  Moreover, through

16

October 2017 MetLife required most Dental Consultants who had received laptop computers to come into the office at least one day every week to perform their duties, except when family or other circumstances dictated an exception.  .

53.    Until November 2017, MetLife dictated the maximum number of hours Dental Consultants could work in a day.  It changed that maximum figure from time to time.

54.    Until November 2017, MetLife required Dental Consultants to designate their "regular" schedule, the days of the week and hours in which they typically worked.  MetLife also required Dental Consultants to sign up in advance in order to work weekends or any days or hours outside of their regular schedule.  Dental Consultants were not allowed simply to log on and work from home or show up at the office.

55.    For most of the liability period, MetLife also required that, once Dental Consultants began work, they work at least four continuous hours.  It did not permit Dental Consultants, for example, to work one or two hours, leave work to perform an errand, and then resume work.

56.    Until late 2016, MetLife required Dental Consultants to sign in and sign out on a time sheet on the days when they worked at MetLife's office.  It even instructed them to sign out when they left the MetLife building and sign back in when they returned.  Dental Consultants who knew that they would be absent from the office on a regularly schedule day was required to sign out in advance.  When Dental Consultants worked from home, they had to email a MetLife secretary their hours at the end of the day.

57.    MetLife eliminated the time sheets on which Dental Consultants had to sign in and sign out and the requirement that they send emails when they worked from home in late

2016 when MetLife switched to electronic timesheets.  But MetLife still required each consultant to record his/her time each day; the medium just switched from paper to computer.

58.     Until November 2017, a MetLife employee supervised Dental Consultants at the Aurora office to ensure that they did not engage in excessive socializing with other Dental Consultants.  A MetLife employee was charged with sending admonitory emails to Dental Consultants deemed to be spending excessive time away from their desks or having other consultants stopping by their desk for excessive periods.

59.     In addition to the Dental Consultants, MetLife personnel characterized as employees work at MetLife's offices.  Consultants and employees entered and exited through the same doors and used the same common areas.  In the Aurora, Illinois facility, these common areas included the kitchen, cafeteria and bathrooms.  Dental Consultants, like other MetLife employees, received employee badges to facilitate entry to and exit from the MetLife facilities. Dental Consultants also received office wide emails about functions for employees such as blood drives, bake sales, and craft fairs.  They attended Employee Appreciation Days alongside other employees. For example, once or twice a year in Aurora Metlife provided lunch or sometimes ice cream for all employees, including the Dental Consultants.

60.     Upon information and belief, MetLife exercised similar control over the work locations, work hours, and work behavior of other Health Consultants until November 2017.

61.     Until November 2016, MetLife required Dental Consultants to submit time records for the number of hours worked each month on a time sheet form prepared by MetLife and disseminated to the consultants.  Since then Dental Consultants still are expected to submit to MetLife the number of hours worked for payment.  They thus are paid based on hours worked

during a monthly time period basis rather than based on a fee for a specific project or assignment.

62.     Dental Consultants provided MetLife with their banking account information, and MetLife compensated them through direct deposit payments rather than through checks.

63.     As alleged above, the Prior Contract provided for consultants to be reimbursed for expenses, including travel expenses, incurred in performing duties for MetLife.  The company in fact reimbursed Dental Consultants for most of their expenses incurred in performing duties for MetLife throughout the period that the Prior Contract was in effect (Internet and phone expenses when they worked from home was an exception) upon submission of evidence of those expenses, provided that they requested reimbursement on a MetLife-prepared form.

64.     According to the 2014 Dental Consulting Manual quoted above, MetLife required "all Consulting dentists to meet Continuing Education requirements for professional license re-registration in the states in which they practice or reside."  MetLife also paid $200-300 per year (up to $250 per annum according to the 2014 Manual) per Dental Consultant for continuing dental education upon a showing that they had completed a continuing education program.

65.     Upon information and belief, MetLife had similar requirements and payment and expense reimbursement arrangements with the other Health Consultants.

66.     MetLife's Prior Contracts, as alleged above, prohibited Dental Consultants from "accept[ing] employment of any character hostile to the interests of MetLife or otherwise engag[ing] in activities adverse to the interests of MetLife."  The contracts did not specify whether similar employment with a competitor would be hostile to MetLife's interests, but Plaintiffs understood that employment for a competitor would be deemed hostile, and believe that other Dental Consultants had the same understanding.

**2.     MetLife provided the Health Consultants with the means to perform their duties, including the claims to review and the equipment, materials, and supplies with which to conduct that review.**

67.     Although the Prior Contracts listed several job duties for Dental Consultants, they spent the bulk of their time throughout the past decade reviewing claims.  In performing claim reviews, these Dental Consultants reviewed the clinical information submitted by treating dentists and evaluated whether the services rendered, such as crowns, bridges, onlays, implants, or periodontal treatments, were dentally necessary. The Dental Consultants could also recommend that an alternate, less expensive benefit be applied to a service.  If MetLife adopted the Dental Consultant's recommendation that a less costly covered service other than the service actually performed could have produced a professionally acceptable result to treat a dental condition, MetLife paid benefits based only upon the less costly service.

68.     Throughout this period, MetLife provided Dental Consultants each day with detailed daily assignments, including the claim forms that they evaluated.  For many years, when an assignment required multiple steps, MetLife often gave Dental Consultants the materials for only the initial step or steps, and they needed to request the additional materials once they finished the earlier steps in the review.  MetLife began implementing a new system in March 2017 that was fully implemented by that summer under which assignments came in one spreadsheet for all consultants. The spreadsheet typically had assignments alongside a consultant's name, and when a Dental Consultant finished one assignment, she then was expected to begin work on the next assignment on the spreadsheet.

69.     MetLife required Dental Consultants to use its company issued equipment. MetLife issued Dental Consultants expected to work from the office, including all of the Aurora Illinois Dental Consultants, a cubicle, desk, desktop computer, two computer monitors, computer keyboard and mouse, and phone.  The company issued Dental Consultants allowed to work from

home laptops, computer bags, docking stations, two computer monitors, computer keyboard and mouse, and a VPN fob permitting them to log into MetLife's computer system remotely. MetLife also issued them either a phone or the technology with which to make calls from their home phones that displayed as MetLife on caller ID.  The computers and other equipment remained company property, and had to be returned when a Dental Consultant left MetLife's employment.

70.     The desktop and laptop computers that MetLife issued to Dental Consultants contained MetLife installed software, which the consultants were required to use in performing their job duties.

71.     MetLife provided free technical support to Dental Consultants for the company-issued equipment and software.

72.     MetLife employees monitored and supervised Dental Consultants.  The Aurora manager was the most active, contacting Dental Consultants often many times a day via emails and/or instant messaging to find out their progress on their assignments. She did not limit herself to Aurora Dental Consultants, however.  If Dental Consultants in other offices didn't reply within a few minutes they would get an instant message from her along the lines of, "Hello...are you there? Did you see my email?"

73.     Another example of the level of monitoring is contained in this exchange between Ms. Vlk and a MetLife monitor, Elizabeth Rudow:

Rudow, Elizabeth 3:20 PM:  have you been working in the TRICARE queues?

Vlk, Shilpa 3:21 PM: I had to make some phone calls from my BOB metcor and initial hold queues and then I started in the Tricare queues-metcor w/o xr at 2:30.

Rudow, Elizabeth 3:24 PM: okay    I show only 2 claims have been done in the w/o xrays queues at 2:55. that's why I was asking

Vlk, Shilpa 3:27 PM: From 1:40-2:30, I completed 2 claims in my initial bob queue and 4 claims in metcor hold queues(3 phone calls). I completed 3 in tricare metcor w/o xr, the 4th claim needed a phone call, but there was no answer at the office.

Rudow, Elizabeth 3:28 PM: I was just asking as I didn't see any claims done and wanted to be sure you were working there WAH. I need as many TRICARE claims completed WAH as possible.

74.    MetLife also monitored and tracked Dental Consultants' use of and activity on the computers.  MetLife did not block Dental Consultants from surfing the net or otherwise using the computers for non-work purposes.  However, MetLife monitored their activity and sent mass emails when surfing times increased beyond the company's satisfaction and reminded the Dental Consultants to limit their personal use of the computers.

75.    In addition to company-issued equipment and software, MetLife provided Dental Consultants with supplies and materials to perform their duties, such as paper, pens and sticky tabs.

76.    Upon information and belief, MetLife provided the means by which other Health Consultants performed their work as well.  Upon information and belief, MetLife provided other Health Consultants the claim materials to evaluate, the computer software on which those consultants performed and recorded their review, the computers on which that software operated, the technical support to maintain and update the hardware and software, and other supplies and materials.

### 3.    MetLife controlled the manner in which the Health Consultants performed their duties.

77.    MetLife controlled the manner by which Dental Consultants performed their duties under the Prior Contracts largely through the software that they were required to use and by obligating them to adhere to MetLife's policies and procedures.  For Dental Consultants, this meant complying with MetLife's "Dental Consultant Guidelines" ("Guidelines"). MetLife

prepared and disseminated the Guidelines to Dental Consultants for at least the last decade, originally in hard copy, but later as a PDF on their computers.

78.     Dental Consultants did not make independent professional decisions.  Rather, MetLife's Guidelines instructed Dental Consultants on the general principles and practices to apply in evaluating claims.  For example, MetLife's Guidelines in 2017 instructed Dental Consultants that if the procedure used by a dentist and the supporting documentation for a claim did not qualify for benefits, they had to deny the claim even if an alternate procedure might have qualified for benefits.  (2017 Guidelines, at 10.)  If instead a dentist submitted "two or more treatment plans … for benefit determination, the consultant will routinely recommend benefits for the less costly plan."  (*Id.*)   Similarly, "[b]enefits will be limited to the amount for the least expensive services or supplies that are recognized as adequate by the dental profession."  (*Id.* at 15.)

79.     As another example, the Guidelines informed Dental Consultants that they should concern themselves only with the "necessity, appropriateness and accepted standards of care" for a service.  Other persons at MetLife afterwards determined whether the service is covered by the plan.  (*Id.* at 17.)

80.     The Guidelines also laid out the general procedures Dental Consultants "must" follow when a dentist asked the company to reconsider a benefit decision.  (*Id.* at 18-20.)

81.     In addition to general guidance, the Guidelines included information on specific services, dental codes, forms, appeals, communication and much more.  (*Id.* at 9.)

82.     MetLife required all new and current consultants to participate in company-sponsored training to further their understanding of MetLife and, of course, to control and direct

how consultants performed their duties. This training was administered both when Dental Consultants were hired and periodically thereafter as MetLife deemed necessary or appropriate.

83. MetLife also controlled Dental Consultants through its full-time employees assigned to supervise and manage them.

84. By these various means, and others, MetLife conveyed to Dental Consultants the standards that it imposed on them "concerning reporting, review quality and production expectations." Among these standards were expectations concerning the minimum number of claims per hour Dental Consultants should process. Managers provided Dental Consultants with monthly reports showing their production. A MetLife supervisor typically sent a warning email when a consultant fell below the expected review rate per hour. MetLife terminated Dental Consultants for failure to meet expectations, especially during an initial probationary period. Conversely, MetLife awarded bonuses in the form of temporary increases in hourly rates based on the number of claims that Dental Consultants as a group were able to process during "crunch" (high-volume) times.

85. MetLife evaluated the performance of Dental Consultants against its standards through MetLife Quality Assurance. As one means of evaluation, once or twice a year MetLife required Dentist Consultants to take quizzes on MetLife premises that were sample claims. MetLife also assigned individuals from its quality assurance team to review Dental Consultants' work and provide an assessment two or three times a year. The quality assurance team performed these assessments by reviewing and providing feedback on a sample of claims that each Dental Consultant had reviewed over a period of several weeks.

86. Upon information and belief, other Health Consultants were subject to similar controls. MetLife conveyed its quality and quantity expectations to them through written

24

materials, training, and supervisors, and monitored to ensure that these Health Consultants met these expectations through a quality assurance process.

> **4.      MetLife did not require Health Professionals to identify themselves as independent contractors when they dealt with medical providers or other third parties.**

87.      As part of their job duties, Dental Consultants frequently had to talk on the telephone with dentists or their staffs to discuss or obtain information with which to evaluate claims or to respond to questions from those people.  Until November 2017, Dental Consultants frequently identified themselves as "_____ from MetLife."  MetLife did not instruct them to identify themselves in a manner that made clear that they were independent contractors.  Since November 2017, Dental Consultants have been supposed to identify themselves as "_____ on behalf of MetLife."

88.      MetLife also issued company email addresses to Dental Consultants.  These email addresses were indistinguishable from the email addresses of employees, and provided no basis for a dentist or other third party to understand that the Dental Consultant was classified as an independent contractor.

89.      On information and belief, MetLife did not make any effort to instruct other Health Consultants to make clear to doctors or other third parties that they are independent businesses and not employees of MetLife.

> **5.      Conclusion:  The Health Consultants were employees, not independent contractors.**

90.      The facts alleged above establish that MetLife's Prior Contract gave it the right to control the means and manner by which Dental Consultants and other Health Consultants performed their job duties, and to treat the Health Consultants as employees rather than independent contractors.  Until that contract was replaced as of November 1, 2017, MetLife used

that authority to exercise control over all aspects of the relationship between it and the consultants, including the means and manner by which consultants performed their job duties. As a result, they were employees, not independent contractors, while working under the Prior Contract.

**D.    Health Consultants Were Not Exempt Under the FLSA and State Wage and Hour Laws Because MetLife Did Not Compensate Them on a Salary Basis and Because They Did Not Engage in the Practice of Medicine.**

91.    Throughout the applicable time periods, MetLife compensated Dental Consultants and other Health Consultants each month by multiplying the number of hours recorded as worked by each Consultant's individual hourly rate.  Because the number of hours worked was not constant from month to month, Health Consultants were not paid the same amount each month.

92.    MetLife did not compensate Dental Consultants and other Health Consultants for days or parts of days in which they did not work, such as because those days were holidays or the consultants were sick, injured, on vacation, or had a non-work appointment.

93.    Because of the varying amounts of pay per pay period and the failure to compensate Health Consultants when they did not work, the consultants were not paid on a salary basis.

94.    Dental Consultants, chiropractors, and psychologists are not licensed in the field of medicine and did not evaluate medical claims for MetLife.

95.    Dental Consultants' duties for MetLife were to evaluate claims for benefits submitted to the company and not to practice dentistry.  They assisted MetLife in deciding whether to pay none, some, or all of the cost of services provided by practicing dentists to policyholders or to participants or beneficiaries in dental plans.  Dental Consultants did not have patient-provider relationships with any of the policyholders, participants or beneficiaries, did not

diagnose the patients' dental needs for the purpose of providing services to those patients, and did not assist or advise the dentist in providing services to the patient.

96.     Similarly, other Health Consultants' duties for MetLife were to evaluate claims submitted to MetLife and not to practice in the field in which they were licensed. They assisted MetLife in deciding whether to pay none, some, or all of the cost of services provided by practicing health care providers to policyholders or to participants or beneficiaries in health plans.  Health Consultants did not have patient-provider relationships with any of the policyholders, participants or beneficiaries, did not diagnose the patients' health needs for the purpose of providing services to those patients, and did not assist or advise the health care provider in providing services to the patient.

97.     Because Health Consultants were not compensated on a salary basis, and because they were not engaged in the practice of medicine while performing work for MetLife, they did not qualify for any exemption from the requirements under the FLSA and the wage and hour laws of the States of Illinois, New York, Rhode Island, and Connecticut that employees receive extra compensation when they work overtime.

**E.     MetLife Did Not Pay Health Consultants 50% More Than Their Regular Rates When They Worked More than Forty Hours in a Week.**

98.     Some Dental Consultants, including Ms. Vlk and Ms. Joyce, frequently worked more than forty hours in a week.  Indeed, when MetLife's Oriskany office adopted the "work from home"" arrangement, the affected Dental Consultants were asked to agree to work 10 hours a week more than they normally had in the office.  Other Dental Consultants, including Ms. McNeely, periodically have worked more than 40 hours a week.  At the end of each month, Dental Consultants reported to MetLife their total number of hours worked each day during that month, permitting MetLife to calculate the number of hours worked each week.  As a result,

27

MetLife knew that Dental Consultants regularly or from time to time exceeded forty hours in a week.  Upon information and belief, MetLife was aware that other Health Consultants also at least sometimes worked in excess of forty hours in a week for the company.

99.     The Prior Contract did not provide that Health Professionals would be compensated at 1.5 times their regular rate for hours in excess of forty in a week or for any other increase in their hourly rates when they worked in excess of forty hours in a week.

100.     In calculating Health Consultants' compensation, MetLife multiplied the number of hours worked by the hourly rate set out in the Prior Contract, without any upward adjustment for time worked in excess of forty hours in a week.

101.     By not compensating Health Consultants at 1.5 times their regular rate for hours in excess of forty in a week, MetLife violated the FLSA and the wage and hour laws of the States in which the Health Consultants were employed, including Illinois, New York, Rhode Island, and Connecticut.

102.     MetLife did not have a reasonable basis for believing that Health Consultants legally were independent contractors or that they were exempt employees under the FLSA or state wage and hour laws.

103.     MetLife did not act in good faith in failing to pay Health Consultants 1.5 times their hourly rate for time worked in excess of forty hours in a week, partly because, upon information and belief, it did not make a good faith effort to determine whether the FLSA and state laws applied to Health Consultants who worked more than forty hours in a week.

104.     MetLife's violation of the FLSA was willful in that it acted recklessly in failing to even consider, let alone make a reasonable effort to determine, whether Health Consultants were

common law employees and whether, if they were, they were non-exempt under the FLSA and the applicable state laws, including the laws of New York, Rhode Island, and Connecticut.

**F.      MetLife Paid Health Consultants Less Frequently than Once Every Two Weeks.**

105.    For the past ten years or longer, MetLife compensated Dental Consultants for their work for it on a monthly basis.  It did not pay them on or before an established date during the following month.  Instead, it typically paid them on a varying date within the first half of the month after the work had been performed.

106.    Upon information and belief, MetLife likewise compensated other Health Consultants on a monthly basis and on a varying date in the month after they have performed work.

107.    Because Health Consultants are non-exempt employees, MetLife violated the laws of the State of Illinois, which requires that non-exempt employees be paid no less frequently than bi-weekly, or the laws of the States of New York, Connecticut, and Rhode Island, all of which require that non-exempt employees be paid no less frequently than bi-monthly.

**G.      MetLife Has Denied Employee Benefits to Health Consultants**

108.    For at least the six years preceding November 2017, MetLife offered a wide variety of employee benefits to its employees.  Its employees generally were eligible to participate in:  a defined benefit pension plan called Metropolitan Life Retirement Plan for United States Employees (the "Defined Benefit Plan"); a defined contribution plan called the Savings and Investment Plan for Employees of Metropolitan Life and Participating Affiliates (the "Defined Contribution Plan"); an employee welfare plan called the MetLife Options & Choices Plan (the "Primary Welfare Plan") with numerous sub-plans that collectively provided

29

employees and certain former employees with medical, dental, prescription drug coverage, group-term life insurance, short-term and long-term disability coverage, flexible spending accounts, and work-life assistance coverage (employee assistance programs); and the Welfare Benefit Plan for Employees of Metropolitan Life (the "Secondary Welfare Plan") which provided eligible employees with life insurance, critical illness insurance, and legal insurance. These four benefit plans are together referred to as the "Defendant Plans".  In addition, MetLife provided employees with additional benefits not covered by employee benefit plans, such as paid vacations and personal time off.

109.    Although Health Consultants were employees, MetLife, the administrator of the Defendant Plans and other employee benefits, did not treat the Health Consultants as eligible to participate in any of the benefits provided by the Defendant Plans, or in any other benefits not provided under ERISA-covered plans, such as paid vacations and personal time off.

110.    MetLife, as the administrator of the Defendant Plans, did not make available to any of the Health Consultants copies of the plan documents and summary plan descriptions for each of the plans.  For example, Health Consultants cannot access those documents using the computers that MetLife issued to them.  As a result, Health Consultants did not know whether they qualified for some or all of the benefits under the terms of those documents if they were treated as employees.  Plaintiffs acquired limited knowledge concerning the Defendant Plans shortly prior to the filing of the Original Complaint from the annual tax returns that MetLife is required by law to file for each of the plans.

111.    Deloitte is the auditor for each of the Defendant Plans.  Attached to the annual tax returns for 2016 for the Defendant Plans were financial statements prepared by Deloitte that,

among other information, describe the principal provisions of the Defined Benefit Plan, the

Principal Welfare Plan, and the Defined Contribution Plan.

112.    The 2016 tax return for the Defined Contribution Plan states that among persons

not eligible to participate in that plan are "Certain individuals performing services for the

Participating Affiliates are not eligible, e.g., an individual classified by the Participating

Affiliates as a leased employee or independent contractor."

113.    Dental Consultants, and upon information and belief other Health Consultants,

were not leased employees, and hence that exclusion did not apply to them.  In addition, the Prior

Contracts did not address whether Dental Consultants were independent contractors.

114.    Upon information and belief, the exclusion in the Defined Contribution Plan

applied only to persons whose contracts stated that they were independent contractors, and the

integration clause in the Prior Contracts prevented MetLife's Plan fiduciaries from resorting to

MetLife's treatment of Dental Consultants as independent contractors in determining whether

Dental Consultants were eligible under the terms of the Defined Contribution Plan.  See Ex. A, ¶

13.  Hence, the "independent contractor" exclusion in the Defined Contribution Plan also did not

apply to Dental Consultants, and upon information and belief, to other Health Consultants.

115.    Deloitte's description of the Defined Benefit Plan and the Principal Welfare Plan

does not mention similar exclusions.  This omission, in contrast to the express exclusions set out

in the tax return for the Defined Contribution Plan, suggests that Health Consultants were

eligible to participate in the other plans.  In addition, MetLife has made available on the Internet

a form version of a dental plan that can be used by employers who offer MetLife's dental

benefits to their employees.  Under this form document, dental benefits are open to all full-time

employees, with the term "full time" meaning "at least 17.5 hours per week on the Employer's

regular work schedule" and the term "employees" not defined.[2]  This formulation would not have excluded individuals classified by the employer as independent contractors.

116.     Upon information and belief, all Health Consultants were eligible until November 2017 to participate in the Defendant Plans as well as the employee benefits not covered by ERISA, notwithstanding MetLife treating them as ineligible.

117.     MetLife, as administrator of the Defendant Plans and other employee benefits, has breached its duties of due care and of loyalty and its duty to act in accordance with plan documents in failing to analyze and determine that the Health Consultants were indeed employees and hence eligible to participate in some or all of these employee benefits.

118.     MetLife, as administrator of the Defendant Plans and other employee benefits, also has breached its duties of due care and of loyalty and its duty to act in accordance with plan documents in failing to provide the Health Consultants with copies of or access to the plan documents, summary plan descriptions, and other documents with respect to the Defendant Plans that ERISA requires be provided to all employees eligible to participate in benefit plans.

119.     The Defendant Plans have denied Health Consultants benefits that they were due under the terms of those Plans and employee benefits not covered by ERISA.

## H.     MetLife Did Not Pay the Employer Share of FICA Taxes

120.     Under the Federal Insurance Contributions Act, employees and employers in the United States must pay FICA taxes to the Internal Revenue Service, with the amount of such tax based on the amount of the employee's pay.  The taxes are used to pay Social Security and Medicare benefits.  Each employer in the United States is obligated to (a) pay its portion of the FICA taxes, and (b) withhold the employee portion of those taxes from employee paychecks and pay them to the IRS.

---

[2]         https://mybenefits.conexis.com/media/docs/Hewitt/81/METLIFE%20DENTAL%20SPD.pdf

121.    Currently the total FICA tax is 15.3% of each employee's gross pay.  The
employer and employee each pays 7.65%: 6.2% of the 7.65% is attributable to Social Security,
and 1.45% is attributable to Medicare.  The Medicare portion is uncapped, but any wages earned
above an annual cap is not subject to the Social Security portion.  That cap was $127,200 in
2017.

122.    Because MetLife has treated Health Consultants as independent contractors rather
than employees, it has reported their annual income to the IRS, and issued to the Health
Consultants, a 1099 instead of a W-2 form.

123.    And because MetLife has treated Health Consultants as independent contractors,
it has neither paid the employer portion of FICA taxes based on the consultants' monthly pay nor
withheld the employee portion from the consultants' monthly pay.

124.    Finally, because MetLife told Health Consultants that they were self-employed
independent contractors and issued them 1099 forms, the Health Consultants believed that they
had to pay, and did pay, the combined employer and employee amount each year, that is, 12.4%
up to the Social Security cap and 2.9% in Medicare tax – the entire 15.3%.  As a result, Health
Consultants were injured and MetLife unjustly enriched itself by shifting an amount equal to
7.65% of each Health Consultant's pay (or a lesser percentage if a Health Consultant's total pay
for the year exceeded the Social Security cap) onto the Health Consultants.

125.    In sum, MetLife damaged Health Consultants monetarily in four ways by its
decision to treat them as independent contractors even though they were employees.  First, it did
not pay them overtime when they worked more than 40 hours in a week.  Second, instead of
paying them weekly to semi-monthly on regular schedules, as required by State law for
employees who were non-exempt, MetLife paid Health Consultants on an irregular monthly

33

basis.  Third, MetLife did not afford them any of the employee benefits that it provided to

persons whom it properly classified as employees.  Finally, it induced Health Consultants to pay

the entirety of FICA taxes instead of paying half of those taxes as their employer.

## V.   CLASS AND COLLECTIVE ACTION ALLEGATIONS

126.    Plaintiffs bring 13 types of claims, as described in Section VI below.  They bring

the first 11 of them on behalf of similarly situated Health Consultants.  Because the State statute

or common law under which each claim is brought defines the persons who are similarly situated

in different ways, the class or collective action corresponding to each type of claim under each

State's law is defined separately.  The chart below briefly summarizes the claims and the

differences in the proposed classes and identifies the section of this Amended Complaint that

discusses the claim or proposed class or collective action in greater detail:

| Claim | | Class or Collective Action | | | | |
|---|---|---|---|---|---|---|
| **Basis of Claim** | **Section of Complaint** | **National or State** | **Rep** | **Liability Period** | **Opt-In or Out** | **Section of Complaint** |
| FLSA | VI.A | National | All five reps | 2 or 3 years | Opt-In | V.A |
| ERISA | VI.B | National | All five reps | 6 years | Opt-Out | V.B |
| Illinois Minimum Wage Law | VI.C | Illinois | McNeely, Vlk, Vlk | 3 years | Opt-Out | V.C |
| Illinois Wage Payment and Collection Act | VI.D | Illinois | McNeely, Vlk, Vlk | 10 years | Opt-Out | V.D |
| Illinois Unjust Enrichment Common Law | VI.E | Illinois | McNeely, Vlk, Vlk | 5 years | Opt-Out | V.E |
| New York Overtime Law | VI.F | New York | Joyce | 6 years | Opt-Out | V.F |
| New York Payment Law | | New York | Joyce | 6 years | Opt-Out | V.G |

| Claim | | Class or Collective Action | | | | |
|---|---|---|---|---|---|---|
| **Basis of Claim** | **Section of Complaint** | **National or State** | **Rep** | **Liability Period** | **Opt-In or Out** | **Section of Complaint** |
| New York Unjust Enrichment Common Law | VI.H | New York | Joyce | 6 years | Opt-Out | V.H |
| Rhode Island Minimum Wage Law | VI.I | R.I. | Bernhard | 3 years | Opt-Out | V.I |
| Rhode Island Payment Law | VI.J | R.I. | Bernhard | 3 years | Opt-Out | VI.J |
| RI Unjust Enrichment Common Law | VI.K | R.I. | Bernhard | 3 years | Opt-Out | VI.K |
| Connecticut Payment Law | VI.L | n/a | n/a | n/a | n/a | n/a |
| Conn. Unjust Enrichment Common Law | VI.M | n/a | n/a | n/a | n/a | n/a |

**A.    Collective Action Pursuant to 29 U.S.C. § 216(b) to Pursue Claims for Violation of the FLSA**

127.    The FLSA Representative Plaintiffs (McNeely, Scott Vlk, Shilpa Vlk, Joyce, and Bernhard) incorporate all of the allegations in the paragraphs above as if set forth fully in this paragraph.

128.    The FLSA Representative Plaintiffs brings their claims for violation of the FLSA on behalf of themselves and any other person who (a)(i) worked for MetLife as a Health Consultant (ii) in the United States (iii) at any time between three years prior to the date on which the Original Complaint was filed and October 31, 2017, and (b) files a timely signed Consent to Join before a deadline to be established by the Court ("Collective Action Members").

129.    The Collective Action Members are similarly situated in that, among other similarities:

a.    MetLife employed the Collective Action Members under similar contracts which, until November 2017, were consistent with them being employees rather than independent contractors;

b.    MetLife compensated the Collective Action Members as "independent contractors";

c.    MetLife required the Collective Action Members to work at its offices either part or all of their working time;

d.    MetLife supplied the claims that the Collective Action Members analyzed, the computers and software on which they worked, and other materials and supplies;

e.    MetLife provided training as to how the Collective Action Members were supposed to perform their duties;

f.    MetLife provided all Dental Consultants who are Collective Action Members with the Guidelines and all other Collective Action Members with similar guidance;

g.    MetLife prevented Collective Action Members from performing similar claims work for other insurance companies;

h.    MetLife reimbursed Collective Action Members for their expenses in performing their duties for the company;

i.    MetLife calculated Collective Action Members' pay each month by multiplying the number of hours worked by the Members' hourly pay rate, and consequently, Members' pay varied from month to month;

j.      MetLife did not increase Collective Action Members' pay rates by 50% for every

hour that they worked over forty hours in a week;

k.      Collective Action Members did not engage in the practice of medicine for

MetLife but instead made recommendations as to payment of claims; and

l.      MetLife's efforts, if any, to determine the appropriate compensation for the

Collective Action Members under the FLSA were the same as to all Members.

**B.      Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Violation of ERISA, 29 U.S.C. § 1001 *et seq.***

130.    The ERISA Representative Plaintiffs (McNeely, Scott Vlk, Shilpa Vlk, Joyce, and

Bernhard) incorporate all of the allegations in the paragraphs above as if set forth fully in this

paragraph.

131.    The ERISA Representative Plaintiffs bring their claims for violation of ERISA on

behalf of themselves and any other person who (a) worked for MetLife as a Health Consultant

(b) in the United States (c) at any time between six years prior to the date on which the Original

Complaint was filed and October 31, 2017.  To the extent that any of the applicable benefit plans

limit benefits to employees who worked a certain number of hours in a stated time period, the

Class excludes persons who worked fewer than the number of hours required to section the

benefits provided under that plan (the "ERISA Class").

132.    The ERISA Class has so many Members that joinder in this action would be

impracticable.  As alleged above, there were about 100 Dental Consultants who worked for

MetLife in the United States in late 2017.  With turnover the number of Dental Consultants alone

probably exceeds 100.  Upon information and belief, other Health Consultants substantially

increase the size of the proposed ERISA Class.  Joinder would be especially difficult because

this action is brought in New York, and Dental Consultants located in Illinois, Rhode Island,

Connecticut, and Texas would have to travel several hundred miles to attend proceedings. Plaintiffs do not know the States in which other Health Consultants have worked, but many of them undoubtedly also would have to travel long distances to attend proceedings in the case.

133.    The claims of the ERISA Class raise numerous common issues, including but not limited to:

a.    Did MetLife have the right under the contracts with the ERISA Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.    Did MetLife in fact control the means and manner by which ERISA Class Members performed their duties for MetLife and otherwise act toward them in a manner that made them employees rather than independent contractors?

c.    Were common law employees eligible to participate in the Defendant Plans and non-ERISA benefits even if they were treated as independent contractors by MetLife's Human Resources department?

d.    Did any of the express exclusions in the Defendant Plans of certain categories of employees make the Health Consultants not eligible to participate in the Defendant Plans and non-ERISA benefits?

e.    Did MetLife as administrator of the Defendant Plans exercise reasonable care in determining whether ERISA Class Members were common law employees and otherwise eligible to participate in the Defendant Plans?

f.    Did MetLife as administrator of the Defendant Plans fail to determine that ERISA Class Members were common law employees and otherwise eligible to participate

in the Defendant Plans because it considered its own interests rather than provide loyalty to the ERISA Class Members?

g.      Would it have been futile for ERISA Class Members to seek benefits from MetLife, the administrator of the Defendant Plans?

h.      Are ERISA Class Members entitled to injunctive relief directing MetLife as administrator of the Defendant Plans to treat them as eligible for benefits under the Plans pursuant to ERISA § 502(a)(3)?

i.      Are ERISA Class Members entitled to injunctive relief directing MetLife as administrator of the non-ERISA benefits to treat them as eligible for benefits under the common law?

j.      Are ERISA Class Members entitled to other equitable relief in the form of money to compensate them for MetLife's failure to treat them as eligible for employee benefits under the Plans pursuant to ERISA § 502(a)(3)?

k.      Are ERISA Class Members entitled to monetary relief to compensate them for MetLife's failure to treat them as eligible for non-ERISA employee benefits?

l.      Are ERISA Class Members entitled to the value of unpaid benefits under the Plans pursuant to ERISA § 502(a)(1)(B)?

134.    The ERISA Representative Plaintiffs' claims are typical of the other ERISA Class Members because they and other members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were denied eligibility to participate in the Plans, were not given copies of the Plans, and were protected by the same rights under ERISA.

135.    The ERISA Representative Plaintiffs are adequate representatives of the ERISA Class.  They are members of the ERISA Class, do not have any conflicts with other class

members, and have engaged lawyers who are experienced in the litigation of employment class action lawsuits and in the litigation of claims under ERISA.

136.    The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of these claims.

**137.**    A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The ERISA Representative Plaintiffs are unaware of any other litigation raising similar claims against MetLife brought by individual ERISA Class Members.  The claims are not sufficiently large monetarily to give individual ERISA Class Members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**C.**    **Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Violation of Illinois Minimum Wage Law, 820 ILCS 105/1 *et seq.***

138.    The Illinois Representatives (McNeely, Scott Vlk, Shilpa Vlk) incorporate all of the allegations in the paragraphs above as if set forth fully in this paragraph.

139.    The Illinois Representatives bring their claims for violation of the Illinois Minimum Wage Law on behalf of themselves and any other person who (a) worked for MetLife as a Health Consultant (b) in the State of Illinois, and (c) for more than forty hours in a week at least once between the three years prior to the date on which the Original Complaint was filed and October 31, 2017, according to the consultant's time records submitted to MetLife (the "Illinois Overtime Class").

140.     The Illinois Overtime Class has so many Members that joinder in this action would be impracticable.  As alleged above, there were about 55 Members who worked as Dental Consultants for MetLife in the State of Illinois in late 2017.  With turnover there are at least 60 Members of the proposed class who are Dental Consultants.  Upon information and belief, other Health Consultants substantially increase the size of the proposed Illinois Overtime Class. Joinder would be especially difficult because this action is brought in New York, several hundred miles away from Illinois.

141.     The claims of the Illinois Overtime Class raise numerous common issues, including but not limited to:

a.     Did MetLife have the right under the contracts with the Illinois Overtime Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.     Did MetLife in fact control the means and manner by which Illinois Overtime Class Members performed their duties for MetLife and otherwise act toward them in a manner that made them employees rather than independent contractors?

c.     Was MetLife's method of calculating the compensation of Illinois Overtime Class Members, multiplying the number of hours worked times an hourly rate, inconsistent with Members being paid on a salary or fee basis?

d.     Were Illinois Overtime Class Members non-exempt employees because they were not paid on a salaried basis?

e.     Did MetLife fail to pay Overtime Class Members 50% more than their normal hourly rate when they worked more than 40 hours in a week?

41

142.     The claims of the Illinois Representatives are typical of the other Illinois Overtime Class Members because they and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were not paid on a salaried or fee basis, and were not paid 50% more than their normal rates for hours worked in excess of 40 in a week.

143.     The Illinois Representatives are adequate representatives of the Illinois Overtime Class.  They are members of the Illinois Overtime Class, do not have any conflicts with other class members, and have engaged lawyers who are experienced in wage and hour law and in the litigation of employment class action lawsuits.

144.     The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

145.     A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The Illinois Representatives are unaware of any other litigation raising similar claims against MetLife brought by individual Illinois Overtime Class Members.  The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**D.     Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Violation of Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq.***

146.     The Illinois Representatives incorporate all of the allegations in the paragraphs above as if set forth fully in this paragraph.

42

147.     The Illinois Representatives bring their claims for violation of the IWPCA on behalf of themselves and any other person who (a) has worked for MetLife as a Health Consultant (b) in the State of Illinois, (c) at any time between ten years prior to the date on which the Original Complaint was filed and October 31, 2017 (the "Illinois Monthly Payment Class").

148.     The Illinois Monthly Payment Class has so many members that joinder in this action would be impracticable.  As alleged above, there are about 55 members who worked as Dental Consultants for MetLife in the State of Illinois in late 2017.  With turnover there are at least 60 members of the proposed class who are Dental Consultants.  Upon information and belief, other Health Consultants substantially increase the size of the proposed Illinois Monthly Payment Class.  Joinder would be especially difficult because this action is brought in New York, several hundred miles away from Illinois.

149.     The claims of the Illinois Monthly Payment Class raise numerous common issues, including but not limited to:

  a.     Did MetLife have the right under the contracts with the Illinois Monthly Payment Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

  b.     Did MetLife in fact control the means and manner by which Illinois Monthly Payment Class Members perform their duties for MetLife and otherwise act toward them in a manner that made them employees rather than independent contractors?

c.      Was MetLife's method of calculating the compensation of Illinois Month

Payment Class Members, multiplying the number of hours worked times an

hourly rate, inconsistent with paying them on a salary basis?

d.      Did MetLife fail to pay Illinois Month Payment Class Members on a bi-weekly or

more frequent basis?

150.    The claims of the Illinois Representatives are typical of the other Illinois Monthly

Payment Class Members because they and other Members signed the same form contracts, were

subject to the same controls of MetLife, had similar duties, were not paid on a salaried basis, and

were not paid bi-weekly or more frequently.

151.    The Illinois Representative are adequate representatives of the Illinois Monthly

Payment Class.  They are members of the class, do not have any conflicts with other class

members, and have engaged lawyers who are experienced in the litigation of employment class

action lawsuits.

152.    The common issues, including but not limited to those identified above, will

predominate over any individualized issues in the litigation of this claim.

153.    A class action would be superior to other available methods for fairly and

efficiently adjudicating the dispute.  The Illinois Representatives are unaware of any other

litigation raising similar claims against MetLife brought by individual Illinois Monthly Payment

Class Members.  The claims are not sufficiently large monetarily to give individual members an

interest in controlling the litigation of separate claims. The commonality of the issues makes it

desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in

managing this litigation that do not exist in all class actions, and litigating the common issues

once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**E.      Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Illinois Unjust Enrichment Claims**

154.    The Illinois Representatives incorporate all of the allegations in the paragraphs above as if set forth fully in this paragraph.

155.    The Illinois Representatives bring their unjust enrichment claims on behalf of themselves and any other person who (a) worked for MetLife as a Health Consultant (b) in the State of Illinois, (c) at any time between five years prior to the date on which the Original Complaint was filed and October 31, 2017 (the "Illinois Unjust Enrichment Class").

156.    The Illinois Unjust Enrichment Class has so many members that joinder in this action would be impracticable.  As alleged above, there were about 55 members who worked as Dental Consultants for MetLife in the State of Illinois in late 2017.  With turnover there are at least 60 members of the proposed class who are Dental Consultants.  Upon information and belief, other Health Consultants substantially increase the size of the proposed Illinois Unjust Enrichment Class.  Joinder would be especially difficult because this action is brought in New York, several hundred miles away from Illinois.

157.    The claims of the Illinois Unjust Enrichment Class raise numerous common issues, including but not limited to:

a.      Did MetLife have the right under the contracts with the Illinois Unjust Enrichment Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

45

b.    Did MetLife in fact control the means and manner by which Illinois Unjust Enrichment Class Members performed their duties for MetLife and otherwise acted toward them in a manner that made them employees rather than independent contractors?

c.    Did MetLife's failure to pay the employer's share of FICA taxes and shifting of that burden to Illinois Unjust Enrichment Class Members enrich MetLife in the amount of the taxes in a manner that is unjust under applicable law?

158.    The claims of the Illinois Representatives are typical of the other Illinois Unjust Enrichment Class Members because they and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, and paid the entirety of FICA taxes on their income instead of having MetLife pay half of those taxes.

159.    The Illinois Representatives are adequate representatives of the Illinois Unjust Enrichment Class.  They are members of the class, do not have any conflicts with other class members, and have engaged lawyers who are experienced in the litigation of employment class action lawsuits.

160.    The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

161.    A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The Illinois Representatives are unaware of any other litigation raising similar claims against MetLife brought by individual Illinois Unjust Enrichment Class Members.  The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in

managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**F.      Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Violation of Overtime Provision of New York Labor Law, 12 NYCRR §§ 142-2.2, 146-1.4**

162.    The New York Representative (Joyce) incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

163.    The New York Representative brings her claims for violation of the overtime provision of New York Labor Law on behalf of herself and any other person who (a) worked for MetLife as a Health Consultant (b) in the State of New York, (c) for more than forty hours in a week at least once between the six years prior to the date on which this Amended Complaint is filed and October 31, 2017, according to the consultant's time records submitted to MetLife (the "New York Overtime Class").

164.    The New York Overtime Class Members live sufficiently far from this District that joinder in this action would be impracticable.  As alleged above, there were about 12 Members who worked as Dental Consultants for MetLife in the State of New York in late 2017. Turnover may bring the number of proposed class members who are Dental Consultants to at least 15 persons.  Upon information and belief, other Health Consultants substantially increase the size of the proposed New York Overtime Class.  Whatever the final number of Class Members, joinder would be difficult because this action is brought in New York City, about 250 miles away from Oriskany, New York, where the Members' MetLife office was located, by the generally fastest route by car.

165.    The claims of the New York Overtime Class raise numerous common issues, including but not limited to:

a.  Did MetLife have the right under the contracts with the New York Overtime Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.  Did MetLife in fact control the means and manner by which New York Overtime Class Members performed their duties for MetLife and otherwise act toward them in a manner that made them employees rather than independent contractors?

c.  Was MetLife's method of calculating the compensation of New York Overtime Class Members, multiplying the number of hours worked times an hourly rate, inconsistent with Members being paid on a salary or fee basis?

d.  Were New York Overtime Class Members non-exempt employees because they were not paid on a salaried basis?

e.  Did MetLife fail to pay New York Overtime Class Members 50% more than their normal hourly rate when they worked more than 40 hours in a week?

166.  The claim of the New York Representative is typical of the other New York Overtime Class Members because she and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were not paid on a salaried or fee basis, and were not paid 50% more than their normal rates for hours worked in excess of 40 in a week.

167.  The New York Representative is an adequate representative of the New York Overtime Class.  She is a member of the New York Overtime Class, does not have any conflicts with other class members, and has engaged lawyers who are experienced in wage and hour law and in the litigation of employment class action lawsuits.

168.     The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

169.     A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The New York Representative is unaware of any other litigation raising similar claims against MetLife brought by individual New York Overtime Class Members.  The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**G.     Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Failure to Make Timely Payment in Violation of New York Labor Law § 191.**

170.     The New York Representative incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

171.     The New York Representative brings her claims for violation of the Labor Law § 191 on behalf of herself and any other person who (a) worked for MetLife as a Health Consultant (b) in the State of New York, (c) at any time between six years prior to the date on which this Amended Complaint is filed and October 31, 2017 (the "New York Monthly Payment Class").

172.     As alleged above, the New York Monthly Payment Class Members live sufficiently far from this District that joinder in this action would be impracticable.

173.     The claims of the New York Monthly Payment Class raise numerous common issues, including but not limited to:

a.      Did MetLife have the right under the contracts with the New York Monthly Payment Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.      Did MetLife in fact control the means and manner by which New York Monthly Payment Class Members performed their duties for MetLife and otherwise acted toward them in a manner that made them employees rather than independent contractors?

c.      Was MetLife's method of calculating the compensation of New York Monthly Payment Class Members, multiplying the number of hours worked times an hourly rate, inconsistent with paying them on a salary basis, thereby making them non-exempt employees?

d.      Was subsection 1.d of Labor Law Section 191 applicable to New York Monthly Payment Class Members, and were they thereby entitled to be paid "not less frequently than semi-monthly, on regular pay days designated in advance by the employer"?

e.      Did MetLife fail to pay New York Monthly Payment Class Members on a semi-monthly or more frequent basis?

174.      The claim of the New York Representative is typical of the claims of the other New York Monthly Payment Class Members because she and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were not paid on a salaried basis, and were not paid semi-monthly or more frequently, and were not paid on regular pay days designated in advance by MetLife.

175.    The New York Representative is an adequate representative of the New York Monthly Payment Class.  She is a member of the class, does not have any conflicts with other class members, and has engaged lawyers who are experienced in the litigation of employment class action lawsuits.

176.    The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

**177.**    A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The New York Representative is unaware of any other litigation raising similar claims against MetLife brought by individual New York Monthly Payment Class Members.  The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**H.    Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue New York Unjust Enrichment Claims.**

178.    The New York Representative incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

179.    The New York Representative brings her unjust enrichment claims on behalf of herself and any other person who (a) worked for MetLife as a Health Consultant (b) in the State of New York, (c) at any time between six years prior to the date on which this Amended Complaint is filed and October 31, 2017 (the "New York Unjust Enrichment Class").

51

180.     As alleged above, the New York Unjust Enrichment Class Members live sufficiently far from this District that joinder in this action would be impracticable, regardless of their actual number.

181.     The claims of the New York Unjust Enrichment Class raise numerous common issues, including but not limited to:

a.     Did MetLife have the right under the contracts with the New York Unjust Enrichment Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.     Did MetLife in fact control the means and manner by which New York Unjust Enrichment Class Members performed their duties for MetLife and otherwise act toward them in a manner that made them employees rather than independent contractors?

c.     Did MetLife's failure to pay the employer's share of FICA taxes and shifting of that burden to New York Unjust Enrichment Class Members enrich MetLife in the amount of the taxes in a manner that is unjust under applicable law?

182.     The claim of the New York Representative is typical of the claims of other New York Unjust Enrichment Class Members because she and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, and paid the entirety of FICA taxes on their income instead of having MetLife pay half of those taxes.

183.     The New York Representative is an adequate representative of the New York Unjust Enrichment Class.  She is a member of the class, does not have any conflict with other

class members, and have engaged lawyers who are experienced in the litigation of employment class action lawsuits.

184.    The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

185.    A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The New York Representatives is unaware of any other litigation raising similar claims against MetLife brought by individual New York Unjust Enrichment Class Members.  The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

I.      **Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Violation of Overtime Provision of Rhode Island Law, R.I. Gen. Laws § 28-12-4.1**

186.    The Rhode Island Representative (Bernhard) incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

187.    The Rhode Island Representative brings his claims for violation of Section 28-12-4.1 of the Rhode Island General Laws on behalf of himself and any other person who (a) worked for MetLife as a Health Consultant (b) in the State of Rhode Island, (c) for more than forty hours in a week at least once between the three years prior to the date on which this Amended Complaint is filed and October 31, 2017, according to the consultant's time records submitted to MetLife (the "Rhode Island Overtime Class").

188.     The Rhode Island Overtime Class Members live sufficiently far from this District that joinder in this action would be impracticable.  As alleged above, there were about eight Members who worked as Dental Consultants for MetLife in the State of Rhode Island in late 2017.  Turnover may bring the number of proposed class members who are Dental Consultants to at least 10 persons.  Upon information and belief, other Health Consultants increase the size of the proposed Rhode Island Overtime Class to an unknown extent.  Whatever the final number of Class Members, joinder would be difficult because this action is brought in New York City, about 175 miles away from Warwick, Rhode Island, where the Members' MetLife office was located, by the generally fastest route by car.

189.     The claims of the Rhode Island Overtime Class raise numerous common issues, including but not limited to:

a.     Did MetLife have the right under the contracts with the Rhode Island Overtime Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.     Did MetLife in fact control the means and manner by which Rhode Island Overtime Class Members performed their duties for MetLife and otherwise act toward them in a manner that made them employees rather than independent contractors?

c.     Was MetLife's method of calculating the compensation of Rhode Island Overtime Class Members, multiplying the number of hours worked times an hourly rate, inconsistent with Members being paid on a salary or fee basis?

     d.     Were Rhode Island Overtime Class Members non-exempt employees because they were not paid on a salaried basis?

     e.     Did MetLife fail to pay Rhode Island Overtime Class Members 50% more than their normal hourly rate when they worked more than 40 hours in a week?

190.     The claim of the Rhode Island Representative is typical of the other New York Overtime Class Members because he and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were not paid on a salaried or fee basis, and were not paid 50% more than their normal rates for hours worked in excess of 40 in a week.

191.     The Rhode Island Representative is an adequate representative of the Rhode Island Overtime Class.  He is a member of the Rhode Island Overtime Class, does not have any conflicts with other class members, and has engaged lawyers who are experienced in wage and hour law and in the litigation of employment class action lawsuits.

192.     The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

193.     A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The Rhode Island Representative is unaware of any other litigation raising similar claims against MetLife brought by individual Rhode Island Overtime Class Members.  The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues

once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**J.      Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Claims for Failure to Make Timely Payment in Violation of Rhode Island General Law § 28-14-2.2.**

194.    The Rhode Island Representative incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

195.    The Rhode Island Representative brings his claims for violation of Rhode Island General Law § 28-14-2.2 on behalf of himself and any other person who (a) worked for MetLife as a Health Consultant (b) in the State of Rhode Island, (c) at any time between three years prior to the date on which this Amended Complaint is filed and October 31, 2017 (the "Rhode Island Monthly Payment Class").

196.    As alleged above, the Rhode Island Monthly Payment Class Members live sufficiently far from this District that joinder in this action would be impracticable.

197.    The claims of the Rhode Island Monthly Payment Class raise numerous common issues, including but not limited to:

a.      Did MetLife have the right under the contracts with the Rhode Island Monthly Payment Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

b.      Did MetLife in fact control the means and manner by which Rhode Island Monthly Payment Class Members performed their duties for MetLife and otherwise acted toward them in a manner that made them employees rather than independent contractors?

c.  Was MetLife's method of calculating the compensation of Rhode Island Monthly Payment Class Members, multiplying the number of hours worked times an hourly rate, inconsistent with paying them on a salary basis, thereby making them non-exempt employees?

d.  Was Rhode Island General Laws §§ 28-14-2 and 2.2(a) applicable to Rhode Island Monthly Payment Class Members, and were they thereby entitled to be paid weekly within nine days after the end of the week?

e.  Did MetLife fail to pay Rhode Island Monthly Payment Class Members on a weekly basis not later than nine days after the end of the week?

198.  The claim of the Rhode Island Representative is typical of the claims of the other Rhode Island Monthly Payment Class Members because he and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, were not paid on a salaried basis, and were not paid on a weekly basis, and were not paid within nine days after the end of each week.

199.  The Rhode Island Representative is an adequate representative of the Rhode Island Monthly Payment Class.  He is a member of the class, does not have any conflicts with other class members, and has engaged lawyers who are experienced in the litigation of employment class action lawsuits.

200.  The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

201.  A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The Rhode Island Representatives is unaware of any other litigation raising similar claims against MetLife brought by individual Rhode Island Monthly

Payment Class Members.  The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

**K.**     **Class Action Pursuant to Fed. R. Civ. P. 23(b)(3) to Pursue Rhode Island Unjust Enrichment Claims.**

202.     The Rhode Island Representative incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

203.     The Rhode Island Representative brings his unjust enrichment claims on behalf of himself and any other person who (a) worked for MetLife as a Health Consultant (b) in the State of Rhode Island, (c) at any time between three years prior to the date on which this Amended Complaint is filed and October 31, 2017 (the "Rhode Island Unjust Enrichment Class").

204.     As alleged above, the Rhode Island Unjust Enrichment Class Members live sufficiently far from this District that joinder in this action would be impracticable, regardless of their actual number.

205.     The claims of the Rhode Island Unjust Enrichment Class raise numerous common issues, including but not limited to:

a.     Did MetLife have the right under the contracts with the Rhode Island Unjust Enrichment Class Members to control the means and manner by which they performed their duties for MetLife to an extent that made them employees rather than independent contractors?

58

a.      Did MetLife in fact control the means and manner by which Rhode Island Unjust Enrichment Class Members performed their duties for MetLife and otherwise act toward them in a manner that made them employees rather than independent contractors?

b.      Did MetLife's failure to pay the employer's share of FICA taxes and shifting of that burden to Rhode Island Unjust Enrichment Class Members enrich MetLife in the amount of the taxes in a manner that is unjust under applicable law?

206.    The claim of the Rhode Island Representative is typical of the claims of other Rhode Island Unjust Enrichment Class Members because he and other Members signed the same form contracts, were subject to the same controls of MetLife, had similar duties, and paid the entirety of FICA taxes on their income instead of having MetLife pay half of those taxes.

207.    The Rhode Island Representative is an adequate representative of the Rhode Island Unjust Enrichment Class.  He is a member of the class, does not have any conflict with other class members, and has engaged lawyers who are experienced in the litigation of employment class action lawsuits.

208.    The common issues, including but not limited to those identified above, will predominate over any individualized issues in the litigation of this claim.

209.    A class action would be superior to other available methods for fairly and efficiently adjudicating the dispute.  The Rhode Island Representatives is unaware of any other litigation raising similar claims against MetLife brought by individual Rhode Island Unjust Enrichment Class Members.  The claims are not sufficiently large monetarily to give individual members an interest in controlling the litigation of separate claims. The commonality of the issues makes it desirable to concentrate the litigation in one forum.  The claims do not raise any

difficulties in managing this litigation that do not exist in all class actions, and litigating the common issues once is more efficient than litigating them multiple times and avoids the risk of inconsistent results.

## VI.   COUNTS

**A.**    **Count One:  MetLife's Violation of Rights of Plaintiffs and Members of the Collective Action Under the FLSA**

210.    Plaintiffs incorporate all of the allegations in the paragraphs above as if set forth fully in this paragraph.

211.    The contracts under which Plaintiffs and other Collective Action Members worked until November 1, 2017 were consistent with their being employees of MetLife.  MetLife also controlled the means and manner by which Members performed their job duties.  This control and the other aspects of MetLife's relationships with Members set forth in the Complaint made Plaintiffs and other Collective Action Members employees rather than independent contractors.

212.    The Collective Action Members are non-exempt employees under the FLSA. Except in limited circumstances not applicable here, employees cannot be exempt under either the professional or administrative exemption unless they are compensated on a salary basis. Under each version of the Prior Contract, MetLife compensated Members by multiplying the number of hours worked each month by an hourly rate specified in those contracts. Consequently, the Members' compensation has varied from month to month with the number of hours worked.  When Collective Action Members worked fewer hours in a week because of vacations, holidays, sickness, or other reasons, they have not been compensated for those unworked hours.  Collective Action Members have been non-exempt employees.

213.    MetLife compensated Collective Action Members at only their regular pay rate, not at 1.5 times their regular pay rate, for time worked in excess of forty hours in a week.  The failure to pay non-exempt employees overtime pay when they work in excess of forty hours in a week violates the FLSA.

214.    MetLife's violation of the FLSA damaged Plaintiffs and Collective Action Members in that they did not receive the overtime premium pay to which they were entitled when they worked more than forty hours in a week.

215.    MetLife's violation of the FLSA was willful.  Upon information and belief, it recklessly failed to consider its obligations to Collective Action Members under the FLSA.  Accordingly, the limitations period for the FLSA claims is three years pursuant to 29 U.S.C. § 255.

216.    MetLife lacked a reasonable basis for not paying Collective Action Members 1.5 times their regular pay rate for time worked in excess of forty hours in a week.  Upon information and belief, MetLife also has not made a good faith effort to determine its obligations under the FLSA to Collective Action Members.  As a result, the Members are entitled to liquidated damages under 29 U.S.C. § 260, along with attorneys' fees, expenses, and costs.

**B.    Count Two:  Violation by MetLife as Employer and as the Administrator of the Defendant Plans of the Rights of the ERISA Class Representatives and ERISA Class Members**

217.    Plaintiffs incorporate all of the allegations in the paragraphs above as if set forth fully in this paragraph.

218.    The contracts under which the ERISA Class Representatives and other ERISA Class Members worked until November 1, 2017 were consistent with their being employees of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which ERISA Class Members performed their job duties.  This control and the other aspects of

MetLife's relationships with the Members set forth in the Complaint made them employees rather than independent contractors.

219.    MetLife offered a generous package of employee benefits to its employees under the Defendant Plans as well as other benefits.  MetLife, however, did not make any of its employee benefits available to ERISA Class Members.  It also did not provide them with any information about the plans, which prevented Members from evaluating whether they were eligible for those benefits.

220.    Upon information and belief common law employees of MetLife (including ERISA Class Members) were eligible through October 31, 2017 for some or all of MetLife's employee benefits, including under the Defendant Plans, unless they were expressly excluded from participation.  None of the exclusions applied to Health Consultants.

221.    As the administrator of Defendant Plans, MetLife was a fiduciary of those plans. Even if some of MetLife's employee benefit plans are not governed by ERISA, MetLife's administration of those plans made it a fiduciary as a matter of common law.

222.    ERISA § 401(a)(1)(B) required MetLife, as the fiduciary of the Defendant Plans, to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims."  29 U.S.C. § 1104(a)(1)(B).  The common law required MetLife, as the fiduciary of any non-ERISA plans, to act with similar care.

223.    During the ERISA liability period, MetLife did not act with the appropriate level of care required of fiduciaries in treating ERISA Class Members as not eligible for benefits under some or all of MetLife's employee benefit plans and in not providing them with information about the plans.

224.    ERISA § 401(a)(1)(A) required MetLife, as the fiduciary of the Defendant Plans, to act "solely in the interest of the participants and beneficiaries and for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." 29 U.S.C. § 1104(a)(1)(A).  The common law required MetLife, as the fiduciary of any non-ERISA plans, to act with similar loyalty to participants and beneficiaries.

225.    In treating ERISA Class Members as not eligible for benefits under MetLife's employee benefit plans during the ERISA liability period, MetLife placed its own interests over the interests of the ERISA Class Members in violation of its duty of loyalty to the Members.

226.    Finally, ERISA § 401(a)(1)(D) required MetLife, as the fiduciary of the Defendant Plans, to act "in accordance with the documents and instruments governing the plan insofar as such documents and instruments are consistent with" ERISA. 29 U.S.C. § 1104(a)(1)(D).  The common law required MetLife, as the fiduciary of any non-ERISA plans, to act in accordance with the terms of the instrument creating the fiduciary relationship subject to the other duties governing fiduciaries, such as the duties of reasonable care and loyalty.

227.    In treating Members as not eligible for benefits under MetLife's employee benefit plans during the ERISA liability period, upon information and belief MetLife did not act in accordance with the plan documents.

228.    The violations of ERISA by MetLife over the past six years or longer have caused harm to the ERISA Class Representatives and ERISA Class Members in that they have not received the employee benefits to which they were entitled.

229.    ERISA § 502(a)(3) authorizes participants, including persons wrongly excluded from participation in employee benefit plans, to bring an action "to enjoin any act or practice

which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations ….”  29 U.S.C. § 1132(a)(3).  Thus, the ERISA Class Representatives may bring this action to obtain “other appropriate equitable relief” for the failure of MetLife to treat them as eligible for those benefits in the past.  The “other appropriate equitable relief” includes but is not limited to an accounting of unpaid benefits to ERISA Class Members followed by payment of the value of the benefits that the accounting determines to be unpaid.  The “other appropriate equitable relief” includes attorneys’ fees, expenses, and costs, and any other remedy that the Court determines to be equitable or otherwise appropriate

230.    MetLife did not treat ERISA Class Members as common law employees, and wrongly denied them benefits under its employee benefit plans, throughout the ERISA liability period.  ERISA § 502(a)(1)(B) authorizes any participant, including any person wrongly excluded from participation in an employee benefit plan, to bring an action “to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan.”  29 U.S.C. § 1132(a)(1)(B).  As a result, the ERISA Class Representatives may bring this action under section 502(a)(1)(B) to obtain for themselves and the ERISA Class Members monetary relief measured by the value of the benefits that they did not receive because MetLife failed to treat them as eligible, along with attorneys’ fees, expenses, and costs, and any other remedy that the Court determines to be equitable or otherwise appropriate.

64

**C.      Count Three:  MetLife's Violation of Rights of the Illinois Representatives and Members of the Illinois Overtime Class Under the Illinois Minimum Wage Law ("IMWL"), 820 ILCS 105/1 *et seq*.**

231.    The Illinois Representatives incorporate all of the allegations in the paragraphs above, including but not limited to the paragraphs with respect to Count One, as if set forth fully in this paragraph.

232.    For the same reasons that MetLife violated the FLSA when it failed to pay Collective Action Members at the rate of 1.5 times their regular rate of pay when they worked more than 40 hours in a workweek, MetLife also violated the IMWL, and in particular the overtime provisions at 820 ILCS 105/4a, when it failed to pay Illinois Overtime Class Members at the rate of 1.5 times their regular rate of pay when they worked more than 40 hours in a workweek.

233.    MetLife's violation of the IMWL damaged the Illinois Representatives and Illinois Overtime Class Members in that they did not receive the overtime premium pay to which they were entitled for any week during the liability period in which they worked more than forty hours.

234.    As a result, the Illinois Representatives and Illinois Overtime Class Members are entitled to the amounts of the underpayment and 2% per month for each month for which the underpayment has existed for the past three years or longer, along with attorneys' fees, expenses, and costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

**D.   Count Four:  MetLife's Violation of Rights of the Illinois Representatives and Members of the Illinois Monthly Payment Class Under the Illinois Wage Payment and Collection Act ("IWPCA"), 820 ILCS 115/1 *et seq*.**

235.    The Illinois Representatives incorporate all of the allegations in the paragraphs above as if set forth fully in this paragraph.

236.    The contracts under which the Illinois Representatives and other Illinois Monthly Payment Class Members worked until November 1, 2017 were consistent with their being employees of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which Members performed their job duties.  This control and the other aspects of MetLife's relationships with Illinois Monthly Payment Class Members set forth in the Complaint made the Members employees rather than independent contractors.

237.    The Illinois Monthly Payment Class Members were non-exempt employees under Illinois law.  Except in limited circumstances not applicable here, employees cannot be exempt under either the professional or administrative exemption unless they are compensated on a salary basis.  Under the annual versions of the Prior Contract, MetLife compensated Members by multiplying the number of hours worked each month by an hourly rate specified in those contracts.  Consequently, the Illinois Monthly Payment Class Members' compensation varied from month to month with the number of hours worked.  When Members worked fewer hours in a week because of vacations, holidays, sickness, or other reasons, MetLife did not compensate them for the unworked hours.

238.    MetLife paid Illinois Monthly Payment Class Members once a month, and even then, not on a regular day of the month.  By paying Illinois Monthly Payment Class Members, who were non-exempt employees, less frequently than once every two weeks, MetLife violated 820 ILCS 115/3 of the IWPCA for the past ten years or longer.  And by delaying payment for more than 13 days after the end of the longest allowed pay period for non-exempt employees,

which is bi-weekly, MetLife violated 820 ILCS 115/4 of the IWPCA for the past ten years or longer.

239.     MetLife's violation of the IWPCA damaged the Illinois Representatives and Illinois Monthly Payment Class Members in that they did not receive timely pay for the past ten years or more.  MetLife had the use of the money they were owed each month, while the Illinois Monthly Payment Class Members were deprived of its use.

240.     As a result, the Illinois Representatives and Illinois Monthly Payment Class Members are entitled to 2% of the amounts of the late payments each month for which the payments were made in violation of the IWPCA, along with attorneys' fees, expenses, costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

**E.     Count Five:  MetLife's Unjust Enrichment by Shifting the Obligation to Pay the Employer Share of FICA to Members of the Illinois Unjust Enrichment Class**

241.     The Illinois Representatives incorporate all of the allegations in the paragraphs above as if set forth fully in this paragraph.

242.     The contracts under which the Illinois Representatives and other Illinois Unjust Enrichment Class Members worked until November 1, 2017 were consistent with their being employees of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which Members performed their job duties.  This control and the other aspects of MetLife's relationships with Illinois Unjust Enrichment Class Members set forth in the Amended Complaint made the class members employees rather than independent contractors.

243.     Notwithstanding that the Illinois Unjust Enrichment Class Members were employees under the common law, MetLife compensated them as independent contractors, informed them that they were indeed independent contractors, and reported their income to the IRS on 1099 forms.

244. As a result of these actions by MetLife, Illinois Unjust Enrichment Class Members, including the Illinois Representatives, paid an amount equal to the employer share of FICA taxes that MetLife actually owed.  The payment by the Illinois Representatives and other Class Members of MetLife's debt to the IRS resulted in a benefit to MetLife.

245. MetLife intended to induce the Illinois Representatives and other Illinois Unjust Enrichment Class Members to pay the IRS the equivalent of the employer share of FICA taxes.

246. MetLife understood from the lack of any inquiries from the IRS about the payment of the employer share of FICA taxes that Illinois Unjust Enrichment Class Members had done as MetLife intended by paying self-employment taxes equivalent to the amount MetLife owed the IRS for the employer share of FICA taxes.

247. MetLife's retention of the benefit that it induced Illinois Unjust Enrichment Class Members to confer on it by paying the equivalent of the employer share of FICA taxes violated fundamental principles of justice, equity, and good conscience.

248. As a result, the Illinois Representatives and Illinois Unjust Enrichment Members are entitled to the amounts of FICA that they unjustly paid, statutory interest, prejudgment interest, attorneys' fees, expenses, costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

**F.    Count Six:  MetLife's Violation of Rights of the New York Representative and Members of the New York Overtime Class Under New York Labor Law, 12 NYCRR §§ 142-2.2, 146-1.4**

249. The New York Representative incorporates all of the allegations in the paragraphs above, including but not limited to the paragraphs with respect to Count One, as if set forth fully in this paragraph.

250. For the same reasons that MetLife violated the FLSA when it failed to pay Collective Action Members at the rate of 1.5 times their regular rate of pay when they worked

68

more than 40 hours in a workweek, MetLife also violated New York Labor Law, and in particular the overtime provisions at 12 NYCRR §§ 142-2.2 and 146-1.4, when it failed to pay New York Overtime Class Members at the rate of 1.5 times their regular rate of pay when they worked more than 40 hours in a workweek.

251.    MetLife's violation of the overtime provisions of New York Labor Law damaged the New York Representative and New York Overtime Class Members in that they did not receive the overtime premium pay to which they were entitled for any week during the liability period in which they worked more than forty hours.

252.    As a result, the New York Representative and New York Overtime Class Members are entitled to the amounts of the underpayment, liquidated damages equal to the amount of that underpayment, prejudgment interest, attorneys' fees, expenses, and costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

**G.    Count Seven:  MetLife's Violation of Rights of the New York Representative and Members of the New York Monthly Payment Class Under New York Labor Law § 191 for Failure to Pay Wages at Least Twice a Month.**

253.    The New York Representative incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

254.    The contracts under which the New York Representative and other New York Monthly Payment Class Members worked until November 1, 2017 were consistent with their being employees of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which Members performed their job duties.  This control and the other aspects of MetLife's relationships with New York Monthly Payment Class Members set forth in this Amended Complaint made the Members employees rather than independent contractors.

255.    The New York Monthly Payment Class Members were non-exempt employees under New York law.  Except in limited circumstances not applicable here, employees cannot be

exempt under either the professional or administrative exemption unless they are compensated on a salary basis.  Under the annual versions of the Prior Contract, MetLife compensated Members by multiplying the number of hours worked each month by an hourly rate specified in those contracts.  Consequently, the New York Monthly Payment Class Members' compensation varied from month to month with the number of hours worked.  When Members worked fewer hours in a week because of vacations, holidays, sickness, or other reasons, MetLife did not compensate them for the unworked hours.

256.    MetLife paid New York Monthly Payment Class Members once a month, and even then, not on a regular day of the month.  By paying New York Monthly Payment Class Members, who were non-exempt employees, less frequently than semi-monthly, MetLife violated New York Labor Law § 191 for the past six years or longer.  And by not paying them on a regular pay day, MetLife also violated that section of New York law

257.    MetLife's violation of New York Labor Law damaged the New York Representative and New York Monthly Payment Class Members in that they did not receive timely pay for the past six years or more.  MetLife had the use of the money they were owed each month, while the New York Monthly Payment Class Members were deprived of its use.

258.    As a result, the New York Representative and New York Monthly Payment Class Members are entitled to liquidated damages in the amount of the delayed payments, statutory interest, prejudgment interest, and attorneys' fees, expenses, costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

**H.    Count Eight:  MetLife's Unjust Enrichment by Shifting the Obligation to Pay the Employer Share of FICA to Members of the New York Unjust Enrichment Class**

259.    The New York Representative incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

260.    The contracts under which the New York Representative and other New York Unjust Enrichment Class Members worked until November 1, 2017 were consistent with their being employees of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which Members performed their job duties.  This control and the other aspects of MetLife's relationships with New York Unjust Enrichment Class Members set forth in this Amended Complaint made the class members employees rather than independent contractors.

261.    Notwithstanding that the New York Unjust Enrichment Class Members were employees under the common law, MetLife compensated them as independent contractors, informed them that they were indeed independent contractors, and reported their income to the IRS on 1099 forms.

262.    As a result of these actions by MetLife, New York Unjust Enrichment Class Members, including the New York Representative, paid an amount equal to the employer share of FICA taxes that MetLife actually owed.  The payment by the New York Representative and other Class Members of MetLife's debt to the IRS resulted in a benefit to MetLife.

263.    MetLife intended to induce the New York Representative and other New York Unjust Enrichment Class Members to pay the IRS the equivalent of the employer share of FICA taxes.

264.    MetLife understood from the lack of any inquiries from the IRS about the payment of the employer share of FICA taxes that New York Unjust Enrichment Class Members had done as MetLife intended by paying self-employment taxes equivalent to the amount MetLife owed the IRS for the employer share of FICA taxes.

265.    MetLife's retention of the benefit that it induced New York Unjust Enrichment Class Members to confer on it by paying the equivalent of the employer share of FICA taxes violated fundamental principles of justice, equity, and good conscience.

266.    As a result, the New York Representative and New York Unjust Enrichment Members are entitled to the amounts of FICA that they unjustly paid, statutory interest, prejudgment interest, attorneys' fees, expenses, costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

I.    **Count Nine:  MetLife's Violation of Rights of the Rhode Island Representative and Members of the Rhode Island Overtime Class Under Rhode Island General Laws § 28-12-4.1**

267.    The Rhode Island Representative incorporates all of the allegations in the paragraphs above, including but not limited to the paragraphs with respect to Count One, as if set forth fully in this paragraph.

268.    For the same reasons that MetLife violated the FLSA when it failed to pay Collective Action Members at the rate of 1.5 times their regular rate of pay when they worked more than 40 hours in a workweek, MetLife also violated Rhode Island law, and in particular the overtime provisions at Gen. Laws § 28-12-4.1, when it failed to pay Rhode Island Overtime Class Members at the rate of 1.5 times their regular rate of pay when they worked more than 40 hours in a workweek.

269.    MetLife's violation of the overtime provisions of Rhode Island law damaged the Rhode Island Representative and Rhode Island Overtime Class Members in that they did not receive the overtime premium pay to which they were entitled for any week during the liability period in which they worked more than forty hours.

270.    As a result, the Rhode Island Representative and Rhode Island Overtime Class Members are entitled to the amounts of the underpayment, liquidated damages equal to twice the

amount of that underpayment, prejudgment interest, and attorneys' fees, expenses, costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate..

**J.      Count Ten:  MetLife's Violation of Rights of the Rhode Island Representative and Members of the Rhode Island Monthly Payment Class Under Rhode Island General Law § 28-14-2.2 for Failure to Pay Wages at Least Twice a Month.**

271.    The Rhode Island Representative incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

272.    The contracts under which the Rhode Island Representative and other Rhode Island Monthly Payment Class Members worked until November 1, 2017 were consistent with their being employees of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which Members performed their job duties.  This control and the other aspects of MetLife's relationships with Rhode Island Monthly Payment Class Members set forth in this Amended Complaint made the Members employees rather than independent contractors.

273.    The Rhode Island Monthly Payment Class Members were non-exempt employees under Rhode Island law.  Except in limited circumstances not applicable here, employees cannot be exempt under either the professional or administrative exemption unless they are compensated on a salary basis.  Under the annual versions of the Prior Contract, MetLife compensated Members by multiplying the number of hours worked each month by an hourly rate specified in those contracts.  Consequently, the Rhode Island Monthly Payment Class Members' compensation varied from month to month with the number of hours worked.  When Members worked fewer hours in a week because of vacations, holidays, sickness, or other reasons, MetLife did not compensate them for the unworked hours.

274.    MetLife paid Rhode Island Monthly Payment Class Members once a month, and even then, not on a regular day of the month.  By paying Rhode Island Monthly Payment Class Members, who were non-exempt employees, less frequently than weekly, MetLife violated

Rhode Island General Law § 28-14-2.2 for the past three years or longer. And by not paying them that wage within nine days after the end of the week, MetLife also violated Rhode Island law.

275.    MetLife's violation of Rhode Island law damaged the Rhode Island Representative and Rhode Island Monthly Payment Class Members in that they did not receive timely pay for the past three years or more. MetLife had the use of the money they were owed each month, while the Rhode Island Monthly Payment Class Members were deprived of its use.

276.    As a result, the Rhode Island Representative and Rhode Island Monthly Payment Class Members are entitled to liquidated damages equal to twice the amount of the delayed payments, statutory interest, prejudgment interest, attorneys' fees, expenses, costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

**K.    Count Eleven:  MetLife's Unjust Enrichment by Shifting the Obligation to Pay the Employer Share of FICA to Members of the Rhode Island Unjust Enrichment Class**

277.    The Rhode Island Representative incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

278.    The contracts under which the Rhode Island Representative and other Rhode Island Unjust Enrichment Class Members worked until November 1, 2017 were consistent with their being employees of MetLife. Until November 1, 2017, MetLife also controlled the means and manner by which Members performed their job duties. This control and the other aspects of MetLife's relationships with Rhode Island Unjust Enrichment Class Members set forth in this Amended Complaint made the class members employees rather than independent contractors.

279.    Notwithstanding that the Rhode Island Unjust Enrichment Class Members were employees under the common law, MetLife compensated them as independent contractors,

74

informed them that they were indeed independent contractors, and reported their income to the IRS on 1099 forms.

280.    As a result of these actions by MetLife, Rhode Island Unjust Enrichment Class Members, including the Rhode Island Representative, paid an amount equal to the employer share of FICA taxes that MetLife actually owed.  The payment by the Rhode Island Representative and other Class Members of MetLife's debt to the IRS resulted in a benefit to MetLife.

281.    MetLife intended to induce the Rhode Island Representative and other Rhode Island Unjust Enrichment Class Members to pay the IRS the equivalent of the employer share of FICA taxes.

282.    MetLife understood from the lack of any inquiries from the IRS about the payment of the employer share of FICA taxes that Rhode Island Unjust Enrichment Class Members had done as MetLife intended by paying self-employment taxes equivalent to the amount MetLife owed the IRS for the employer share of FICA taxes.

283.    MetLife's retention of the benefit that it induced Rhode Island Unjust Enrichment Class Members to confer on it by paying the equivalent of the employer share of FICA taxes violated fundamental principles of justice, equity, and good conscience.

284.    As a result, the Rhode Island Representative and Rhode Island Unjust Enrichment Members are entitled to the amounts of FICA that they unjustly paid, statutory interest, prejudgment interest, attorneys' fees, expenses, costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

**L.**     **Count Twelve:  MetLife's Violation of Rights of the George Bernhard Under Connecticut General Statute § 31-71b for Failure to Pay Wages at Least Every Two Weeks.**

285.     Plaintiff George Bernhard incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

286.     While Mr. Bernhard was a member of the Rhode Island panel of Dental Consultants, he lived and worked primarily from his home in Connecticut between December 2013 and October, 31, 2017.  Upon information and belief, no other Health Consultants worked in Connecticut during the liability period.

287.     The contracts under which Mr. Bernhard worked until November 1, 2017 were consistent with his being an employee of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which Mr. Bernhard performed his job duties.  This control and the other aspects of MetLife's relationships with Mr. Bernhard set forth in this Amended Complaint made him an employee rather than an independent contractor.

288.     Mr. Bernhard was a non-exempt employee under Connecticut law.  Except in limited circumstances not applicable here, an employee cannot be exempt under either the professional or administrative exemption unless he is compensated on a salary basis.  Under the annual versions of the Prior Contract, MetLife compensated Mr. Bernhard by multiplying the number of hours worked each month by an hourly rate specified in his contracts.  Consequently, his compensation varied from month to month with the number of hours worked.  When he worked fewer hours in a week because of vacations, holidays, sickness, or other reasons, MetLife did not compensate him for the unworked hours.

289.     MetLife paid Mr. Bernhard once a month, and even then, not on a regular day of the month.  By paying Mr. Bernhard, who was a non-exempt employee, less frequently than bi-weekly, MetLife violated Connecticut General Statute § 31-71b for the past two years or longer.

And by not paying him that wage within eight days after the end of the period, MetLife also violated Connecticut law.

290.    MetLife's violation of Connecticut law damaged Mr. Bernhard in that he did not receive timely pay for the past two years or more.  MetLife had the use of the money he was owed each month, while he was deprived of its use.

291.    As a result, Mr. Bernhard is entitled to liquidated damages equal to the amount of the late payment each month, statutory interest, prejudgment interest, attorneys' fees, expenses, costs, and any other remedy that the Court determines to be legal, equitable, or otherwise appropriate.

**M.    Count Thirteen:  MetLife's Unjust Enrichment by Shifting the Obligation to Pay the Employer Share of FICA to Mr. Bernhard**

292.    Mr. Bernhard incorporates all of the allegations in the paragraphs above as if set forth fully in this paragraph.

293.    The contracts under which Mr. Bernhard worked until November 1, 2017 were consistent with his being an employee of MetLife.  Until November 1, 2017, MetLife also controlled the means and manner by which Mr. Bernhard performed his job duties.  This control and the other aspects of MetLife's relationships with Mr. Bernhard set forth in this Amended Complaint made him an employee rather than an independent contractor.

294.    Notwithstanding that Mr. Bernhard was an employee under the common law, MetLife compensated him as an independent contractor, informed him that he was indeed an independent contractor, and reported his income to the IRS on 1099 forms.

295.    As a result of these actions by MetLife, Mr. Bernhard paid an amount equal to the employer share of FICA taxes that MetLife actually owed.  Mr. Bernhard's payment of MetLife's debt to the IRS resulted in a benefit to MetLife.

296.     MetLife intended to induce Mr. Bernhard to pay the IRS the equivalent of the employer share of FICA taxes.

297.     MetLife understood from the lack of any inquiries from the IRS about the payment of the employer share of FICA taxes that Mr. Bernhard had done as MetLife intended by paying self-employment taxes equivalent to the amount MetLife owed the IRS for the employer share of FICA taxes.

298.     MetLife's retention of the benefit that it induced Mr. Bernhard to confer on it by paying the equivalent of the employer share of FICA taxes violated fundamental principles of justice, equity, and good conscience.

299.     As a result, Mr. Bernhard is entitled to the amount of FICA that he unjustly paid, statutory interest, prejudgment interest, attorneys' fees, expenses, costs, and any other remedy that the Court determines to be equitable or otherwise appropriate.

## VII.   PRAYER FOR RELIEF

WHEREFORE, Plaintiffs (as to Count I) and the Class Representatives (as to all other Counts) requests that this Court enter a judgment against MetLife and in the favor of them and the other Members and award the following relief:

A.     Conditionally certifying the collective action identified in Section V.A above pursuant to 29 U.S.C. § 216(b) to litigate  its members' FLSA claims, followed by sending of Court-approved notice of their right to opt in to all of those members, and thereafter denying any motion to decertify the collective action that MetLife may file;

B.     Certifying the classes identified in Sections V.B-E above pursuant to Fed. R. Civ. P. 23(b)(3) or (c)(4) to litigate the claims identified in Sections VI.B-E above;

C.    Declaring the Class Representatives to be the representatives of the collective action identified in Section V.A above and the designated Class Representative(s) to be the representative(s) of each of the proposed classes identified in Sections V.B-K above;

D.    Declaring Plaintiff's counsel to be the counsel for the collective action and each of the proposed classes;

E.    Declaring that the limitations period for the FLSA claim will be three years pursuant to 29 U.S.C. § 255 and awarding the Class Representatives and other Collective Action Members the amount of overtime pay that MetLife did not pay to them, liquidated damages in an equal amount, attorneys' fees, expenses, and costs;

F.    Ordering an accounting of the employee benefits that each ERISA Class Member should have but did not receive and, after that accounting is completed, directing that the benefits or the benefit values that the ERISA Class Representatives and other ERISA Class Members should have but did not receive be afforded to the ERISA Class Members or credited to accounts to be established for them, along with attorneys' fees, expenses, and costs;

G.    If relief is awarded to the ERISA Class under ERISA § 502(a)(1)(B) instead of 502(a)(3), ordering that MetLife and/or its benefit plans afford ERISA Class Members the value of the employee benefits that the ERISA Class Members should have but did not receive or credit such amounts to accounts to be established for them, along with attorneys' fees, expenses, and costs;

H.      Awarding Illinois, New York, and Rhode Island Overtime Class Members: the amount of overtime pay that MetLife did not pay to them; the amount of liquidated damages, statutory interest, and prejudgment interest authorized by the applicable state law; and attorneys' fees, expenses, and costs;

I.      Awarding Illinois, New York, and Rhode Island Monthly Payment Class Members along with Mr. Barnard the statutory remedies authorized by applicable state law, along with attorneys' fees, expenses, and costs;

J.      Awarding Illinois, New York, and Rhode Island Unjust Enrichment Class Members an amount equal to the amount of FICA tax that they paid that was owed by MetLife as the employer share of FICA taxes;

K.      Awarding pre- and post-judgment interest on any awards;

L.      Granting the Class Representatives and the members of each of the class and collective actions such other, further and different relief as the nature of the case may require or as may be determined to be just, equitable and proper by this Court.

## VIII.   DEMAND FOR A JURY TRIAL

The Plaintiffs (as to Count I) or the Class Representatives (as to all other Counts), on behalf of themselves and the collective and class actions that they seek to represent, demand a jury trial on all issues triable as of right by a jury.

Respectfully submitted,


*/s/ Michael D. Lieder*_____

**MEHRI & SKALET PLLC**
Michael D. Lieder (*pro hac vice*)
Cyrus Mehri (*pro hac vice*)
Steven A. Skalet (*pro hac vice*)
Joanna K. Wasik
Mehri & Skalet, PLLC
1250 Connecticut Ave., NW, Suite 300
Washington, DC 20036
Telephone: (202) 822-5100
Facsimile: (202) 822-4997
mlieder@findjustice.com
cmehri@findjustice.com
sskalet@findjustice.com
jwasik@findjustice.com

**STACEY GRAY PC**
60 East 42nd Street
46th Floor
New York, NY 10165
Telephone: (212) 227-9163
Facsimile: (866) 224-6703
sgray@staceygray.com

**CERTIFICATE OF SERVICE**

I hereby certify that on March 30, 2018, I electronically filed the foregoing with the Clerk of the Court by using the CM/ECF system, and I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

_/s/ Michael D. Lieder_
Michael D. Lieder